# EXHIBIT 1

EXHIBIT 1

| | |
|---|---|
| **From:** | Marc Kulick [marc@vestarealproperty.com] |
| **Sent:** | 2/14/2025 10:17:30 AM |
| **To:** | Efraim Diveroli [ed@vdacquisitions.com] |
| **CC:** | Robert Miley [robert@vdacquisitions.com] |
| **Subject:** | Re: YSA Investments x Vesta Loan - Due Diligence |

Agreed!

On Fri, Feb 14, 2025, 9:16 AM Efraim Diveroli <ed@vdacquisitions.com> wrote:
Marc, see below
Sent from my iPhone

On Feb 14, 2025, at 8:33 AM, Marc Kulick <marc@vestarealproperty.com> wrote:

Efraim

The fastest way to get you paid this morning is for the bank to return the money to me. Then I'll turn around and wire immediately. We should have the money in your account by 1030 est.

Ok, plus the $25k inconvenience fee we agreed to for a total of $975k

As far as the diligence above. I believe after looking over your list we can accomplish what you are wanting to accomplish with the following documents:

All tax returns
All mortgage statements
A portfolio p&l
Constant live access to data curated between my team and you

If that's acceptable let me know and Kara will send all information

Yes it is let's get it going so my guys can race through DD

On Thu, Feb 13, 2025, 1:00 PM Marc Kulick <marc@vestarealproperty.com> wrote:
Guys, I need to be honest. I really don't like how you do business. Please release all liens immediately that YSA has from the original loan agreement. Please also release me from ay ROFOs and let's part ways here

On Thu, Feb 13, 2025 at 1:57 PM Marc Kulick <marc@vestarealproperty.com> wrote:
Thanks, Robert. It will literally take me a week to put all of this together. Also, not to doubt your ability to speed through this but it will take you days to pour through this. So, this leaves me deeply uncomfortable with timing which I believe I have been very clear on

On Thu, Feb 13, 2025 at 1:54 PM Robert Miley <robert@vdacquisitions.com> wrote:
Hi Marc,

CONFIDENTIAL

YSA_00008157

Thank you for your patience. As discussed before, we plan to recycle the existing loan documents so I don't expect much drafting time to be incurred once we've gotten past due diligence. We've put together a preliminary due diligence list below:

- Bank Statements (all entities; 6 months)
- Financial Statements (all entities; 3 years)
- Tax Returns (all entities; 3 years)
- All Internal Analytics re the Entities and Properties*
- Any and all Loan Documents related to loans currently encumbering one or multiple properties that will be securing the loan
- Any and all active UCC filings related to any of the entities/properties

* I understand that you have internal analytics that you have developed regarding the properties. I do not want to inadvertently narrow or misconstrue this request by referring to those items incorrectly so we're asking that you produce whatever is relevant to this request.

We are requesting these items with respect to all properties that are identified in the master spreadsheet. To the extent that certain entities haven't had 3 years of tax returns yet, please produce them for whatever years do exist. Feel free to send items over as email attachments. I've also created and invited you to a dropbox subfolder (link: https://www.dropbox.com/scl/fo/d2cd62jdwytrrgvvt8ugr/AHlJbwJ0is7czg6xBNncJ4Y?rlkey=ewxiv0w6xvzgulzwy2crlmsjx&st=0qb8p39f&dl=0) in case it's easier to upload items directly

I plan to block out as much time as I'm able to tomorrow so that I can speed through the review. Given that questions may develop, can we lock in a time to speak tomorrow afternoon? Early afternoon is preferable, but I'll work around your availability

Thanks,
Robert

--
Marc Kulick, *CEO*

6911 S 66th E Ave., Ste. 100
Tulsa, OK 74133
(913) 277-9535
marc@vestarealproperty.com

--
Marc Kulick, *CEO*

6911 S 66th E Ave., Ste. 100

CONFIDENTIAL

YSA_00008158

Tulsa, OK 74133
(913) 277-9535
marc@vestarealproperty.com

CONFIDENTIAL

YSA_00008159

# EXHIBIT 2

EXHIBIT 2

# Conversation Details

| | |
|---|---|
| **Custodian:** Marc Kulick | **Custodian Phone Number:** +19132779535 |
| **Message Count:** 26 | **Start Date/Time (UTC):** 2025-02-18 14:26:47 |
| **Attachment Count:** 2 | **End Date/Time (UTC):** 2025-02-18 21:59:04 |

**Participants:** Robert EFRAIM (+16784648773),Efriam Deveroli (+13057478978),Efriam Deveroli (+13057478978),Robert EFRAIM (+16784648773),Robert EFRAIM (+16784648773),Marc Kulick (+19132779535)

> Morning guys! How are we looking
>
> 2025-02-18 14:26:47

Robert EFRAIM (+16784648773)

> Hey Marc. I'll have updates to you as soon as I have them myself. I'm reviewing everything you sent and will be speaking with Christopher shortly

2025-02-18 15:04:11

Robert EFRAIM (+16784648773)

> Hey guys. Senr email re outline of terms, the two docs Christopher wanted to understand differences on I'm no longer ahead of schedule due to other matters today. Will still get this done quickly but I can't talk until in Christopher hands so please email text with specificity

2025-02-18 18:52:47

**JX012 - p. 1 of 4**

meaning in the Note.

B.  Borrower holds the rights, title, and interests (collectively, the "**Unencumbered Interests**") in and to each of the following entities (each, a "**Borrower Entity**"): (1) a membership interest in Capitol on 28th Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000); (2) a membership interest in Remington Ranch Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000); (3) a membership interest in Copperfield Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000); (4) a membership interest in Putnam Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000).

C.  Pledgor holds the following rights, title, and interests (collectively, the "**Encumbered Interests**") in and to each of the following entities (each, a "**Pledgor Entity**"): (1) a membership interest in WoodScape Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000); (2) a membership interest in Barcelona Best Living, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Three Hundred Thousand Dollars ($300,000); (3) a membership interest in Riverpark Best Living Investors, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Eighty-Nine Thousand Three Hundred Dollars ($189,300); (4) a membership interest in Montgomery Vesta Investors, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (5) a membership interest in Fairfax Holding Company, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (6) a membership interest in OKC3 Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (7) a membership interest in Eton Investor, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (8) a membership interest in Eaton Place Investor, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (9) a membership interest in W.O. Holding Co., LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Thousand Dollars ($100,000); (10) a membership interest in Regency Holdings, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Thousand Dollars ($100,000); (11) a membership interest in Woodland Manor Holdings, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Thousand Dollars ($100,000); (12) a membership interest in 727-Classen Best Living Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Fifty Thousand Dollars ($50,000); and (13) a membership interest in Muntage Vesta Investors, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of Forty-Nine Thousand Two Hundred Seventy-Five Dollars ($49,275).

D.  Together, the Unencumbered Interests and Encumbered Interests comprise the "**Interests**".

JS | 10/8/24 | 1

Where this had previously included 17 total entities (4 unencumbered), are we expanding to rest of portfolio? If so, can you please send me a paragraph that I can copy into it with the other entities? If just names, it's easier. If we want to include the capital contribution for each as in prior version though, that's more tedious and I need the exact numbers Thanks, guys

2025-02-18 19:01:32

The answer is yes and no. I suggest we keep that the same but maybe add a joinder to the portfolio as a whole

2025-02-18 19:02:55

**Robert EFRAIM (+16784648773)**

Marc, re your email "On the final point, point 5, I'd just say that the T3 NOI from Jan, December and November will be no less than 5.3m on accrual accounting", are you suggesting that instead of reconciliation with t12s or in addition to? Agreed it would be the individualized and consolidated? Efraim, please let me know what's acceptable. Just need final answer if yall can give to me

2025-02-18 19:23:16

1) as discussed on the phone reconciliation isn't the right word. It's more just justifying my numbers from the other spreadsheet 2) what was sent to you was consolidated so the above will he consolidated as well 3) however the DOMO report will be individualized per asset

2025-02-18 19:25:22

But my biggest concern is as usual (lol) funding. Do we have enough time to get this done?

2025-02-18 19:26:10

**Robert EFRAIM (+16784648773)**

Yes, pretty certain. I wanted to get it to you earlier. I need to learn to hang up on calls/say no to odds and ends (nothing to do with this project whatsoever) and somehow control my schedule and workload. Just wanted things to you sooner

2025-02-18 19:32:36



2025-02-18 19:38:15

Ahead*

2025-02-18 19:38:17

Robert EFRAIM (+16784648773)

Together with that, can yall give me consensus on the entity language for collateral agreement. I can't get in weeds on it, but I can copy and paste whatever we want to include re other entities Unless counsel were to say otherwise, main pain point thouvh is keeping encumbered and unencumbered entities separate. There are covenants on unencumbered that would cause problems if we got them backwards, I think

2025-02-18 19:45:29

Yes the collateral needs to remain the same but does my idea for a joinder with any asset controlled by any affiliate of mine work?

2025-02-18 19:46:41

Robert EFRAIM (+16784648773)

It may, I would think so which makes life easier if so. Sounds viable to me

2025-02-18 19:47:55

Robert EFRAIM (+16784648773)

All docs in christopher's hands, have asked him to ensure whatever he sends back is final. Will furtber ask that whatever he sends can be directly forwarded by me to Marc for execution. If any possible issue identified by either of you in any doc, plz let me know as quickly as feasible

2025-02-18 21:14:42

Can we find a way to fund today still

2025-02-18 21:15:01

Efriam Deveroli (+13057478978)

I can make it happen if we sign in next 20 min

2025-02-18 21:17:56

First two docs witned

2025-02-18 21:40:56

Signed and sent

2025-02-18 21:40:58



# EXHIBIT 3

EXHIBIT 3

**From:** Marc Kulick [marc@vestarealproperty.com]
**Sent:** 2/18/2025 3:28:46 PM
**To:** Robert Miley [robert@vdacquisitions.com]
**CC:** Christopher Rogers [crogers@capitalfundlaw.com]; Efraim Diveroli [ed@vdacquisitions.com]
**Subject:** Re: YSA x Vesta Loan Docs - T12 Justification

Robert the entity list would remain exactly the same. No change to this document at all except to add a joinder that joins any asset controlled by any affiliate of mine

On Tue, Feb 18, 2025, 2:26 PM Robert Miley <robert@vdacquisitions.com> wrote:

Note attached. Btw, I think it's obvious, but I mistyped the maturity date in earlier email. It would be May 19 (May 18 is weekend). Assuming no heartburn was created by my error, but flagging it

Btw, concern that Marc gave a proposed solution for - collateral agreement included list of encumbered and unencumbered entities (17 total; 4 unencumbered). I don't have a paragraph ready to go w/ the contribution amounts for the full suite of entities, nor am I clear on which entities are unencumbered vs encumbered (likely have that info from Marc, but not time to hunt for it). Marc suggested adding joinder to his portfolio as a whole. Is that easy to integrate, and do you have language ready to go for it? Thank you as always, Christopher

**From:** Robert Miley <robert@vdacquisitions.com>
**Sent:** Tuesday, February 18, 2025 2:42 PM
**To:** crogers@capitalfundlaw.com <crogers@capitalfundlaw.com>
**Cc:** Efraim Diveroli <ed@vdacquisitions.com>; Marc Kulick <marc@vestarealproperty.com>
**Subject:** Fw: YSA x Vesta Loan Docs - T12 Justification

Christopher, attaching first two items. Marc cc'd just so he can see anything in real time, but feel free to remove him from replies as necessary and I'll keep him updated. Attaching first two docs (COJ and Guaranty). Haven't created redlines, but main edits are Sections 4 and 5 of Guaranty. Language is currently messy, but I think I caught intent. Where we want attestation re all documents provided, I didn't have time to name each and every one of them so I provided file names, date, and total file size which inherently provides specificity

**From:** Marc Kulick <marc@vestarealproperty.com>
**Sent:** Tuesday, February 18, 2025 2:01 PM
**To:** Robert Miley <robert@vdacquisitions.com>
**Cc:** Efraim Diveroli <ed@vdacquisitions.com>
**Subject:** Re: YSA x Vesta Loan Docs - T12 Justification

Robert

My summary is using T3 financials tracking Jan 25, December 24 and November 24th. What Kara sent on the T12 was Jan 24 - December 24. Beyond that I am using cash accounting whereas the sheet Kara sent is using accrual accounting. Therr are always differences.

On the final point, point 5, I'd just say that the T3 NOI from Jan, December and November will be no less than 5.3m on accrual accounting

CONFIDENTIAL

YSA_00003352

On Tue, Feb 18, 2025, 12:50 PM Robert Miley <robert@vdacquisitions.com> wrote:
Hi Marc,

I'm attaching the docs that I believe created the confusion. Basic question that Christopher has asked for an answer to: why does one of the attachments reference $45m NOI and the other reference $54m NOI

Efraim/Marc,

I'm outlining all terms as I understand them below. If either of you see any error or omission, please email or text me with specificity on the mistake. I can't be on any more calls until this is done and in Christopher's hands. This includes any changes to the proposed dates below - made efforts to verify all dates fall on weekdays, no issues on that end. Thanks guys

Working to make edits as rapidly as possible. May silence my phone until I'm done - once I'm done, I'll get them in Christopher's hands to review like lightning

To ensure there's no hiccup at the finish line, I'm summarizing the edits/terms below:

1. Loan Amount - $1.5m
a. Day One Deductions:
i. 2% origination fee
ii. $15k legal/admin fees
iii. First month's interest of $166,666.67 (regardless of whether we call it interest, effectively saying $166k~ is being paid on the first day of each month)
b. Wire Amount to Vesta - $1,288,333.33
2. Repayment Schedule (3-month term)
a. $166,666.67 on Feb 18, March 18, April 18 (Feb 18 payment is the same as referenced above)
b. Principal Repayment - April 18
c. 10-day extension option: Vesta may provide written notice no later than 5 days prior to April 18 electing to exercise a 10-day option period. If exercised, Vesta will pay $75k on April 18 and principal payment by April 28
3. Warranties and Reps:
a. Attestations that provided DD items are true and correct; warrant no material changes since providing docs; affirmative duty to advise if there is a negative material change (will ask Christopher for proposed language re negative material change)
4. Reporting:
a. Vesta will provide constant access via DOMO to a report tracking each property's NOI on a monthly, annualized 3-month annualized, and 12-month period. In the event that YSA requests other info/data, Vesta will make good faith effort to provide
5. Post-Closing Obligation:

CONFIDENTIAL

YSA_00003353



a.      By February 28, provide consolidated and individual T12s and T3s (from Jan through Dec 2023?). Maximum margin of error - .1% (example: for every $1m, max margin of error of $100)

CONFIDENTIAL

YSA_00003354

# EXHIBIT 4

## At 1, 18, 32

**EXHIBIT 4**

| | |
|---|---|
| **From:** | Christopher Rogers [crogers@capitalfundlaw.com] |
| **Sent:** | 2/18/2025 4:58:51 PM |
| **To:** | Robert Miley [robert@vdacquisitions.com] |
| **CC:** | Efraim Diveroli [ed@vdacquisitions.com]; Marc Kulick [marc@vestarealproperty.com] |
| **Subject:** | Re: Fw: YSA x Vesta Loan Docs - T12 Justification |
| **Attachments:** | YSA Vesta Collateral Pledge and Security Agreement - 02.18.25(CR Revised)redlines.docx; YSA Vesta Collateral Pledge and Security Agreement - 02.18.25(CR Revised).docx |

Robert,

See attached revised collateral agreement in clean and redlines.

Christopher

On Tue, Feb 18, 2025 at 3:09 PM Robert Miley <robert@vdacquisitions.com> wrote:

> Collateral Agreement attached. Through in a paragraph on last page re joinder. Let me know if it's effective as-is, if it also needs to be notarized, etc
>
> For all docs, please let me know if there are any outstanding questions. Need what you send back to be final. Really have been doing all in my power to make this timeline
>
> Efraim/Marc, if any changes whatsoever, if anything let out, plz let me know very specifically what needs to be added, where it needs to go, and the exact language that would accomplish agreed intent. Not time to review and triple-check so counting on any other set of eyes available
>
> Thanks,
> Robert
>
> **From:** Christopher Rogers <crogers@capitalfundlaw.com>
> **Sent:** Tuesday, February 18, 2025 3:39 PM
> **To:** Robert Miley <robert@vdacquisitions.com>
> **Cc:** Efraim Diveroli <ed@vdacquisitions.com>; Marc Kulick <marc@vestarealproperty.com>
> **Subject:** Re: Fw: YSA x Vesta Loan Docs - T12 Justification
>
> Robert,
>
> Thanks.  Reviewing them.
>
> Christopher
>
> On Tue, Feb 18, 2025 at 1:42 PM Robert Miley <robert@vdacquisitions.com> wrote:
>
>> Christopher, attaching first two items. Marc cc'd just so he can see anything in real time, but feel free to remove him from replies as necessary and I'll keep him updated. Attaching first two docs (COJ and Guaranty). Haven't created redlines, but main edits are Sections 4 and 5 of Guaranty. Language is currently messy, but I think I caught intent. Where we want attestation re all documents provided, I didn't have time to name each and every one of them so I provided file names, date, and total file size which inherently provides specificity
>>
>> **From:** Marc Kulick <marc@vestarealproperty.com>
>> **Sent:** Tuesday, February 18, 2025 2:01 PM

CONFIDENTIAL

YSA_00003470

**To:** Robert Miley <robert@vdacquisitions.com>
**Cc:** Efraim Diveroli <ed@vdacquisitions.com>
**Subject:** Re: YSA x Vesta Loan Docs - T12 Justification

Robert

My summary is using T3 financials tracking Jan 25, December 24 and November 24th. What Kara sent on the T12 was Jan 24 - December 24. Beyond that I am using cash accounting whereas the sheet Kara sent is using accrual accounting. Therr are always differences.

On the final point, point 5, I'd just say that the T3 NOI from Jan, December and November will be no less than 5.3m on accrual accounting

On Tue, Feb 18, 2025, 12:50 PM Robert Miley <robert@vdacquisitions.com> wrote:

Hi Marc,

I'm attaching the docs that I believe created the confusion. Basic question that Christopher has asked for an answer to: why does one of the attachments reference $45m NOI and the other reference $54m NOI

Efraim/Marc,

I'm outlining all terms as I understand them below. If either of you see any error or omission, please email or text me with specificity on the mistake. I can't be on any more calls until this is done and in Christopher's hands. This includes any changes to the proposed dates below - made efforts to verify all dates fall on weekdays, no issues on that end. Thanks guys

Working to make edits as rapidly as possible. May silence my phone until I'm done - once I'm done, I'll get them in Christopher's hands to review like lightning

To ensure there's no hiccup at the finish line, I'm summarizing the edits/terms below:

1.   Loan Amount - $1.5m
a.          Day One Deductions:
i. 2% origination fee
ii. $15k legal/admin fees
iii. First month's interest of $166,666.67 (regardless of whether we call it interest, effectively saying $166k~ is being paid on the first day of each month)
b.          Wire Amount to Vesta - $1,288,333.33
2.   Repayment Schedule (3-month term)
a.          $166,666.67 on Feb 18, March 18, April 18 (Feb 18 payment is the same as referenced above)
b.          Principal Repayment - April 18

CONFIDENTIAL

YSA_00003471

c.        10-day extension option: Vesta may provide written notice no later than 5 days prior to April 18 electing to exercise a 10-day option period. If exercised, Vesta will pay $75k on April 18 and principal payment by April 28

3.    Warranties and Reps:

a.        Attestations that provided DD items are true and correct; warrant no material changes since providing docs; affirmative duty to advise if there is a negative material change (will ask Christopher for proposed language re negative material change)

4.    Reporting:

a.        Vesta will provide constant access via DOMO to a report tracking each property's NOI on a monthly, annualized 3-month annualized, and 12-month period. In the event that YSA requests other info/data, Vesta will make good faith effort to provide

5.    Post-Closing Obligation:

a.        By February 28, provide consolidated and individual T12s and T3s (from Jan through Dec 2023?). Maximum margin of error - .1% (example: for every $1m, max margin of error of $100)

--

**Christopher Rogers, Esq. | Senior Partner**

**a:** 405 Lexington Ave | NYC, NY | 222 S Main Street | SLC, UT
**e:** crogers@capitalfundlaw.com | **w:** www.capitalfundlaw.com
**p:** 212.203.4300



The information contained in this electronic mail message is confidential information intended only for the use of the individual or entity named above and may be privileged. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us and delete the original. Thank you.

Circular 230 Disclaimer: To ensure compliance with Treasury Regulations governing written tax advice, please be advised that any tax advice included in this communication, including any attachments, is not intended, and cannot be used, for the purpose of avoiding any federal tax penalty, or promoting, marketing, or recommending any transaction or matter to another person.

CONFIDENTIAL

YSA_00003472

--



**Christopher Rogers, Esq. | Senior Partner**

**a:** 405 Lexington Ave | NYC, NY | 222 S Main Street | SLC, UT
**e:** crogers@capitalfundlaw.com | **w:** www.capitalfundlaw.com
**p:** 212.203.4300



The information contained in this electronic mail message is confidential information intended only for the use of the individual or entity named above and may be privileged. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us and delete the original. Thank you.

Circular 230 Disclaimer: To ensure compliance with Treasury Regulations governing written tax advice, please be advised that any tax advice included in this communication, including any attachments, is not intended, and cannot be used, for the purpose of avoiding any federal tax penalty, or promoting, marketing, or recommending any transaction or matter to another person.

CONFIDENTIAL

YSA_00003473

## COLLATERAL PLEDGE AND SECURITY AGREEMENT

This Collateral Pledge and Security Agreement (this "**Agreement**") is made as of February 18, 2025 by and among **YSA INVESTMENTS 1 LLC**, a Delaware limited liability company ("**Lender**"), **ASSET HOLDER, LLC**, an Oklahoma limited liability company ("**Borrower**"), and **VESTA HOLDINGS, LLC**, an Oklahoma limited liability company ("**Pledgor**").

### RECITALS

A.      Concurrently herewith, Lender is making a loan (the "**Loan**") to Borrower.  The Loan is evidenced by documents that include a Promissory Note of even date herewith by Borrower in favor of Lender (as same may be amended, renewed, extended, substituted for, amended and restated, or otherwise modified from time to time, the "**Note**").  Any defined term that is used herein and not defined herein shall have its meaning in the Note.

B.      Borrower holds the rights, title, and interests (collectively, the "**Unencumbered Interests**") in and to each of the following entities (each, a "**Borrower Entity**"): (1) a membership interest in Capitol on 28th Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000); (2) a membership interest in Remington Ranch Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000); (3) a membership interest in Copperfield Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000); (4) a membership interest in Putnam Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000).

C.      Pledgor holds the following rights, title, and interests (collectively, the "**Encumbered Interests**") in and to each of the following entities (each, a "**Pledgor Entity**"): (1) a membership interest in WoodScape Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000); (2) a membership interest in Barcelona Best Living, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Three Hundred Thousand Dollars ($300,000); (3) a membership interest in Riverpark Best Living Investors, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Eighty-Nine Thousand Three Hundred Dollars ($189,300); (4) a membership interest in Montgomery Vesta Investors, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (5) a membership interest in Fairfax Holding Company, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (6) a membership interest in OKC3 Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (7) a membership interest in Eton Investor, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (8) a membership interest in Eaton Place Investor, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (9) a membership interest in W.O. Holding Co., LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Thousand Dollars ($100,000); (10) a membership interest in Regency Holdings, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Thousand Dollars ($100,000); (11) a membership interest in Woodland Manor Holdings, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Thousand Dollars ($100,000); (12) a membership interest in 727-Classen Best Living Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Fifty Thousand Dollars ($50,000); and (13) a membership interest in Muntage Vesta Investors, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of Forty-Nine Thousand Two Hundred Seventy-Five Dollars ($49,275).

D.      Together, the Unencumbered Interests and Encumbered Interests comprise the "**Interests**".

| 1

CONFIDENTIAL

YSA_00003474

E.      Together, the Borrower Entities and Pledgor Entities comprise the "**Entities**".

F.      In connection with the Loan, Pledgor and Borrower have agreed to pledge the Interest to Lender on the terms and conditions herein.

AGREEMENTS

NOW, THEREFORE, for and in consideration of the direct benefits to be realized by Borrower (which will indirectly benefit Pledgor) from the Loan, the mutual covenants hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower, Pledgor, and Lender hereby agree as written below.

1.      PLEDGE.

    1.1    SECURITY INTEREST.

        (a)    Borrower and Pledgor pledge, grant, and assign to Lender a security interest in and lien upon the Collateral (defined below) to secure the payment and the performance of the Obligations (defined below). "**Collateral**" shall mean the Interest and any and all other interests in any Entity that are now owned or hereafter acquired by Borrower or Pledgor, as applicable, in or to any Entity, together with (i) all additional membership interests or other equity interests in any Entity now or hereafter acquired by Borrower or Pledgor, as applicable, and (1) all options, warrants, and other rights now or hereafter acquired by Borrower or Pledgor, as applicable, in respect of such membership interests or other equity interests in any Entity (whether in connection with any capital increase, recapitalization, reclassification, or reorganization of such Entity or otherwise), and (2) all other property, rights or instruments of any description at any time issued or issuable as an addition to or in substitution for such membership interests or other equity interests in any Entity; (ii) any certificates, instruments, or other writings representing or evidencing membership interests or other ownership interests in any Entity now or hereafter acquired by Borrower or Pledgor, as applicable, and all accounts and general intangibles arising out of, or in connection with, the membership interests in any Entity now or hereafter acquired by Borrower or Pledgor, as applicable; (iii) any and all monies or property due and to become due to Borrower or Pledgor, as applicable, now or in the future in respect of its membership interests or other ownership interests in any Entity, or to which Borrower or Pledgor, as applicable, may now or in the future be entitled in its capacity as a member or other equity holder of any Entity, whether by way of a dividend, distribution, return of capital or otherwise; (iv) all other claims that Borrower or Pledgor, as applicable, now has or may in the future acquire in its capacity as a member, partner, shareholder, or other equity holder of any Entity against such Entity and its property; and (v) all rights of Borrower or Pledgor, as applicable, under any Entity's organizational documents (and all other agreements, if any, to which Borrower is a party from time to time which relate to its ownership of the membership interests or other ownership interests in any Entity), including all voting and consent rights of Borrower or Pledgor, as applicable, arising thereunder or otherwise in connection with Borrower's or Pledgor's, as applicable, ownership of the membership interests or other equity interests in any Entity (provided, however, that any time an Event of Default (defined below) does not exist, Borrower or Pledgor, as applicable, may exercise all rights of Borrower or Pledgor, as applicable, under each Entity's organizational documents, including all voting rights). With respect to the Unencumbered Interests comprising the Collateral, the same may be referred to hereafter as the "**Unencumbered Collateral**". With respect to the Encumbered Interests comprising the Collateral, the same may be referred to hereafter as the "**Pledgor Collateral**".

        (b)    For clarity, it is acknowledged and agreed that the Collateral does not include a personal residence.

| 2

CONFIDENTIAL

YSA_00003475

1.2     ATTACHMENT. The foregoing security interest shall attach automatically to any interests in any Entity that Borrower or Pledgor, as applicable, may at any time in the future acquire without any further action by Borrower or Lender; provided, however, that as a condition to Lender's consent to any such transfer, Lender may require Borrower to execute a modification to this Agreement or a supplementary collateral pledge and security agreement.

1.3     UNENCUMBERED COLLATERAL. The Unencumbered Collateral is and will remain unencumbered by any debt or other payment obligation. The Parties further agree that in its sole discretion, Lender may at any time file a financing statement against the Unencumbered Collateral in the form of a UCC-1 or UCC-3, as applicable, filed pursuant to the Uniform Commercial Code, but Lender's failure to do so shall not impair the validity or enforceability of this Agreement.

2.     OBLIGATIONS.

2.1     SECURITY. The following obligations (the "**Obligations**") are secured by this Agreement: (i) all payment and performance duties, liabilities, and obligations of Borrower under the Note; and (ii) all reasonable costs incurred by Lender to obtain, preserve, perfect, and enforce this Agreement and security interest, collect the Obligations, and maintain, preserve, collect, and enforce the Collateral, including taxes, assessments, insurance premiums, attorneys' fees and legal expenses, and expenses of sale.

2.2     DIRECT. The obligations of Borrower and Pledgor under this Agreement shall be direct and immediate and not conditional or contingent upon the pursuit of any remedies against any other person or entity (including the other entities that comprise Borrower or Pledgor, as applicable) nor against the security or liens or encumbrances available to Lender. Borrower and Pledgor waive any right to require that an action be brought against any other person or entity or to require that resort be had to any security or to any balance of any account or credit on the books of Lender in favor of any other person or entity prior to any exercise of rights or remedies hereunder. No renewal or extension of or any other indulgence with respect to the Obligations or any part thereof, no release of any security, no release of any person (including any maker, endorser, guarantor or surety) liable on the Obligations, no delay in enforcement of payment, and no delay or omission or lack of diligence or care in exercising any right or power with respect to the Obligations or any security therefor or guaranty thereof or under this Agreement shall in any manner impair or affect the rights of Lender under this Agreement, applicable law, or any other agreement pertaining to security for the Obligations. Borrower and Pledgor (i) waive any right to the benefit of, or to require or control application of, any other security or proceeds thereof, and (ii) agree that Lender shall have no duty or obligation to Borrower or Pledgor to apply to the Obligations any such other security or proceeds thereof.

3.     REPRESENTATIONS AND WARRANTIES. Borrower and Pledgor represent and warrant as follows:

3.1     FINANCING STATEMENTS. No financing statement covering the Unencumbered Collateral is or will be on file in any public office except a financing statement filed by Lender pursuant to this Agreement.

3.2     OWNERSHIP. Borrower owns the Unencumbered Collateral absolutely and free of any setoff, claim, restriction, lien, security interest, or encumbrance. Borrower has the unencumbered and unrestricted right to pledge the Unencumbered Collateral. No consent or approval of any governmental authority or other person that has not been obtained was or is necessary to the validity of this pledge or the enforcement of Lender's rights and remedies hereunder.

3.3     POWER AND AUTHORITY. Borrower and Pledgor have the full power and authority to make and deliver this Agreement. This Agreement constitutes the valid and legally binding obligation of Borrower and Pledgor, and is enforceable in accordance with its terms.

| 3

CONFIDENTIAL

YSA_00003476

3.4    MEMBERSHIP INTERESTS. The Collateral constitutes "general intangibles," as defined in the Uniform Commercial Code as in effect in the State of Delaware (the "**UCC**"), and this Agreement constitutes a security agreement under the UCC.

3.5    LITIGATION. As of the date hereof, there are no Material Actions, as defined below, against Borrower, Pledgor, or Guarantor, or any entity (i) directly or indirectly controlled or managed by Guarantor or (ii) directly or indirectly owned by Guarantor in whole or in part with respect to which Guarantor receives notices in the ordinary course of business (each of (i) and (ii), a "**Guarantor Entity**"), in each except as follows: (1) Case No. 22-cv-00392-JFH-CDL in the United States District Court for the Northern District of Oklahoma; and (2) Case No. CJ-2024-35 in the District Court of Adair County, Oklahoma. This statement is being made by Pledgor under the penalty of perjury. For purposes of this Section, "**Material Action**" means any pending litigation against Borrower, Pledgor, Guarantor, or any Guarantor Entity that (x) is not a landlord-tenant dispute and (y) if such lawsuit were adversely adjudicated against such entity or person, such entity or person would have liability that exceeds $150,000.

3.6    CURRENT DEFAULT. As of the date hereof, neither Borrower, Pledgor, Guarantor, nor any Guarantor Entity (x) is to Pledgor's knowledge in material breach or default of, or (y) has been notified in writing of any material breach or default, in each case under any loan agreement taken by Borrower, Pledgor, Guarantor, or such entity (each, an "**Other Loan Default**").

3.7    Due Diligence Materials. The .xlsx file titled "Vesta Master Spreadsheet -02022025" which Borrower emailed to Lender on February 2, 2025 together with the other materials provided by Borrower to Lender via a dropbox hyperlink[1] delivered on February 14, 2025, including five "zip files" - file names "KBST&M Returns"; "Mortgage stmts"; "Neuman, Pollak"; "PWC TR"; and "Siples" – and a .xlsx file titled "T12 – Income Statement – Consolidated", which have an aggregate file size of approximately 79.58 Megabytes are true and correct as of this date, and there have been no material changes since the date that they were provided to Lender. which have an aggregate file size of approximately 79.58 Megabytes, and include but are not limited to 2023 tax returns, certain mortgage agreements and current loan balances, summary sheets, and TLO reports related to certain Collateral pledged in the Agreement are true and correct as of this date, and there have been no Material Changes since the date that they were provided to Lender. In the event of a change to Guarantor, Borrower, Pledgor, any Guarantor Entity or any asset owned by, or any liability of, any Guarantor Entity, that would have a material adverse effect on Guarantor, Borrower, Pledgor, any Guarantor Entity (a "**Material Change**"), Borrower shall provide Lender with written notice of the same, and such Material Change shall be deemed a default of this Agreement.

4.    COVENANTS. Borrower and Pledgor shall promptly perform all of its covenants in this Agreement, including the covenants in this section.

4.1    OWNERSHIP OF UNENCUMBERED COLLATERAL. Borrower shall not further transfer, sell, pledge, assign, or encumber any of the Unencumbered Collateral. Borrower shall keep the Unencumbered Collateral free from any liens, claims, encumbrances, or security interests except the security interest created hereby and shall preserve the priority of all security interests in the Unencumbered Collateral in favor of Lender. Lender shall have no duty to preserve such security but may do so at the expense of Borrower without waiving any default hereunder.

4.2    COSTS. Borrower and Pledgor shall pay all costs that are reasonably necessary to obtain, preserve, perfect, defend, and enforce the security interests created by this Agreement, and to preserve, defend, enforce, and collect the Collateral.

---

[1]    Accessible as of February 18, 2025 via the following hyperlink: https://www.dropbox.com/scl/fo/0nvozc8k07witgga8z5cd/ADakWoyvFtgP9emDas7rvBQ?rlkey=gc5mto1sbrmef bwtimwmbc0qg&e=1&st=j01p1kik&dl=0)

| 4

CONFIDENTIAL

YSA_00003477

4.3     DEBT OBLIGATIONS. So long as the Payoff Amount remains outstanding, Borrower and Pledgor shall alert Lender of any debt in excess of $50,000 that is taken by Borrower, Guarantor, or any entity directly or indirectly controlled by Guarantor and provide a summary of the same, including the name of the party owed, the amount, and a summary of the purpose or cause of the debt. This Section shall not apply to any future loan arising from the Right of First Offer (as defined in the Guaranty).

4.4     OTHER LOAN DEFAULT AND MATERIAL ACTIONS. So long as the Payoff Amount remains outstanding, Borrower and Pledgor shall notify Lender within two (2) business days after (i) an Other Loan Default occurs or (ii) receiving notice of a Material Action, which notice shall be delivered to:

> YSA Investments 1, LLC
> C/O Capital Fund Law Group, P.C.
> Attn: Christopher Rogers
> 405 Lexington Ave, 26th Floor
> New York, New York 10174
> email: crogers@capitalfundlaw.com

This notice will include a summary of the default and, with respect to any action, the summary shall include the court in which it is filed, the plaintiff(s) and defendant(s), case number, and summary of the claims being brought. A copy of any notice pursuant to this section shall also be delivered to Lender.

4.5     RIGHT OF LENDER TO NOTIFY OTHERS. While an Event of Default exists, Lender may (i) notify persons obligated on any Collateral to make payments directly to Lender, (ii) take control of all proceeds of any Collateral (subject to any other secured lenders' interests in the Pledgor Collateral), and (iii) take any other steps that Lender deems necessary with respect to the Collateral that are permissible in accordance with applicable law. Until Lender elects to exercise such rights, Borrower and Pledgor, as trustees for the benefit of Lender, shall collect and enforce all payments owed on the Collateral pledged by Borrower and Pledgor.

4.6     POWER OF ATTORNEY. Borrower and Pledgor each appoint Lender as its/his/her/their attorney-in-fact with full power in Borrower's and Pledgor's name and behalf to do every act that Borrower and Pledgor are obligated to do or may be required to do hereunder or to do all other things which Lender is permitted to do under this Agreement or any other Loan Documents or are necessary to carry out this Agreement or the other Loan Documents; however, nothing in this section shall be construed to obligate Lender to take any action hereunder. Through exercise of this irrevocable power of attorney, Lender may take whatever steps that it deems necessary in its sole discretion to secure and protect its interests, including but not limited to filing any action and doing whatever else is necessary to protect its interests, enforce its rights, and collect all amounts due to Lender. This shall include but not be limited to taking any action against any of the Collateral or any real or personal property owned by the Collateral. The power of attorney hereby created is a power coupled with an interest, and shall be irrevocable. Neither Lender nor any of its officers, managers, employees or agents of Lender will be liable for any acts of commission or omission nor for any error in judgment or mistake of fact or law unless the same shall have resulted from gross negligence or willful misconduct. Notwithstanding anything to the contrary above, Lender shall not exercise the foregoing power of attorney unless an Event of Default exists and only as long as an Event of Default exists.

4.7     NO WAIVER BY LENDER. No renewal or extension of or any other indulgence with respect to the Obligations or any part thereof, no release of any security, no release of any person (including any maker, endorser, guarantor or surety) liable on the Obligations, no delay in enforcement of payment, and no delay or omission or lack of diligence or care in exercising any right or power with respect to the Obligations or any security therefor or guaranty thereof or under this

| 5

CONFIDENTIAL

YSA_00003478

Agreement shall in any manner impair or affect the rights of Lender under the law, hereunder or under any other agreement pertaining to security for the Obligations. Borrower and Pledgor waive any right to the benefit of or to require or control application of any other security or proceeds thereof and agree that Lender shall have no duty or obligation to Borrower or Pledgor to apply to the Obligations any such other security or proceeds thereof.

4.8     INDEMNIFICATION.   In addition to any other indemnifications expressly provided for herein, Borrower will save, indemnify, and hold Lender harmless from and against all actual expenses, losses, or damages suffered by reason of any (a) wrongful interference (i.e., interference in bad faith) by Borrower with the exercise of any rights or remedies by Lender under this Agreement, or (b) Event of Default.  The foregoing obligation of Borrower and Pledgor to indemnify Lender shall not extend to any suit, proceeding, or action arising out of the gross negligence or willful misconduct of Lender.

4.9     TRAILING REPORTS. By or before February 28, 2025, Borrower shall provide Lender with individual and consolidated trailing three-month reports ("T3 Reports") of all entities owned and/or controlled by Guarantor, Pledgor, and/or Borrower which shall report an aggregate net operating income of no less than $5,300,000 in accordance with accrual accounting principles. Deviation between the consolidated and individual T3 Reports shall not exceed $1/10^{th}$ of a percent.

4.10    DOMO REPORTING ACCESS. By or before February 20, 2025, Borrower and Pledgor shall provide Lender with a link to Borrower's financial reporting generated via its "DOMO" software subscription. This link will provide Lender with monthly annualized, three-month annualized, and twelve-month annualized reporting of all entities owned and/or controlled by Guarantor, Borrower, and Pledgor (directly or indirectly) and shall be refreshed no less frequently than once every business day. Lender may request that Borrower provide additional information and data related to the same, and Borrower shall make a good faith effort to provide such information and data to Lender.

5.    DEFAULT.

5.1     EVENTS OF DEFAULT.  Each of the following shall be an "**Event of Default**" by Borrower and Pledgor hereunder:

(a)     a levy on, seizure, or attachment of the Collateral by any third party, and same is not fully removed within thirty (30) days thereafter;

(b)     a failure to pay any amount that becomes due under this Agreement, and neither Borrower nor Pledgor cures such failure within ten (10) days thereafter;

(c)     a default in the performance or observance of any other term or condition in this Agreement, and neither Borrower nor Pledgor cures such default within ten (10) days after Lender notifies Borrower thereof;

(d)     a breach of any warranty or representation under this Agreement, and neither Borrower nor Pledgor cures such breach within ten (10) days after Lender notifies Borrower thereof (provided, however, that no cure period shall apply if the cause of such breach is fraud in the inducement);

(e)     Borrower or Pledgor makes a general assignment for the benefit of its creditors, or Borrower or Pledgor consents to an application for the appointment of a trustee, receiver, or other custodian for Borrower or Pledgor, as applicable, or the institution of any proceeding by Borrower or Pledgor, as applicable, under any federal or state laws providing for the relief of debtors or otherwise alleging that Borrower or Pledgor, as

| 6

CONFIDENTIAL

YSA_00003479

applicable, is insolvent, bankrupt, or unable to pay its debts generally as they become due, and same is not dismissed within ninety (90) days of filing; or

(f)     an Event of Default occurs under the Note or any other Loan Document.

5.2     REMEDIES UPON DEFAULT.  While an Event of Default exists, Lender may, without notice or demand to Borrower or Pledgor, enforce payment of the Obligations then due (whether due by acceleration in whole or part or otherwise), and may exercise any rights under the UCC, rights and remedies of Lender under this Agreement, or otherwise, including but not limited to taking any action against the Collateral or any of the Collateral's real or personal property.  Upon any Event of Default, Lender shall further be entitled to its attorney's fees, costs, and any other damages that may be available to it. Without limiting the foregoing, (i) Lender may file a financing statement against Borrower to perfect Lender's lien on the Collateral, and (ii) Lender may conduct a private sale as written below.

(a)     Borrower and Pledgor recognize that Lender may be unable to effect a public sale of any or all of the Collateral, by reason of certain prohibitions contained in the Securities Act of 1933, as amended (the "**Securities Act**"), and applicable state securities laws or otherwise, and may be compelled to resort to one or more private sales thereof to a restricted group of purchasers who will be obliged to agree, among other things, to acquire such securities for their own account for investment and not with a view to the distribution or resale thereof.  Borrower and Pledgor (i) acknowledge and agree that any such private sale may result in prices and other terms less favorable to Lender than if such sale were a public sale, and (ii) notwithstanding such circumstances, agrees that any such private sale shall not be deemed to have been made in a commercially unreasonable manner solely by virtue of being a private sale.  Lender shall be under no obligation to delay a sale of any of the Collateral for the period of time necessary to permit any Entity, Borrower, or Pledgor to register such securities for public sale under the Securities Act, or under applicable state securities laws, even if such Entity, Pledgor, or Borrower would agree to do so.

(b)     Further, Borrower and Pledgor shall use commercially reasonable efforts to do or cause to be done all such other acts as may be reasonably necessary to make any sale or sales of all or any portion of the Collateral pursuant to this section valid and binding and in compliance with any and all other requirements of applicable law.  Borrower and Pledgor further agree that a breach of any of the covenants contained in this section will cause irreparable injury to Lender, that Lender has no adequate remedy at law in respect of such breach, and, as a consequence, that each and every covenant contained in this section shall be specifically enforceable against Borrower and Pledgor; and Borrower and Pledgor hereby waive and agree not to assert any defenses against an action for specific performance of such covenants except for a defense that no Event of Default has occurred, or any defense relating to Lender's willful misconduct or gross negligence.

(c)     Lender shall not incur any liability as a result of the sale of any Collateral, or any part thereof, at any private sale conducted in a commercially reasonable manner, it being agreed that some or all of the Collateral is or may be of one or more types that threaten to decline speedily in value and that are not customarily sold in a recognized market. Borrower and Pledgor hereby waive any claims against Lender arising by reason of the fact that the price at which any of the Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale or was less than the aggregate amount of the Obligations, provided that Lender has acted in a commercially reasonable manner in conducting such private sale.

(d)     It is acknowledged that the UCC states that a lender is able to purchase collateral only if it is sold at a public sale.  Lender has advised Borrower and Pledgor that Securities and

| 7

CONFIDENTIAL

YSA_00003480

Exchange Commission ("**SEC**") staff personnel have issued various No-Action Letters describing procedures that, in the view of the SEC staff, permit a foreclosure sale of securities to occur in a manner that is public for purposes of Article 9 of the UCC, yet not public for purposes of §4(2) of the Securities Act. It is also acknowledged that the UCC permits Borrower and Pledgor to agree on the standards for determining whether a lender has complied with its obligations under Article 9 of the UCC. Pursuant to the UCC, Borrower and Pledgor specifically agree that (x) they shall not raise any objection to Lender's purchase of the Collateral (through bidding on the obligations or other commercially reasonable means), and (y) a sale conducted in conformity with the principles set forth in the No-Action Letters (i) shall be considered to be a "public" sale for purposes of the UCC, (ii) will be considered commercially reasonable notwithstanding that Lender has not registered or sought to register the Collateral under the Securities Laws, even if Borrower, Pledgor, or any Entity agrees to pay all costs of the registration process, and (iii) shall not be considered to be commercially unreasonable solely because Lender purchases the Collateral at such a sale.

(e)  Borrower and Pledgor agree that Lender shall not have any general duty or obligation to make any effort to obtain or pay any particular price for any Collateral sold by Lender pursuant to this Agreement. Lender, in its sole discretion, may decide to approach or not to approach any potential purchasers provided that the method of sale is commercially reasonable. Without in any way limiting Lender's right to conduct a sale in any manner that is considered commercially reasonable, Borrower and Pledgor hereby agree that any sale conducted in accordance with the following provisions shall be considered a commercially reasonable sale and hereby irrevocably waives any right to contest any such sale:

(i)  Lender conducts the sale in the State of Delaware;

(ii)  the sale is conducted in accordance with the laws of the State of Delaware;

(iii)  at least ten (10) days in advance of the sale, Lender notifies Borrower or Pledgor, as applicable, of the time and place of the sale;

(iv)  the sale is conducted by an auctioneer licensed in the State of Delaware on any Business Day between the hours of 9:00 a.m. and 5:00 p.m. Eastern Time;

(v)  the notice of the date, time and location of the sale is published in the auction section of the Sunday edition of a local newspaper at least five (5) days prior to the date of the sale; and

(vi)  Lender sends notification of the sale to all secured parties identified as a result of a search of the UCC financings statements in the filing offices located in the state(s) of residence of Borrower(s) or Pledgor(s), as applicable, conducted not later than twenty (20) days and not earlier than thirty (30) days before such notification date.

(f)  Upon a sale of the Collateral, Borrower and Pledgor hereby give their consent to the admission of the purchaser of the Collateral as a member of the applicable Entity, notwithstanding any provision of the operating agreement of such Entity to the contrary. Such consent shall be irrevocable as long as any Obligation remains unpaid.

6.  LIMITATION AS TO PLEDGOR.

6.1  OTHER INTERESTS. Lender acknowledges and agrees to the following matters: (i) security interests exist on the Encumbered Interests as of the date hereof, and Pledgor may grant

| 8

CONFIDENTIAL

YSA_00003481

additional security interests from time to time on the Encumbered Interests (collectively, "**Other Interests**"); (ii) Pledgor and the Encumbered Interests have entered into this Agreement merely as an accommodation to Lender; and (iii) Lender may be unable to foreclose on, sell, or otherwise exercise its remedies in this Agreement with respect to the Encumbered Interests.

6.2 LIMITATION. Accordingly, and notwithstanding anything to the contrary in this Agreement, at law, in equity, or otherwise, (i) any security interest in the Encumbered Interests that Lender has under this Agreement shall be subordinate to each Other Interest, whether any such Other Interest (a) was created before the date hereof or (b) is created after the date hereof, (ii) the existence or creation of any Other Interest from time to time shall not be a breach of this Agreement, and (iii) any inability of Lender to foreclose on, sell, or otherwise exercise its remedies in this Agreement with respect to the Encumbered Interests shall not constitute a breach of this Agreement.

7. MISCELLANY.

7.1 CONFIDENTIALITY. Each party hereto shall keep confidential the existence of the Loan and the terms of this Agreement and the other Loan Documents, except in each case to the extent that disclosing such information may be (a) required by law or other governmental requirement or (b) reasonably required in connection with entering into or enforcing the Loan, including disclosures to a party's owners (whether direct or indirect), service professionals (including lawyers, accountants, advisors, and consultants), and lenders.

7.2 PARTIES BOUND. Lender's rights and interests hereunder shall inure to the benefit of its successors and assignees (and any subsequent successor or assignee). In the event of any assignment or transfer of any of the Obligations or the Collateral, the assignor or transferor, as applicable, shall be fully discharged from any responsibility with respect to the Collateral so assigned or transferred, but the assignor or transferor, as applicable, shall retain all rights and powers hereby given with respect to any of the Obligations or Collateral not so assigned or transferred. All representations, warranties, and agreements of Borrower and Pledgor shall be joint and several and shall be binding upon their successors and assignees. Time is of the essence of this Agreement.

7.3 WAIVER. No delay of Lender in exercising any power or right shall operate as a waiver or modification thereof, nor shall any single or partial exercise of any power or right preclude other or further exercise thereof or the exercise of any other power or right. No waiver by Lender of any right hereunder or of any default by Borrower or Pledgor shall be binding upon Lender unless in writing, and no failure by Lender to exercise any power or right hereunder or waiver of any default by Borrower or Pledgor shall operate as a waiver of any other or further exercise of such right or power or of any further default.

7.4 TERMINATION OF SECURITY INTEREST. Upon the full and indefeasible payment of all of the Obligations, Lender shall release the security interests granted herein.

7.5 CHOICE OF LAW; VENUE. This Agreement shall in all respects be governed by and enforced in accordance with the laws of the State of Delaware. Each party hereto waives trial by jury in any action, proceeding, or claim pertaining to this Agreement. Any chancery court in Delaware shall have exclusive jurisdiction to hear and determine any and all claims, actions, and proceedings brought by Borrower or Pledgor and pertaining to or arising from this Agreement, the Loan Documents, their negotiation, execution, or performance, or the transactions described herein; provided, however, that if such claim, action, or proceeding cannot be brought in a chancery court in Delaware, the state and federal courts of Delaware shall have exclusive jurisdiction with respect to such claim, action, or proceeding. Lender may bring any and all claims, actions, and proceedings pertaining to or arising from this Agreement, the Loan Documents, their negotiation, execution, or performance, or the transactions described herein in any court of competent jurisdiction. In connection with any claim, action, or proceeding that is against a party hereto

| 9

CONFIDENTIAL

YSA_00003482

and pertains to this Agreement (including any document or agreement executed in connection herewith), the substantially prevailing party therein shall be entitled to receive, and shall be awarded, all its court costs, collection costs, and reasonable attorneys' fees. Notwithstanding anything in this Agreement to the contrary, the Parties agree that any Event of Default will result in irreparable harm to the injured Party. In case any Event of Default occurs and is not waived, the injured Party will be entitled to the issuance of an injunction, restraining order, or other equitable relief in its favor as a result of the breach, and the breaching Party will be deemed to have consented to the granting of an application for the same without any prior notice to the breaching Party and without the injured Party being required to furnish a bond or other undertaking in connection with the application. Upon an Event of Default, Borrower and Pledgor further waive and are estopped from asserting any defense to expedited or pre-judgment relief by Lender and waives any defense or protection mechanism that may be available to Borrower or Pledgor, in each case excluding the defense of full performance.

7.6     CLAIMS UNDER SEAL.    Any claim, whether made in arbitration or a court of competent jurisdiction, shall be filed under seal.

7.7     DEFAULT BY LENDER.   Lender shall not be liable for any action or inaction arising out of this Agreement and the other Loan Documents except for (a) Lender's failure to pay to Borrower the Principal Amount minus the Origination Fee, as defined in the Note, and/or (b) Lender's gross negligence or willful misconduct.

7.8     ADDITIONAL WAIVERS.    BORROWER AND PLEDGOR EXPRESSLY AND UNCONDITIONALLY WAIVE, IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING BROUGHT BY LENDER ON THIS AGREEMENT, ANY AND EVERY RIGHT HE, SHE, IT OR THEY MAY HAVE TO (i) INTERPOSE ANY COUNTERCLAIM THEREIN UNLESS UNDER THE APPLICABLE RULES OF COURT SUCH COUNTERCLAIM MUST BE ASSERTED IN SUCH PROCEEDING, OR (ii) HAVE THE SAME CONSOLIDATED WITH ANY OTHER OR SEPARATE SUIT, ACTION OR PROCEEDING UNLESS UNDER THE APPLICABLE RULES OF COURT SUCH SUIT, ACTION OR PROCEEDING MUST BE CONSOLIDATED WITH THE PROCEEDING BROUGHT BY LENDER.

7.9     MODIFICATIONS.   No provision hereof shall be modified or limited except by a written agreement expressly referring hereto and to the provisions so modified or limited and signed by Borrower, Pledgor, and Lender.  No modification or limitation may be accomplished by course of conduct, usage of trade, or by the law merchant.

7.10    SEVERABILITY.   In the event any provision (or any part of any provision) contained in this Agreement shall for any reason be finally held by a court of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision (or remaining part of the affected provision, or application of the provision to other circumstances) but this Agreement shall be construed as if such invalid, illegal or unenforceable provision (or part thereof) had never been contained herein, but only to the extent it is invalid, illegal or unenforceable.

7.11    FURTHER ASSURANCES.   Borrower and Pledgor shall execute and deliver, or cause to be executed and delivered, such further assurances, including financing statements, as Lender from time to time may reasonably request, to accomplish the provisions of, and carry out the intent of, this Agreement.

7.12    LIMITATIONS OF LAW.  If any law prohibits or limits any charge or expense provided for in this Agreement in connection with any Obligations secured hereby, then such charge or expense will not be made or incurred in connection with such Obligations beyond the limits permitted by such law.

| 10

CONFIDENTIAL

YSA_00003483

7.13    NOTICES.   Any notice, request, demand, approval, consent, and other communication that pertains to this Agreement shall be delivered in accordance with the Note.

7.14    INTERPRETATION.   Whenever the context of any provisions hereof shall require it, words in the singular shall include the plural, words in the plural shall include the singular, and pronouns of any gender shall include the other gender.   Captions and headings in this Agreement are for convenience only and shall not affect the construction of the Agreement.   All references in this Agreement to Schedules, articles, sections, subsections, paragraphs, and subparagraphs refer to the respective subdivisions of this Agreement, unless such reference specifically identifies another document.   The terms "herein," "hereof," "hereto," "hereunder" and similar terms refer to this Agreement and not to any particular section or subsection of this Agreement.   The terms "include" and "including" shall be interpreted as if followed by the words "without limitation." All references in this Agreement to sums denominated in dollars or with the symbol "$" refer to the lawful currency of the United States of America unless such reference specifically identifies another currency.   For purposes of this Agreement, "person" or "persons" shall include firms, associations, partnerships (including limited partnerships), joint ventures, trusts, corporations, limited liability companies, and other legal entities, including governmental bodies, agencies, or instrumentalities, as well as natural persons.   Provisions of this Agreement, unless by their terms exclusive, shall be in addition to other agreements between the parties.   Unless the context indicates otherwise, definitions in the UCC apply to words and phrases in this Agreement; if UCC definitions conflict, then Chapter 9 definitions shall apply.

7.15    EXECUTION AND STORAGE.

(a)    This Agreement may be executed in counterpart signature pages.   Electronic and other non-original signatures on this Agreement shall be permitted, shall be deemed to be original signatures, and shall be as effective as originals for all purposes.   Without limiting the foregoing, this Agreement may be executed, accepted, and/or agreed to through the use of an electronic signature in accordance with the Electronic Signatures in Global and National Commerce Act, Title 15, United States Code, §§7001 et seq., the Uniform Electronic Transaction Act, and any applicable state law.   Any Agreement that is executed, accepted, and/or agreed to in conformity with such laws shall be binding on the parties hereto as though such Agreement had been physically executed using so-called "wet ink" signatures.

(b)    A copy of this Agreement may be stored by each party using any electronic or digital storage method or process, and each party may destroy any original Agreement so stored.   All parties hereto agree and stipulate that any reproduction of this Agreement that has been electronically or digitally stored shall be admissible in evidence as the original itself in any judicial, arbitration, or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made by each party in the regular course of business), and that any further reproduction of such reproduction shall likewise be admissible in evidence.

[signature pages follow]

| 11

CONFIDENTIAL

YSA_00003484

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the first date written above.

**BORROWER**

**ASSET HOLDER, LLC**, an Oklahoma limited liability company


By: _____
Name: Marc Kulick
Title: Manager

**PLEDGOR**

**VESTA HOLDINGS LLC**, an Oklahoma limited liability company


By: _____
Name: Marc Kulick
Title: Manager


STATE OF OKLAHOMA        )
                         )
COUNTY OF TULSA          )

  This instrument was acknowledged before me on February ___, 2025 by Marc Kulick, as the Manager of each of Asset Holder, LLC, an Oklahoma limited liability company, and Vesta Holdings, LLC, an Oklahoma limited liability company.


_____
(Signature of notarial officer)

My Commission Expires:_____

Commission No.:_____


(STAMP SEAL ABOVE)


[signature pages continue]

| 12

CONFIDENTIAL

YSA_00003485

**LENDER**

**YSA INVESTMENTS 1, LLC**, a Delaware limited liability company

By: _____
Name: _____
Title: _____

| 13

CONFIDENTIAL

YSA_00003486

## JOINDER OF BORROWER-AFFILIATED ENTITIES

The undersigned, as a manager, member or other authorized person of any and all Guarantor Entities and any other entities in which the undersigned does now own or control or may herein after own or control during the term of that certain Collateral Pledge and Security Agreement dated February 18, 2025 (the "**Collateral Pledge and Security Agreement**"), hereby agrees to jointly and severally assume all obligations of Pledgor under the Collateral Pledge and Security Agreement for all purposes thereof on the terms set forth therein and to be bound by the terms of the Collateral Pledge and Security Agreement as fully as if the undersigned had personally and individually executed and delivered the Collateral Pledge and Security Agreement as of the date thereof.

By: _____

Name: Marc Kulick

Date:

STATE OF OKLAHOMA          )
                                               )
COUNTY OF TULSA            )

        This instrument was acknowledged before me on February ____, 2025 by Marc Kulick, as and individual.

_____
(Signature of notarial officer)

My Commission Expires:_____

Commission No.:_____

(STAMP SEAL ABOVE)

| 14

CONFIDENTIAL

YSA_00003487

## COLLATERAL PLEDGE AND SECURITY AGREEMENT

This Collateral Pledge and Security Agreement (this "**Agreement**") is made as of February 18, 2025 by and among **YSA INVESTMENTS 1 LLC**, a Delaware limited liability company ("**Lender**"), **ASSET HOLDER, LLC**, an Oklahoma limited liability company ("**Borrower**"), and **VESTA HOLDINGS, LLC**, an Oklahoma limited liability company ("**Pledgor**").

RECITALS

A.    Concurrently herewith, Lender is making a loan (the "**Loan**") to Borrower. The Loan is evidenced by documents that include a Promissory Note of even date herewith by Borrower in favor of Lender (as same may be amended, renewed, extended, substituted for, amended and restated, or otherwise modified from time to time, the "**Note**"). Any defined term that is used herein and not defined herein shall have its meaning in the Note.

B.    Borrower holds the rights, title, and interests (collectively, the "**Unencumbered Interests**") in and to each of the following entities (each, a "**Borrower Entity**"): (1) a membership interest in Capitol on 28th Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000); (2) a membership interest in Remington Ranch Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000); (3) a membership interest in Copperfield Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000); (4) a membership interest in Putnam Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000).

C.    Pledgor holds the following rights, title, and interests (collectively, the "**Encumbered Interests**") in and to each of the following entities (each, a "**Pledgor Entity**"): (1) a membership interest in WoodScape Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000); (2) a membership interest in Barcelona Best Living, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Three Hundred Thousand Dollars ($300,000); (3) a membership interest in Riverpark Best Living Investors, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Eighty-Nine Thousand Three Hundred Dollars ($189,300); (4) a membership interest in Montgomery Vesta Investors, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (5) a membership interest in Fairfax Holding Company, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (6) a membership interest in OKC3 Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (7) a membership interest in Eton Investor, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (8) a membership interest in Eaton Place Investor, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (9) a membership interest in W.O. Holding Co., LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Thousand Dollars ($100,000); (10) a membership interest in Regency Holdings, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Thousand Dollars ($100,000); (11) a membership interest in Woodland Manor Holdings, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Thousand Dollars ($100,000); (12) a membership interest in 727-Classen Best Living Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Fifty Thousand Dollars ($50,000); and (13) a membership interest in Muntage Vesta Investors, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of Forty-Nine Thousand Two Hundred Seventy-Five Dollars ($49,275).

D.    Together, the Unencumbered Interests and Encumbered Interests comprise the "**Interests**".

| 1

CONFIDENTIAL

YSA_00003488

E.  Together, the Borrower Entities and Pledgor Entities comprise the "**Entities**".

F.  In connection with the Loan, Pledgor and Borrower have agreed to pledge the Interest to Lender on the terms and conditions herein.

AGREEMENTS

NOW, THEREFORE, for and in consideration of the direct benefits to be realized by Borrower (which will indirectly benefit Pledgor) from the Loan, the mutual covenants hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower, Pledgor, and Lender hereby agree as written below.

1.  PLEDGE.

   1.1  SECURITY INTEREST.

   (a)  Borrower and Pledgor pledge, grant, and assign to Lender a security interest in and lien upon the Collateral (defined below) to secure the payment and the performance of the Obligations (defined below). "**Collateral**" shall mean the Interest and any and all other interests in any Entity that are now owned or hereafter acquired by Borrower or Pledgor, as applicable, in or to any Entity, together with (i) all additional membership interests or other equity interests in any Entity now or hereafter acquired by Borrower or Pledgor, as applicable, and (1) all options, warrants, and other rights now or hereafter acquired by Borrower or Pledgor, as applicable, in respect of such membership interests or other equity interests in any Entity (whether in connection with any capital increase, recapitalization, reclassification, or reorganization of such Entity or otherwise), and (2) all other property, rights or instruments of any description at any time issued or issuable as an addition to or in substitution for such membership interests or other equity interests in any Entity; (ii) any certificates, instruments, or other writings representing or evidencing membership interests or other ownership interests in any Entity now or hereafter acquired by Borrower or Pledgor, as applicable, and all accounts and general intangibles arising out of, or in connection with, the membership interests in any Entity now or hereafter acquired by Borrower or Pledgor, as applicable; (iii) any and all monies or property due and to become due to Borrower or Pledgor, as applicable, now or in the future in respect of its membership interests or other ownership interests in any Entity, or to which Borrower or Pledgor, as applicable, may now or in the future be entitled in its capacity as a member or other equity holder of any Entity, whether by way of a dividend, distribution, return of capital or otherwise; (iv) all other claims that Borrower or Pledgor, as applicable, now has or may in the future acquire in its capacity as a member, partner, shareholder, or other equity holder of any Entity against such Entity and its property; and (v) all rights of Borrower or Pledgor, as applicable, under any Entity's organizational documents (and all other agreements, if any, to which Borrower is a party from time to time which relate to its ownership of the membership interests or other ownership interests in any Entity), including all voting and consent rights of Borrower or Pledgor, as applicable, arising thereunder or otherwise in connection with Borrower's or Pledgor's, as applicable, ownership of the membership interests or other equity interests in any Entity (provided, however, that any time an Event of Default (defined below) does not exist, Borrower or Pledgor, as applicable, may exercise all rights of Borrower or Pledgor, as applicable, under each Entity's organizational documents, including all voting rights). With respect to the Unencumbered Interests comprising the Collateral, the same may be referred to hereafter as the "**Unencumbered Collateral**". With respect to the Encumbered Interests comprising the Collateral, the same may be referred to hereafter as the "**Pledgor Collateral**".

   (b)  For clarity, it is acknowledged and agreed that the Collateral does not include a personal residence.

| 2

CONFIDENTIAL

YSA_00003489

1.2 ATTACHMENT. The foregoing security interest shall attach automatically to any interests in any Entity that Borrower or Pledgor, as applicable, may at any time in the future acquire without any further action by Borrower or Lender; provided, however, that as a condition to Lender's consent to any such transfer, Lender may require Borrower to execute a modification to this Agreement or a supplementary collateral pledge and security agreement.

1.3 UNENCUMBERED COLLATERAL. The Unencumbered Collateral is and will remain unencumbered by any debt or other payment obligation. The Parties further agree that in its sole discretion, Lender may at any time file a financing statement against the Unencumbered Collateral in the form of a UCC-1 or UCC-3, as applicable, filed pursuant to the Uniform Commercial Code, but Lender's failure to do so shall not impair the validity or enforceability of this Agreement.

2. OBLIGATIONS.

2.1 SECURITY. The following obligations (the "**Obligations**") are secured by this Agreement: (i) all payment and performance duties, liabilities, and obligations of Borrower under the Note; and (ii) all reasonable costs incurred by Lender to obtain, preserve, perfect, and enforce this Agreement and security interest, collect the Obligations, and maintain, preserve, collect, and enforce the Collateral, including taxes, assessments, insurance premiums, attorneys' fees and legal expenses, and expenses of sale.

2.2 DIRECT. The obligations of Borrower and Pledgor under this Agreement shall be direct and immediate and not conditional or contingent upon the pursuit of any remedies against any other person or entity (including the other entities that comprise Borrower or Pledgor, as applicable) nor against the security or liens or encumbrances available to Lender. Borrower and Pledgor waive any right to require that an action be brought against any other person or entity or to require that resort be had to any security or to any balance of any account or credit on the books of Lender in favor of any other person or entity prior to any exercise of rights or remedies hereunder. No renewal or extension of or any other indulgence with respect to the Obligations or any part thereof, no release of any security, no release of any person (including any maker, endorser, guarantor or surety) liable on the Obligations, no delay in enforcement of payment, and no delay or omission or lack of diligence or care in exercising any right or power with respect to the Obligations or any security therefor or guaranty thereof or under this Agreement shall in any manner impair or affect the rights of Lender under this Agreement, applicable law, or any other agreement pertaining to security for the Obligations. Borrower and Pledgor (i) waive any right to the benefit of, or to require or control application of, any other security or proceeds thereof, and (ii) agree that Lender shall have no duty or obligation to Borrower or Pledgor to apply to the Obligations any such other security or proceeds thereof.

3. REPRESENTATIONS AND WARRANTIES. Borrower and Pledgor represent and warrant as follows:

3.1 FINANCING STATEMENTS. No financing statement covering the Unencumbered Collateral is or will be on file in any public office except a financing statement filed by Lender pursuant to this Agreement.

3.2 OWNERSHIP. Borrower owns the Unencumbered Collateral absolutely and free of any setoff, claim, restriction, lien, security interest, or encumbrance. Borrower has the unencumbered and unrestricted right to pledge the Unencumbered Collateral. No consent or approval of any governmental authority or other person that has not been obtained was or is necessary to the validity of this pledge or the enforcement of Lender's rights and remedies hereunder.

3.3 POWER AND AUTHORITY. Borrower and Pledgor have the full power and authority to make and deliver this Agreement. This Agreement constitutes the valid and legally binding obligation of Borrower and Pledgor, and is enforceable in accordance with its terms.

| 3

CONFIDENTIAL YSA_00003490

3.4    MEMBERSHIP INTERESTS.  The Collateral constitutes "general intangibles," as defined in the Uniform Commercial Code as in effect in the State of Delaware (the "**UCC**"), and this Agreement constitutes a security agreement under the UCC.

3.5    LITIGATION.  As of the date hereof, there are no Material Actions, as defined below, against Borrower, Pledgor, or Guarantor, or any entity (i) directly or indirectly controlled or managed by Guarantor or (ii) directly or indirectly owned by Guarantor in whole or in part with respect to which Guarantor receives notices in the ordinary course of business (each of (i) and (ii), a "**Guarantor Entity**"), in each except as follows: (1) Case No. 22-cv-00392-JFH-CDL in the United States District Court for the Northern District of Oklahoma; and (2) Case No. CJ-2024-35 in the District Court of Adair County, Oklahoma.  This statement is being made by Pledgor under the penalty of perjury.  For purposes of this Section, "**Material Action**" means any pending litigation against Borrower, Pledgor, Guarantor, or any Guarantor Entity that (x) is not a landlord-tenant dispute and (y) if such lawsuit were adversely adjudicated against such entity or person, such entity or person would have liability that exceeds $150,000.

3.6    CURRENT DEFAULT.  As of the date hereof, neither Borrower, Pledgor, Guarantor, nor any Guarantor Entity (x) is to Pledgor's knowledge in material breach or default of, or (y) has been notified in writing of any material breach or default, in each case under any loan agreement taken by Borrower, Pledgor, Guarantor, or such entity (each, an "**Other Loan Default**").

3.7    Due Diligence Materials. The .xlsx file titled "Vesta Master Spreadsheet -02022025" which Borrower emailed to Lender on February 2, 2025 together with the other materials provided by Borrower to Lender via a dropbox hyperlink[1] delivered on February 14, 2025, including five "zip files" - file names "KBST&M Returns"; "Mortgage stmts"; "Neuman, Pollak"; "PWC TR"; and "Siples" – and a .xlsx file titled "T12 – Income Statement – Consolidated", which have an aggregate file size of approximately 79.58 Megabytes are true and correct as of this date, and there have been no material changes since the date that they were provided to Lender. which have an aggregate file size of approximately 79.58 Megabytes, and include but are not limited to 2023 tax returns, certain mortgage agreements and current loan balances, summary sheets, and TLO reports related to certain Collateral pledged in the Agreement are true and correct as of this date, and there have been no Material Changes since the date that they were provided to Lender. In the event of a change to Guarantor, Borrower, Pledgor, any Guarantor Entity or any asset owned by, or any liability of, any Guarantor Entity, that would have a material adverse effect on Guarantor, Borrower, Pledgor, any Guarantor Entity (a "**Material Change**"), Borrower shall provide Lender with written notice of the same, and such Material Change shall be deemed a default of this Agreement.

4.    COVENANTS.  Borrower and Pledgor shall promptly perform all of its covenants in this Agreement, including the covenants in this section.

4.1    OWNERSHIP OF UNENCUMBERED COLLATERAL.  Borrower shall not further transfer, sell, pledge, assign, or encumber any of the Unencumbered Collateral. Borrower shall keep the Unencumbered Collateral free from any liens, claims, encumbrances, or security interests except the security interest created hereby and shall preserve the priority of all security interests in the Unencumbered Collateral in favor of Lender. Lender shall have no duty to preserve such security but may do so at the expense of Borrower without waiving any default hereunder.

4.2    COSTS.  Borrower and Pledgor shall pay all costs that are reasonably necessary to obtain, preserve, perfect, defend, and enforce the security interests created by this Agreement, and to preserve, defend, enforce, and collect the Collateral.

---

[1]    Accessible    as    of    February    18,    2025    via    the    following    hyperlink: https://www.dropbox.com/scl/fo/0nvozc8k07witgga8z5cd/ADakWoyvFtgP9emDas7rvBQ?rlkey=gc5mto1sbrmef bwtimwmbc0qg&e=1&st=j01p1kik&dl=0)

| 4

CONFIDENTIAL

YSA_00003491

4.3    DEBT OBLIGATIONS.  So long as the Payoff Amount remains outstanding, Borrower and Pledgor shall alert Lender of any debt in excess of $50,000 that is taken by Borrower, Guarantor, or any entity directly or indirectly controlled by Guarantor and provide a summary of the same, including the name of the party owed, the amount, and a summary of the purpose or cause of the debt.  This Section shall not apply to any future loan arising from the Right of First Offer (as defined in the Guaranty).

4.4    OTHER LOAN DEFAULT AND MATERIAL ACTIONS.  So long as the Payoff Amount remains outstanding, Borrower and Pledgor shall notify Lender within two (2) business days after (i) an Other Loan Default occurs or (ii) receiving notice of a Material Action, which notice shall be delivered to:

> YSA Investments 1, LLC
> C/O Capital Fund Law Group, P.C.
> Attn: Christopher Rogers
> 405 Lexington Ave, 26th Floor
> New York, New York 10174
> email: crogers@capitalfundlaw.com

This notice will include a summary of the default and, with respect to any action, the summary shall include the court in which it is filed, the plaintiff(s) and defendant(s), case number, and summary of the claims being brought.  A copy of any notice pursuant to this section shall also be delivered to Lender.

4.5    RIGHT OF LENDER TO NOTIFY OTHERS.  While an Event of Default exists, Lender may (i) notify persons obligated on any Collateral to make payments directly to Lender, (ii) take control of all proceeds of any Collateral (subject to any other secured lenders' interests in the Pledgor Collateral), and (iii) take any other steps that Lender deems necessary with respect to the Collateral that are permissible in accordance with applicable law.  Until Lender elects to exercise such rights, Borrower and Pledgor, as trustees for the benefit of Lender, shall collect and enforce all payments owed on the Collateral pledged by Borrower and Pledgor.

4.6    POWER OF ATTORNEY.  Borrower and Pledgor each appoint Lender as its/his/her/their attorney-in-fact with full power in Borrower's and Pledgor's name and behalf to do every act that Borrower and Pledgor are obligated to do or may be required to do hereunder or to do all other things which Lender is permitted to do under this Agreement or any other Loan Documents or are necessary to carry out this Agreement or the other Loan Documents; however, nothing in this section shall be construed to obligate Lender to take any action hereunder.  Through exercise of this irrevocable power of attorney, Lender may take whatever steps that it deems necessary in its sole discretion to secure and protect its interests, including but not limited to filing any action and doing whatever else is necessary to protect its interests, enforce its rights, and collect all amounts due to Lender.  This shall include but not be limited to taking any action against any of the Collateral or any real or personal property owned by the Collateral.  The power of attorney hereby created is a power coupled with an interest, and shall be irrevocable.  Neither Lender nor any of its officers, managers, employees or agents of Lender will be liable for any acts of commission or omission nor for any error in judgment or mistake of fact or law unless the same shall have resulted from gross negligence or willful misconduct.  Notwithstanding anything to the contrary above, Lender shall not exercise the foregoing power of attorney unless an Event of Default exists and only as long as an Event of Default exists.

4.7    NO WAIVER BY LENDER.  No renewal or extension of or any other indulgence with respect to the Obligations or any part thereof, no release of any security, no release of any person (including any maker, endorser, guarantor or surety) liable on the Obligations, no delay in enforcement of payment, and no delay or omission or lack of diligence or care in exercising any right or power with respect to the Obligations or any security therefor or guaranty thereof or under this

CONFIDENTIAL

YSA_00003492

Agreement shall in any manner impair or affect the rights of Lender under the law, hereunder or under any other agreement pertaining to security for the Obligations. Borrower and Pledgor waive any right to the benefit of or to require or control application of any other security or proceeds thereof and agree that Lender shall have no duty or obligation to Borrower or Pledgor to apply to the Obligations any such other security or proceeds thereof.

4.8 INDEMNIFICATION. In addition to any other indemnifications expressly provided for herein, Borrower will save, indemnify, and hold Lender harmless from and against all actual expenses, losses, or damages suffered by reason of any (a) wrongful interference (i.e., interference in bad faith) by Borrower with the exercise of any rights or remedies by Lender under this Agreement, or (b) Event of Default. The foregoing obligation of Borrower and Pledgor to indemnify Lender shall not extend to any suit, proceeding, or action arising out of the gross negligence or willful misconduct of Lender.

4.9 TRAILING REPORTS. By or before February 28, 2025, Borrower shall provide Lender with individual and consolidated trailing three-month reports ("T3 Reports") of all entities owned and/or controlled by Guarantor, Pledgor, and/or Borrower which shall report an aggregate net operating income of no less than $5,300,000 in accordance with accrual accounting principles. Deviation between the consolidated and individual T3 Reports shall not exceed $1/10^{th}$ of a percent.

4.10 DOMO REPORTING ACCESS. By or before February 20, 2025, Borrower and Pledgor shall provide Lender with a link to Borrower's financial reporting generated via its "DOMO" software subscription. This link will provide Lender with monthly annualized, three-month annualized, and twelve-month annualized reporting of all entities owned and/or controlled by Guarantor, Borrower, and Pledgor (directly or indirectly) and shall be refreshed no less frequently than once every business day. Lender may request that Borrower provide additional information and data related to the same, and Borrower shall make a good faith effort to provide such information and data to Lender.

5. DEFAULT.

5.1 EVENTS OF DEFAULT. Each of the following shall be an "**Event of Default**" by Borrower and Pledgor hereunder:

(a) a levy on, seizure, or attachment of the Collateral by any third party, and same is not fully removed within thirty (30) days thereafter;

(b) a failure to pay any amount that becomes due under this Agreement, and neither Borrower nor Pledgor cures such failure within ten (10) days thereafter;

(c) a default in the performance or observance of any other term or condition in this Agreement, and neither Borrower nor Pledgor cures such default within ten (10) days after Lender notifies Borrower thereof;

(d) a breach of any warranty or representation under this Agreement, and neither Borrower nor Pledgor cures such breach within ten (10) days after Lender notifies Borrower thereof (provided, however, that no cure period shall apply if the cause of such breach is fraud in the inducement);

(e) Borrower or Pledgor makes a general assignment for the benefit of its creditors, or Borrower or Pledgor consents to an application for the appointment of a trustee, receiver, or other custodian for Borrower or Pledgor, as applicable, or the institution of any proceeding by Borrower or Pledgor, as applicable, under any federal or state laws providing for the relief of debtors or otherwise alleging that Borrower or Pledgor, as

| 6

CONFIDENTIAL

YSA_00003493

applicable, is insolvent, bankrupt, or unable to pay its debts generally as they become due, and same is not dismissed within ninety (90) days of filing; or

(f)     an Event of Default occurs under the Note or any other Loan Document.

5.2   REMEDIES UPON DEFAULT.  While an Event of Default exists, Lender may, without notice or demand to Borrower or Pledgor, enforce payment of the Obligations then due (whether due by acceleration in whole or part or otherwise), and may exercise any rights under the UCC, rights and remedies of Lender under this Agreement, or otherwise, including but not limited to taking any action against the Collateral or any of the Collateral's real or personal property.  Upon any Event of Default, Lender shall further be entitled to its attorney's fees, costs, and any other damages that may be available to it. Without limiting the foregoing, (i) Lender may file a financing statement against Borrower to perfect Lender's lien on the Collateral, and (ii) Lender may conduct a private sale as written below.

(a)     Borrower and Pledgor recognize that Lender may be unable to effect a public sale of any or all of the Collateral, by reason of certain prohibitions contained in the Securities Act of 1933, as amended (the "**Securities Act**"), and applicable state securities laws or otherwise, and may be compelled to resort to one or more private sales thereof to a restricted group of purchasers who will be obliged to agree, among other things, to acquire such securities for their own account for investment and not with a view to the distribution or resale thereof.  Borrower and Pledgor (i) acknowledge and agree that any such private sale may result in prices and other terms less favorable to Lender than if such sale were a public sale, and (ii) notwithstanding such circumstances, agrees that any such private sale shall not be deemed to have been made in a commercially unreasonable manner solely by virtue of being a private sale.  Lender shall be under no obligation to delay a sale of any of the Collateral for the period of time necessary to permit any Entity, Borrower, or Pledgor to register such securities for public sale under the Securities Act, or under applicable state securities laws, even if such Entity, Pledgor, or Borrower would agree to do so.

(b)     Further, Borrower and Pledgor shall use commercially reasonable efforts to do or cause to be done all such other acts as may be reasonably necessary to make any sale or sales of all or any portion of the Collateral pursuant to this section valid and binding and in compliance with any and all other requirements of applicable law.  Borrower and Pledgor further agree that a breach of any of the covenants contained in this section will cause irreparable injury to Lender, that Lender has no adequate remedy at law in respect of such breach, and, as a consequence, that each and every covenant contained in this section shall be specifically enforceable against Borrower and Pledgor; and Borrower and Pledgor hereby waive and agree not to assert any defenses against an action for specific performance of such covenants except for a defense that no Event of Default has occurred, or any defense relating to Lender's willful misconduct or gross negligence.

(c)     Lender shall not incur any liability as a result of the sale of any Collateral, or any part thereof, at any private sale conducted in a commercially reasonable manner, it being agreed that some or all of the Collateral is or may be of one or more types that threaten to decline speedily in value and that are not customarily sold in a recognized market. Borrower and Pledgor hereby waive any claims against Lender arising by reason of the fact that the price at which any of the Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale or was less than the aggregate amount of the Obligations, provided that Lender has acted in a commercially reasonable manner in conducting such private sale.

(d)     It is acknowledged that the UCC states that a lender is able to purchase collateral only if it is sold at a public sale.  Lender has advised Borrower and Pledgor that Securities and

| 7

CONFIDENTIAL

YSA_00003494

Exchange Commission ("**SEC**") staff personnel have issued various No-Action Letters describing procedures that, in the view of the SEC staff, permit a foreclosure sale of securities to occur in a manner that is public for purposes of Article 9 of the UCC, yet not public for purposes of §4(2) of the Securities Act. It is also acknowledged that the UCC permits Borrower and Pledgor to agree on the standards for determining whether a lender has complied with its obligations under Article 9 of the UCC. Pursuant to the UCC, Borrower and Pledgor specifically agree that (x) they shall not raise any objection to Lender's purchase of the Collateral (through bidding on the obligations or other commercially reasonable means), and (y) a sale conducted in conformity with the principles set forth in the No-Action Letters (i) shall be considered to be a "public" sale for purposes of the UCC, (ii) will be considered commercially reasonable notwithstanding that Lender has not registered or sought to register the Collateral under the Securities Laws, even if Borrower, Pledgor, or any Entity agrees to pay all costs of the registration process, and (iii) shall not be considered to be commercially unreasonable solely because Lender purchases the Collateral at such a sale.

(e)     Borrower and Pledgor agree that Lender shall not have any general duty or obligation to make any effort to obtain or pay any particular price for any Collateral sold by Lender pursuant to this Agreement. Lender, in its sole discretion, may decide to approach or not to approach any potential purchasers provided that the method of sale is commercially reasonable. Without in any way limiting Lender's right to conduct a sale in any manner that is considered commercially reasonable, Borrower and Pledgor hereby agree that any sale conducted in accordance with the following provisions shall be considered a commercially reasonable sale and hereby irrevocably waives any right to contest any such sale:

(i)     Lender conducts the sale in the State of Delaware;

(ii)    the sale is conducted in accordance with the laws of the State of Delaware;

(iii)   at least ten (10) days in advance of the sale, Lender notifies Borrower or Pledgor, as applicable, of the time and place of the sale;

(iv)    the sale is conducted by an auctioneer licensed in the State of Delaware on any Business Day between the hours of 9:00 a.m. and 5:00 p.m. Eastern Time;

(v)     the notice of the date, time and location of the sale is published in the auction section of the Sunday edition of a local newspaper at least five (5) days prior to the date of the sale; and

(vi)    Lender sends notification of the sale to all secured parties identified as a result of a search of the UCC financings statements in the filing offices located in the state(s) of residence of Borrower(s) or Pledgor(s), as applicable, conducted not later than twenty (20) days and not earlier than thirty (30) days before such notification date.

(f)     Upon a sale of the Collateral, Borrower and Pledgor hereby give their consent to the admission of the purchaser of the Collateral as a member of the applicable Entity, notwithstanding any provision of the operating agreement of such Entity to the contrary. Such consent shall be irrevocable as long as any Obligation remains unpaid.

6.      LIMITATION AS TO PLEDGOR.

6.1     OTHER INTERESTS. Lender acknowledges and agrees to the following matters: (i) security interests exist on the Encumbered Interests as of the date hereof, and Pledgor may grant

| 8

CONFIDENTIAL                                                                                    YSA_00003495

additional security interests from time to time on the Encumbered Interests (collectively, "**Other Interests**"); (ii) Pledgor and the Encumbered Interests have entered into this Agreement merely as an accommodation to Lender; and (iii) Lender may be unable to foreclose on, sell, or otherwise exercise its remedies in this Agreement with respect to the Encumbered Interests.

6.2     LIMITATION.  Accordingly, and notwithstanding anything to the contrary in this Agreement, at law, in equity, or otherwise, (i) any security interest in the Encumbered Interests that Lender has under this Agreement shall be subordinate to each Other Interest, whether any such Other Interest (a) was created before the date hereof or (b) is created after the date hereof, (ii) the existence or creation of any Other Interest from time to time shall not be a breach of this Agreement, and (iii) any inability of Lender to foreclose on, sell, or otherwise exercise its remedies in this Agreement with respect to the Encumbered Interests shall not constitute a breach of this Agreement.

7.     MISCELLANY.

7.1     CONFIDENTIALITY.  Each party hereto shall keep confidential the existence of the Loan and the terms of this Agreement and the other Loan Documents, except in each case to the extent that disclosing such information may be (a) required by law or other governmental requirement or (b) reasonably required in connection with entering into or enforcing the Loan, including disclosures to a party's owners (whether direct or indirect), service professionals (including lawyers, accountants, advisors, and consultants), and lenders.

7.2     PARTIES BOUND.  Lender's rights and interests hereunder shall inure to the benefit of its successors and assignees (and any subsequent successor or assignee).  In the event of any assignment or transfer of any of the Obligations or the Collateral, the assignor or transferor, as applicable, shall be fully discharged from any responsibility with respect to the Collateral so assigned or transferred, but the assignor or transferor, as applicable, shall retain all rights and powers hereby given with respect to any of the Obligations or Collateral not so assigned or transferred.  All representations, warranties, and agreements of Borrower and Pledgor shall be joint and several and shall be binding upon their successors and assignees.  Time is of the essence of this Agreement.

7.3     WAIVER.  No delay of Lender in exercising any power or right shall operate as a waiver or modification thereof, nor shall any single or partial exercise of any power or right preclude other or further exercise thereof or the exercise of any other power or right.  No waiver by Lender of any right hereunder or of any default by Borrower or Pledgor shall be binding upon Lender unless in writing, and no failure by Lender to exercise any power or right hereunder or waiver of any default by Borrower or Pledgor shall operate as a waiver of any other or further exercise of such right or power or of any further default.

7.4     TERMINATION OF SECURITY INTEREST.  Upon the full and indefeasible payment of all of the Obligations, Lender shall release the security interests granted herein.

7.5     CHOICE OF LAW; VENUE.  This Agreement shall in all respects be governed by and enforced in accordance with the laws of the State of Delaware.  Each party hereto waives trial by jury in any action, proceeding, or claim pertaining to this Agreement.  Any chancery court in Delaware shall have exclusive jurisdiction to hear and determine any and all claims, actions, and proceedings brought by Borrower or Pledgor and pertaining to or arising from this Agreement, the Loan Documents, their negotiation, execution, or performance, or the transactions described herein; provided, however, that if such claim, action, or proceeding cannot be brought in a chancery court in Delaware, the state and federal courts of Delaware shall have exclusive jurisdiction with respect to such claim, action, or proceeding. Lender may bring any and all claims, actions, and proceedings pertaining to or arising from this Agreement, the Loan Documents, their negotiation, execution, or performance, or the transactions described herein in any court of competent jurisdiction.  In connection with any claim, action, or proceeding that is against a party hereto

| 9

CONFIDENTIAL

YSA_00003496

and pertains to this Agreement (including any document or agreement executed in connection herewith), the substantially prevailing party therein shall be entitled to receive, and shall be awarded, all its court costs, collection costs, and reasonable attorneys' fees. Notwithstanding anything in this Agreement to the contrary, the Parties agree that any Event of Default will result in irreparable harm to the injured Party. In case any Event of Default occurs and is not waived, the injured Party will be entitled to the issuance of an injunction, restraining order, or other equitable relief in its favor as a result of the breach, and the breaching Party will be deemed to have consented to the granting of an application for the same without any prior notice to the breaching Party and without the injured Party being required to furnish a bond or other undertaking in connection with the application. Upon an Event of Default, Borrower and Pledgor further waive and are estopped from asserting any defense to expedited or pre-judgment relief by Lender and waives any defense or protection mechanism that may be available to Borrower or Pledgor, in each case excluding the defense of full performance.

7.6     CLAIMS UNDER SEAL.   Any claim, whether made in arbitration or a court of competent jurisdiction, shall be filed under seal.

7.7     DEFAULT BY LENDER.   Lender shall not be liable for any action or inaction arising out of this Agreement and the other Loan Documents except for (a) Lender's failure to pay to Borrower the Principal Amount minus the Origination Fee, as defined in the Note, and/or (b) Lender's gross negligence or willful misconduct.

7.8     ADDITIONAL WAIVERS.   BORROWER AND PLEDGOR EXPRESSLY AND UNCONDITIONALLY WAIVE, IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING BROUGHT BY LENDER ON THIS AGREEMENT, ANY AND EVERY RIGHT HE, SHE, IT OR THEY MAY HAVE TO (i) INTERPOSE ANY COUNTERCLAIM THEREIN UNLESS UNDER THE APPLICABLE RULES OF COURT SUCH COUNTERCLAIM MUST BE ASSERTED IN SUCH PROCEEDING, OR (ii) HAVE THE SAME CONSOLIDATED WITH ANY OTHER OR SEPARATE SUIT, ACTION OR PROCEEDING UNLESS UNDER THE APPLICABLE RULES OF COURT SUCH SUIT, ACTION OR PROCEEDING MUST BE CONSOLIDATED WITH THE PROCEEDING BROUGHT BY LENDER.

7.9     MODIFICATIONS.   No provision hereof shall be modified or limited except by a written agreement expressly referring hereto and to the provisions so modified or limited and signed by Borrower, Pledgor, and Lender. No modification or limitation may be accomplished by course of conduct, usage of trade, or by the law merchant.

7.10    SEVERABILITY.   In the event any provision (or any part of any provision) contained in this Agreement shall for any reason be finally held by a court of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision (or remaining part of the affected provision, or application of the provision to other circumstances) but this Agreement shall be construed as if such invalid, illegal or unenforceable provision (or part thereof) had never been contained herein, but only to the extent it is invalid, illegal or unenforceable.

7.11    FURTHER ASSURANCES.   Borrower and Pledgor shall execute and deliver, or cause to be executed and delivered, such further assurances, including financing statements, as Lender from time to time may reasonably request, to accomplish the provisions of, and carry out the intent of, this Agreement.

7.12    LIMITATIONS OF LAW.   If any law prohibits or limits any charge or expense provided for in this Agreement in connection with any Obligations secured hereby, then such charge or expense will not be made or incurred in connection with such Obligations beyond the limits permitted by such law.

| 10

CONFIDENTIAL

YSA_00003497

7.13    NOTICES.    Any notice, request, demand, approval, consent, and other communication that pertains to this Agreement shall be delivered in accordance with the Note.

7.14    INTERPRETATION.    Whenever the context of any provisions hereof shall require it, words in the singular shall include the plural, words in the plural shall include the singular, and pronouns of any gender shall include the other gender.  Captions and headings in this Agreement are for convenience only and shall not affect the construction of the Agreement.  All references in this Agreement to Schedules, articles, sections, subsections, paragraphs, and subparagraphs refer to the respective subdivisions of this Agreement, unless such reference specifically identifies another document.  The terms "herein," "hereof," "hereto," "hereunder" and similar terms refer to this Agreement and not to any particular section or subsection of this Agreement.  The terms "include" and "including" shall be interpreted as if followed by the words "without limitation."  All references in this Agreement to sums denominated in dollars or with the symbol "$" refer to the lawful currency of the United States of America unless such reference specifically identifies another currency.  For purposes of this Agreement, "person" or "persons" shall include firms, associations, partnerships (including limited partnerships), joint ventures, trusts, corporations, limited liability companies, and other legal entities, including governmental bodies, agencies, or instrumentalities, as well as natural persons.  Provisions of this Agreement, unless by their terms exclusive, shall be in addition to other agreements between the parties.  Unless the context indicates otherwise, definitions in the UCC apply to words and phrases in this Agreement; if UCC definitions conflict, then Chapter 9 definitions shall apply.

7.15    EXECUTION AND STORAGE.

(a)    This Agreement may be executed in counterpart signature pages.  Electronic and other non-original signatures on this Agreement shall be permitted, shall be deemed to be original signatures, and shall be as effective as originals for all purposes.  Without limiting the foregoing, this Agreement may be executed, accepted, and/or agreed to through the use of an electronic signature in accordance with the Electronic Signatures in Global and National Commerce Act, Title 15, United States Code, §§7001 et seq., the Uniform Electronic Transaction Act, and any applicable state law.  Any Agreement that is executed, accepted, and/or agreed to in conformity with such laws shall be binding on the parties hereto as though such Agreement had been physically executed using so-called "wet ink" signatures.

(b)    A copy of this Agreement may be stored by each party using any electronic or digital storage method or process, and each party may destroy any original Agreement so stored.  All parties hereto agree and stipulate that any reproduction of this Agreement that has been electronically or digitally stored shall be admissible in evidence as the original itself in any judicial, arbitration, or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made by each party in the regular course of business), and that any further reproduction of such reproduction shall likewise be admissible in evidence.

[signature pages follow]

| 11

CONFIDENTIAL

YSA_00003498

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the first date written above.

**BORROWER**

**ASSET HOLDER, LLC**, an Oklahoma limited liability company

By: _____
Name: Marc Kulick
Title: Manager

**PLEDGOR**

**VESTA HOLDINGS LLC**, an Oklahoma limited liability company

By: _____
Name: Marc Kulick
Title: Manager

STATE OF OKLAHOMA )
                                 )
COUNTY OF TULSA )

This instrument was acknowledged before me on February ___, 2025 by Marc Kulick, as the Manager of each of Asset Holder, LLC, an Oklahoma limited liability company, and Vesta Holdings, LLC, an Oklahoma limited liability company.

_____
(Signature of notarial officer)

My Commission Expires:_____

Commission No.:_____

(STAMP SEAL ABOVE)

[signature pages continue]

| 12

CONFIDENTIAL

YSA_00003499

**LENDER**

**YSA Investments 1, LLC**, a Delaware limited liability company


By: _____
Name: _____
Title: _____

| 13

CONFIDENTIAL

YSA_00003500

## JOINDER OF BORROWER-AFFILIATED ENTITIES

The undersigned, as a manager, member or other authorized person of any and all Guarantor Entities and any other entities in which the undersigned does now own or control or may herein after own or control during the term of that certain Collateral Pledge and Security Agreement dated February 18, 2025 (the "**Collateral Pledge and Security Agreement**"), hereby agrees to jointly and severally assume all obligations of Pledgor under the Collateral Pledge and Security Agreement for all purposes thereof on the terms set forth therein and to be bound by the terms of the Collateral Pledge and Security Agreement as fully as if the undersigned had personally and individually executed and delivered the Collateral Pledge and Security Agreement as of the date thereof.

By: _____

Name: Marc Kulick

Date:

STATE OF OKLAHOMA      )
                                   )

COUNTY OF TULSA         )

        This instrument was acknowledged before me on February ____, 2025 by Marc Kulick, as and individual.

_____

(Signature of notarial officer)

My Commission Expires:_____

Commission No.:_____

(STAMP SEAL ABOVE)

| 14

CONFIDENTIAL

YSA_00003501

# EXHIBIT 5

EXHIBIT 5

# PROMISSORY NOTE

February 18, 2025 (the "Effective Date")

| | |
|---|---|
| "Borrower": | ASSET HOLDER, LLC, an Oklahoma limited liability company, having an address for notices of % Vesta Realty, LLC, 6911 S. 66th E. Ave., Suite 100, Tulsa, OK 74133, Attention: Marc Kulick and A.J. Jindal, Email: legalnotices@vestarealproperty.com |
| "Lender": | YSA INVESTMENTS 1, LLC, a Delaware limited liability company, having an address for notices of 8325 NE 2nd Ave, Miami, FL 33138, Email: robert@vdacquisitions.com |
| "Pledgor": | VESTA HOLDINGS, LLC, an Oklahoma limited liability company, having an address for notices of % Vesta Realty, LLC, 6911 S. 66th E. Ave., Suite 100, Tulsa, OK 74133, Attention: Marc Kulick and A.J. Jindal, Email: legalnotices@vestarealproperty.com |
| "Principal Amount": | One Million Five Hundred Thousand Dollars ($1,500,000). |
| "Funding Date": | The date on which Lender funds the Principal Amount (subject to reductions set forth under §§ 2.2, 3 and 4 below) to Borrower, which Lender shall cause to occur within the same business day as the Effective Date |
| "Original Maturity Date": | May 19, 2025 |
| "Maturity Date": | The first to occur of (i) the Original Maturity Date and (ii) the date on which an Event of Default (defined below) occurs |
| "Interest Rate": | One Hundred Thirty-Three and One-Third Percent (133.333%) per annum, based on a three-hundred-sixty (360)-day year and compounded monthly |
| "Note": | This Promissory Note, as same may be amended, renewed, extended, substituted for, amended and restated, or otherwise modified from time to time |
| "Loan Documents": | Collectively, (1) this Note, (2) the Collateral Pledge and Security Agreement of even date herewith between Lender and Borrower (as same may be amended, renewed, extended, substituted for, amended and restated, or otherwise modified from time to time, the "CPSA"), (3) the Guaranty and ROFO of even date herewith made by Marc Kulick, an individual ("Guarantor"), for the benefit of Lender, (4) the Affidavit of Confession of Judgment made by Borrower for the benefit of Lender, and (5) and any other document that is executed in connection with the Loan from time to time |
| "Loan": | The Loan from Lender to Borrower, as evidenced by this Note and the other Loan Documents |
| "O.P.B.": | At any given time, the sum of (i) the outstanding Principal Amount, (ii) any and all capitalized interest on the Loan, and (iii) any other amounts that are due or have accrued under the Loan and have not been paid (excluding interest that has not been capitalized) |
| "Payoff Amount": | At any given time, the sum of (i) the O.P.B., (ii) all interest on the Loan that has accrued, not been paid, and not been capitalized, and (iii) any amounts that would become due under the Loan (including under this Note) if the O.P.B. were prepaid, including the Minimum Interest (defined below), if due |

| "Event of Default": | Each of the following: (i) Borrower fails to pay any amount that becomes due under this Note, (ii) Borrower defaults in the performance or observance of any other term or condition in this Note (including §8.5 below), and Borrower does not cure such default within ten (10) days after Lender notifies Borrower thereof; (iii) Borrower breaches any warranty or representation under this Note and does not cure such breach within ten (10) days after Lender notifies Borrower thereof; and (iv) the occurrence of an "Event of Default" under any other Loan Document. Notwithstanding anything to the contrary in clauses (ii) and (ii) above, if the cause of the default thereunder is fraud in the inducement, then Borrower shall not be entitled to the cure period therein. |
|---|---|

1.    PROMISE TO PAY. For value received, Borrower promises to pay to the order of Lender the Loan, together with any other amounts due under this Note and any other Loan Document, on or before the Maturity Date.

2.    PRINCIPAL AND INTEREST.

    2.1.    ACCRUAL. Interest shall accrue on the O.P.B. at the Interest Rate, subject to §4.

    2.2.    PAYMENTS.

        2.2.1.    Notwithstanding anything in this Agreement to the contrary, payments shall be made in accordance with the following schedule and in the following minimum amounts except as otherwise increased by accrued interest or any other applicable costs or fees:

| February 18, 2025 | $166,666.67 (which shall be deducted from Lender's funding of the Principal Amount funded to Borrower) |
|---|---|
| March 18, 2025 | $166,666.67 |
| April 18, 2025 | $166,666.66 |
| May 19, 2025 | $1,500,000 |

        2.2.2.    On the Maturity Date, the entire Payoff Amount shall be due.

        2.2.3.    All payments under the Loan must be made in immediately available U.S. funds.

    2.3.    DUE DATE. Whenever any payment is stated to be due or a computation is to be made on a day that is not a business day, such payment or computation will be made on the immediately following business day.

    2.4.    APPLICATION. Each payment under the Loan shall be applied when received as follows: first, to any fees, penalties, expenses, and other costs (including reasonable attorneys' fees and costs incurred hereunder or under any other Loan Document) that Borrower is obligated to pay hereunder or under any other Loan Document; second, to interest on the Loan that has accrued, not been paid, and not been capitalized; and the remainder to reduce the O.P.B.

    2.5.    MINIMUM INTEREST. Borrower shall be obligated to pay Lender at least three (3) months of interest on the Principal Amount at the Interest Rate (the "Minimum Interest"). I.e., if when Borrower pays the Payoff Amount, the amount of interest that has become due under the Loan (the "Total Interest Due") is less than the Minimum Interest, then the Payoff Amount shall be increased by the difference between the Minimum Interest and the Total Interest Due.

Alternatively, if when Borrower pays the Payoff Amount, the Total Interest Due equals or exceeds the Minimum Interest, then the Payoff Amount shall not be increased or otherwise affected by the Minimum Interest.

2.6. LENDER PAYMENT INSTRUCTIONS. All payments by Borrower to Lender shall be made payable by ACH in accordance with the following ACH payment instructions except as otherwise provided by Lender to Borrower in writing:

YSA Investments I LLC
6899 Collins Ave
Unit #808
Miami Beach, FL 33141

| ACH & Domestic wires | |
| --- | --- |
| Receiving Bank ABA: | 064008637 |
| Receiving Bank Name: | Pinnacle Bank |
| | 150 3rd Ave S, Nashville, TN 37201 |
| For Credit to (Beneficiary): | YSA Investments I LLC |
| Account number: | 800109606954 |

2.7. PREPAYMENTS. Subject to the Minimum Interest, Borrower may prepay the Loan in whole or in part from time to time without penalty, fee, or premium.

2.8 LATE FEE. If any payment that is due under the Loan is not timely paid, then a late charge equal to two percent (2%) of the amount of such payment shall immediately and automatically accrue. Borrower (i) acknowledges that a late payment would result in losses and expenses to Lender such as lost opportunity costs and increased costs of collection, (ii) agrees that the actual losses and expenses in connection with a late payment are unpredictable and uncertain (and may be less or more than the late charge), and (iii) agrees that such charge is a fair, *ex ante* agreement on such losses and expenses.

2.9. MATURITY DATE EXTENSION. Notwithstanding anything in the Loan Documents to the contrary, Borrower may receive a 10-day extension of the Maturity Date by (i) providing Lender with written notice requesting the extension via email by or before May 14, 2025 and (ii) paying Lender the amount of seventy-five thousand dollars ($75,000) by or before the original Maturity Date, which amount shall be received by Lender by or before the original Maturity Date for such extension to be effective.

3. ORIGINATION FEE. On the date hereof, Borrower shall pay Lender an origination fee equal to two percent (2%) of the Principal Amount (the "**Origination Fee**"). The Origination Fee shall be deemed fully earned, payable, and non-refundable upon the execution of this Note and the other Loan Documents. On the Funding Date, Lender shall deduct the Origination Fee from Lender's funding of the Principal Amount, and Borrower shall be deemed to have paid same.

4. LEGAL FEES. The Parties acknowledge that Lender has incurred legal fees in connection with the negotiation, revision, and execution of the Loan Documents. On the Funding Date, Lender shall deduct the amount of $15,000 from Lender's funding of the Principal Amount.

5. EVENT OF DEFAULT.

5.1. If an Event of Default occurs, then Lender may exercise any lawful rights and remedies that may be available to Lender, whether at law, in equity, or otherwise. In addition thereto and without limiting the foregoing: (i) the commitment and obligation of Lender to extend credit or to make disbursements under this Note or any other Loan Document shall immediately and automatically terminate; (ii) Borrower shall indemnify, defend, and hold Lender harmless from and against any actual loss, damage, harm, injury, claim, liability, cost, or expense

(including reasonable attorneys' fees) that is caused by such Event of Default or arises therefrom; (iii) while an Event of Default exists, the O.P.B. shall accrue interest at a rate equal to the Interest Rate plus five percent (5%) per annum; (iv) pursuant to Section 4.6 of the CPSA, Lender as Borrower's attorney-in-fact may take any steps it deems necessary in its sole discretion to protect its interests; and (v) Lender may pursue any remedy provided in the CPSA. Lender shall further be entitled to any attorney's fees, costs, or other damages that may be available to it as a result of an Event of Default.

5.2. In connection with any Event of Default (and in addition to any other remedies Lender may possess), Borrower knowingly, voluntarily, and intentionally authorizes any attorney who represents Lender to appear on Borrower's behalf, from time to time, in any court of record possessing jurisdiction over this Note for the purposes of (i) waiving issuance and service of process and (ii) confessing judgment in favor of Lender against Borrower in the Payoff Amount. In connection therewith, presenting this Note or a copy hereof verified by an affidavit shall be a sufficient warrant.

6. WAIVER. Borrower—for itself and any and all endorsers, guarantors and sureties of this Note, and each of them, and their successors and assignees, respectively—hereby (i) waives presentment for payment, demand, notice of nonpayment, notice of dishonor, protest of any dishonor, notice of protest and protest of this Note, and all other notices in connection with the delivery, acceptance, performance, default or enforcement of the Note and CPSA, including but not limited to the payment of this Note (excepting only notices expressly provided for herein), and agrees that its liability shall be unconditional and without regard to the liability of any other party and shall not be in any manner affected by any indulgence, extension of time, renewal, waiver or modification granted or consented to by Lender; (ii) waives all defenses to the enforcement of this Note other than the defense of full performance; (iii) consents to every extension of time, renewal, waiver or modification that may be granted by Lender with respect to the payment or other provisions of this Note, and to the release of any borrowers, makers, endorsers, guarantors or sureties, or of the collateral pledged under the CPSA (the "Collateral"), or any part hereof, with or without substitution, and agrees that additional borrowers, makers, guarantors or endorsers may become parties hereto without notice to Borrower and without affecting the liability of Borrower hereunder; and (iv) waives the right to assert a setoff, counterclaim, or deduction in any action or arising out of or in any way connected with this Note or any other Loan Document (except for compulsory counterclaims and the defense of full performance). No right of rescission, setoff, abatement, diminution, counterclaim, or defense has been or will be asserted with respect to this Note or any other Loan Document.

7. SECURITY. This Note is secured by—and on the terms in the CPSA, Lender is and shall be entitled to the benefits of—the liens, encumbrances, and obligations on the Collateral that are created by this Note and the other Loan Documents. In connection therewith, the applicable terms and provisions of the other Loan Documents are hereby incorporated herein.

8. BUSINESS LOAN; USURY.

8.1. Borrower represents and warrants that (i) the entire proceeds of the Loan will be used to further the business purposes and objectives of it and its affiliates, and (ii) none of the proceeds of the Loan will be used for personal, family, or household purposes. Borrower shall not, whether directly or indirectly, use any proceeds of the Loan (a) for the purpose of purchasing or carrying any margin stock within the meaning of Regulation U of the Board of Governors of the Federal Reserve System, (b) to extend credit to any person for the purpose of purchasing or carrying any such margin stock, or (c) for any purpose which violates, or is inconsistent with, Regulation X of such Board of Governors.

8.2. If the interest rate under this Note exceeds the maximum lawful interest rate at any time, then the interest rate under this Note, for such period of time which it exceeds the maximum lawful rate, will be reduced to (and will equal) the maximum lawful rate at such time. If Lender

receives any interest payments in excess of the maximum amount permitted by law, then (i) such excess will be applied to reduce the O.P.B., whether then due and payable or not, and any other amounts owing under this Note, and (ii) the balance remaining (if any) will be returned to Borrower upon Borrower's request.

9. REPRESENTATIONS AND WARRANTIES OF BORROWER. Borrower represents and warrants as follows:

9.1. FORMATION. Borrower is a limited liability company duly organized, validly existing, and in good standing under the laws of its jurisdiction of formation, and is duly qualified or licensed and in good standing to do business as a foreign entity in all jurisdictions in which Borrower does business and such qualification is required.

9.2. AUTHORIZATION. Borrower has full power and authority to enter into this Note and to perform all obligations required to be performed by it hereunder. The execution, delivery and performance by Borrower of this Note and any Loan Documents to which Borrower is a party are within Borrower's powers, have been authorized by all necessary company action and do not and will not contravene Borrower's formation or constitutional documents, violate any provision of law or result in a breach of or default under any other agreement to which Borrower is a party.

9.3. OBLIGATION. This Note, when executed and delivered by Borrower, will constitute Borrower's valid and legally binding obligation, enforceable in accordance with its terms, except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance and any other laws of general application affecting enforcement of creditors' rights generally, and (ii) as limited by laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

9.4. LITIGATION. As of the Effective Date, there are no Material Actions, as defined below, against Borrower, Pledgor, or Guarantor, or any entity (i) directly or indirectly controlled or managed by Guarantor or (ii) directly or indirectly owned by Guarantor in whole or in part with respect to which Guarantor receives notices in the ordinary course of business (each of (i) and (ii), a "**Guarantor Entity**"), in each except as follows: (1) Case No. 22-cv-00392-JFH-CDL in the United States District Court for the Northern District of Oklahoma; and (2) Case No. CJ-2024-35 in the District Court of Adair County, Oklahoma. This statement is being made by Borrower under the penalty of perjury. For purposes of this Section, "**Material Action**" means any pending litigation against Borrower, Pledgor, Guarantor, or any Guarantor Entity that (x) is not a landlord-tenant dispute and (y) if such lawsuit were adversely adjudicated against such entity or person, such entity or person would have liability that exceeds $150,000.

9.5. CURRENT DEFAULT. As of the Effective Date, neither Borrower, Pledgor, Guarantor, nor any Guarantor Entity (x) is to Borrower's knowledge in material breach or default of, or (y) has been notified in writing of any material breach or default in each case under any loan agreement taken by Borrower, Pledgor, Guarantor, or such entity (each, an "**Other Loan Default**").

10. RELATED COVENANTS.

10.1. OTHER LOAN DEFAULT AND MATERIAL ACTIONS. So long as the Payoff Amount remains outstanding, Borrower covenants that if an Other Loan Default occurs or if Borrower receives notice of a Material Action, then Borrower shall notify Lender within two (2) business days thereafter, which notice shall be delivered to:

YSA Investments 1, LLC
C/O Capital Fund Law Group, LLP

Attn: Christopher Rogers
405 Lexington Ave, 26th Floor
New York, New York 10174
email: crogers@capitalfundlaw.com

This notice will include a summary of the default and, with respect to any action, the summary shall include the court in which it is filed, the plaintiff(s) and defendant(s), case number, and summary of the claims being brought. A copy of any notice pursuant to this section shall also be delivered to Lender.

10.2. DEBT OBLIGATIONS. So long as the Payoff Amount remains outstanding, Borrower shall alert Lender of any debt in excess of $50,000 that is taken by Borrower, Guarantor, or any Guarantor Entity and provide a summary of the same, including the name of the party owed, the amount, and a summary of the purpose or cause of the debt. This Section shall not apply to any future loan arising from the Right of First Offer (as defined in the Guaranty).

11. MISCELLANY.

11.1. JOINT AND SEVERAL LIABILITY. If more than one person or entity constitutes "Borrower," then all obligations of any kind under this Note (including all liabilities) shall be joint and several to each person or entity that constitutes "Borrower" from time to time.

11.2. NOTICES, DISBURSEMENTS, AND PAYMENTS.

11.2.1. Each notice, request, demand, approval, consent, and other communication that pertains to this Note (each, a "notice") must be in writing, be delivered to the address(es) set forth on the first page of this Note, and be delivered (a) personally, (b) by a national overnight courier, or (c) by electronic mail (provided, however, that any notice delivered personally or by a national overnight courier must also be sent on the same day by electronic mail). Each notice shall be deemed to have been given when it is received or refused (whether affirmatively or due to the recipient failing to maintain a current address for receiving notices with the sender).

11.2.2. Each disbursement or payment under this Note (as applicable) shall be made using wire, A.C.H., or other such instructions that Borrower or Lender (as applicable) provides to the other party from time to time. Each such disbursement or payment shall be deemed to have been made when it is received.

11.2.3. From time to time, each of Borrower and Lender may (i) change its address for receiving notices and/or instructions for receiving disbursements or payments (as applicable), and (ii) specify up to two (2) additional addresses for receiving a copy of any notice, in each case by delivering a notice thereof to the other party in accordance with §9.2.1 above at least five (5) days in advance.

11.3. TRANSFER OF LOAN. Without the other party's prior approval, neither party hereto shall assign, delegate, or otherwise transfer or convey any of its rights or obligations pertaining to the Loan. Subject to the foregoing, this Note shall bind and inure to the benefit of each party hereto and its successors and assignees.

11.4. GOVERNING LAW; VENUE. This Note shall in all respects be governed by and enforced in accordance with the laws of the State of Delaware. Any chancery court in Delaware shall have exclusive jurisdiction to hear and determine any and all claims, actions, and proceedings brought by Borrower and pertaining to or arising from this Note, the Loan Documents, their negotiation, execution, or performance, or the transactions described herein; provided, however, that if such claim, action, or proceeding cannot be brought in a chancery court in

Delaware, the state and federal courts of Delaware shall have exclusive jurisdiction with respect to such claim, action, or proceeding. Lender may bring any and all claims, actions, and proceedings pertaining to or arising from this Note, the Loan Documents, their negotiation, execution, or performance, or the transactions described herein in any court of competent jurisdiction. Each party hereto (i) waives any right it may have to domesticate any judgment obtained in connection with this Note, and (ii) waives trial by jury in any action, proceeding, or claim pertaining to this Note. In connection with any claim, action, or proceeding that is against a party hereto and pertains to this Note (including any document or agreement executed in connection herewith), the substantially prevailing party therein shall be entitled to receive, and shall be awarded, all its court costs, collection costs, and reasonable attorneys' fees. Notwithstanding anything in this Note to the contrary, the parties agree that any Event of Default will result in irreparable harm to the injured party. In case any Event of Default occurs and is not waived, the injured Party will be entitled to the issuance of an injunction, restraining order, or other equitable relief in its favor as a result of the breach, and the breaching party will be deemed to have consented to the granting of an application for the same without any prior notice to the breaching party and without the injured party being required to furnish a bond or other undertaking in connection with the application. Upon an Event of Default by Borrower, Borrower further waives and is estopped from asserting any defense to expedited or pre-judgment relief by Lender and waives any defense or protection mechanism that may be available to Borrower, in each case excluding the defense of full performance.

11.5.   CLAIMS UNDER SEAL. Any claim, whether made in arbitration or a court of competent jurisdiction, shall be filed under seal.

11.6.   TIME OF ESSENCE. Time is of the essence in this Note.

11.7.   SEVERABLE PROVISIONS. Every provision of this Note is intended to be severable. If any term or provision hereof is declared by a court of competent jurisdiction to be illegal, invalid, or unenforceable for any reason whatsoever, such illegality, invalidity or unenforceability shall not affect the balance of the terms and provisions hereof, which shall remain binding and enforceable.

11.8.   INTERPRETATION. Unless specifically written to the contrary, (i) all instances of "including" and other derivations of "include" in this Note shall mean "including, without limitation," and (ii) all instances of "any" shall mean "any and all." Section headings shall be for convenience and reference only—not interpretation.

11.9.   NO ORAL MODIFICATION: INTEGRATION. This Note and any other Loan Document may be amended or revised only by a written instrument that is signed by Borrower and Lender. This Note, together with any other Loan Documents, (i) supersedes any prior commitments, agreements, representations, and understandings (whether oral or written) between Borrower and Lender regarding the subject matter hereof and thereof, and (ii) may not be contradicted or varied by evidence of prior, contemporaneous, or subsequent oral agreements or discussions between Borrower and Lender. Each of Borrower and Lender acknowledges and agrees that there are no oral agreements between Borrower and Lender.

11.10.  EXECUTION AND STORAGE.

11.10.1. This Note may be executed in counterpart signature pages. Electronic and other non-original signatures on this Note shall be permitted, shall be deemed to be original signatures, and shall be as effective as originals for all purposes. Without limiting the foregoing, this Note may be executed, accepted, and/or agreed to through the use of an electronic signature in accordance with the Electronic Signatures in Global and National Commerce Act, Title 15, United States Code, §§7001 et seq., the Uniform

Electronic Transaction Act, and any applicable state law. Any Note that is executed, accepted, and/or agreed to in conformity with such laws shall be binding on the parties hereto as though such Note had been physically executed using so-called "wet ink" signatures.

11.10.2. A copy of this Note may be stored by each party using any electronic or digital storage method or process, and each party may destroy any original Note so stored. All parties hereto agree and stipulate that any reproduction of this Note that has been electronically or digitally stored shall be admissible in evidence as the original itself in any judicial, arbitration, or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made by each party in the regular course of business), and that any further reproduction of such reproduction shall likewise be admissible in evidence.

IN WITNESS WHEREOF, Borrower has executed this Note as of the Effective Date.

**BORROWER**

**ASSET HOLDER, LLC**, an Oklahoma limited liability company

By: _____
Name: Marc Kulick
Title: Manager

STATE OF OKLAHOMA    )
                     )
COUNTY OF TULSA      )

This instrument was acknowledged before me on February 18ᵗʰ 2025 by Marc Kulick, as the Manager of Asset Holder, LLC, an Oklahoma limited liability company.

CHANDLER RAE PHILLIPS
Notary Public, State of Oklahoma
Commission # 21013210
My Commission Expires 10-07-2025

_____
(Signature of notarial officer)

My Commission Expires: 10/07/2025

Commission No.: 21013210

(STAMP SEAL ABOVE)

## COLLATERAL PLEDGE AND SECURITY AGREEMENT

This Collateral Pledge and Security Agreement (this "**Agreement**") is made as of February 18, 2025 by and among **YSA INVESTMENTS 1 LLC**, a Delaware limited liability company ("**Lender**"), **ASSET HOLDER, LLC**, an Oklahoma limited liability company ("**Borrower**"), and **VESTA HOLDINGS, LLC**, an Oklahoma limited liability company ("**Pledgor**").

## RECITALS

A.   Concurrently herewith, Lender is making a loan (the "**Loan**") to Borrower. The Loan is evidenced by documents that include a Promissory Note of even date herewith by Borrower in favor of Lender (as same may be amended, renewed, extended, substituted for, amended and restated, or otherwise modified from time to time, the "**Note**"). Any defined term that is used herein and not defined herein shall have its meaning in the Note.

B.   Borrower holds the rights, title, and interests (collectively, the "**Unencumbered Interests**") in and to each of the following entities (each, a "**Borrower Entity**"): (1) a membership interest in Capitol on 28th Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000); (2) a membership interest in Remington Ranch Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000); (3) a membership interest in Copperfield Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000); (4) a membership interest in Putnam Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000).

C.   Pledgor holds the following rights, title, and interests (collectively, the "**Encumbered Interests**") in and to each of the following entities (each, a "**Pledgor Entity**"): (1) a membership interest in WoodScape Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000); (2) a membership interest in Barcelona Best Living, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Three Hundred Thousand Dollars ($300,000); (3) a membership interest in Riverpark Best Living Investors, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Eighty-Nine Thousand Three Hundred Dollars ($189,300); (4) a membership interest in Montgomery Vesta Investors, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (5) a membership interest in Fairfax Holding Company, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (6) a membership interest in OKC3 Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (7) a membership interest in Eton Investor, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (8) a membership interest in Eaton Place Investor, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (9) a membership interest in W.O. Holding Co., LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Thousand Dollars ($100,000); (10) a membership interest in Regency Holdings, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Thousand Dollars ($100,000); (11) a membership interest in Woodland Manor Holdings, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Thousand Dollars ($100,000); (12) a membership interest in 727-Classen Best Living Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Fifty Thousand Dollars ($50,000); and (13) a membership interest in Muntage Vesta Investors, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of Forty-Nine Thousand Two Hundred Seventy-Five Dollars ($49,275).

D.   Together, the Unencumbered Interests and Encumbered Interests comprise the "**Interests**".

I. Together, the Borrower Entities and Pledgor Entities comprise the "**Entities**".

J. In connection with the Loan, Pledgor and Borrower have agreed to pledge the Interest to Lender on the terms and conditions herein.

### AGREEMENTS

NOW, THEREFORE, for and in consideration of the direct benefits to be realized by Borrower (which will indirectly benefit Pledgor) from the Loan, the mutual covenants hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower, Pledgor, and Lender hereby agree as written below.

1. **PLEDGE.**

   1.1 **SECURITY INTEREST.**

   (a) Borrower and Pledgor pledge, grant, and assign to Lender a security interest in and lien upon the Collateral (defined below) to secure the payment and the performance of the Obligations (defined below). "**Collateral**" shall mean the Interest and any and all other interests in any Entity that are now owned or hereafter acquired by Borrower or Pledgor, as applicable, in or to any Entity, together with (i) all additional membership interests or other equity interests in any Entity now or hereafter acquired by Borrower or Pledgor, as applicable, and (1) all options, warrants, and other rights now or hereafter acquired by Borrower or Pledgor, as applicable, in respect of such membership interests or other equity interests in any Entity (whether in connection with any capital increase, recapitalization, reclassification, or reorganization of such Entity or otherwise), and (2) all other property, rights or instruments of any description at any time issued or issuable as an addition to or in substitution for such membership interests or other equity interests in any Entity; (ii) any certificates, instruments, or other writings representing or evidencing membership interests or other ownership interests in any Entity now or hereafter acquired by Borrower or Pledgor, as applicable, and all accounts and general intangibles arising out of, or in connection with, the membership interests in any Entity now or hereafter acquired by Borrower or Pledgor, as applicable; (iii) any and all monies or property due and to become due to Borrower or Pledgor, as applicable, now or in the future in respect of its membership interests or other ownership interests in any Entity, or to which Borrower or Pledgor, as applicable, may now or in the future be entitled in its capacity as a member or other equity holder of any Entity, whether by way of a dividend, distribution, return of capital or otherwise; (iv) all other claims that Borrower or Pledgor, as applicable, now has or may in the future acquire in its capacity as a member, partner, shareholder, or other equity holder of any Entity against such Entity and its property; and (v) all rights of Borrower or Pledgor, as applicable, under any Entity's organizational documents (and all other agreements, if any, to which Borrower is a party from time to time which relate to its ownership of the membership interests or other ownership interests in any Entity), including all voting and consent rights of Borrower or Pledgor, as applicable, arising thereunder or otherwise in connection with Borrower's or Pledgor's, as applicable, ownership of the membership interests or other equity interests in any Entity (provided, however, that any time an Event of Default (defined below) does not exist, Borrower or Pledgor, as applicable, may exercise all rights of Borrower or Pledgor, as applicable, under each Entity's organizational documents, including all voting rights). With respect to the Unencumbered Interests comprising the Collateral, the same may be referred to hereafter as the "**Unencumbered Collateral**". With respect to the Encumbered Interests comprising the Collateral, the same may be referred to hereafter as the "**Pledgor Collateral**".

   (b) For clarity, it is acknowledged and agreed that the Collateral does not include a personal

residence.

1.2   ATTACHMENT. The foregoing security interest shall attach automatically to any interests in any Entity that Borrower or Pledgor, as applicable, may at any time in the future acquire without any further action by Borrower or Lender; provided, however, that as a condition to Lender's consent to any such transfer, Lender may require Borrower to execute a modification to this Agreement or a supplementary collateral pledge and security agreement.

1.3   UNENCUMBERED COLLATERAL. The Unencumbered Collateral is and will remain unencumbered by any debt or other payment obligation. The Parties further agree that in its sole discretion, Lender may at any time file a financing statement against the Unencumbered Collateral in the form of a UCC-1 or UCC-3, as applicable, filed pursuant to the Uniform Commercial Code, but Lender's failure to do so shall not impair the validity or enforceability of this Agreement.

2.   OBLIGATIONS.

2.1   SECURITY. The following obligations (the "**Obligations**") are secured by this Agreement: (i) all payment and performance duties, liabilities, and obligations of Borrower under the Note; and (ii) all reasonable costs incurred by Lender to obtain, preserve, perfect, and enforce this Agreement and security interest, collect the Obligations, and maintain, preserve, collect, and enforce the Collateral, including taxes, assessments, insurance premiums, attorneys' fees and legal expenses, and expenses of sale.

2.2   DIRECT. The obligations of Borrower and Pledgor under this Agreement shall be direct and immediate and not conditional or contingent upon the pursuit of any remedies against any other person or entity (including the other entities that comprise Borrower or Pledgor, as applicable) nor against the security or liens or encumbrances available to Lender. Borrower and Pledgor waive any right to require that an action be brought against any other person or entity or to require that resort be had to any security or to any balance of any account or credit on the books of Lender in favor of any other person or entity prior to any exercise of rights or remedies hereunder. No renewal or extension of or any other indulgence with respect to the Obligations or any part thereof, no release of any security, no release of any person (including any maker, endorser, guarantor or surety) liable on the Obligations, no delay in enforcement of payment, and no delay or omission or lack of diligence or care in exercising any right or power with respect to the Obligations or any security therefor or guaranty thereof or under this Agreement shall in any manner impair or affect the rights of Lender under this Agreement, applicable law, or any other agreement pertaining to security for the Obligations. Borrower and Pledgor (i) waive any right to the benefit of, or to require or control application of, any other security or proceeds thereof, and (ii) agree that Lender shall have no duty or obligation to Borrower or Pledgor to apply to the Obligations any such other security or proceeds thereof.



3.   REPRESENTATIONS AND WARRANTIES. Borrower and Pledgor represent and warrant as follows:

3.1   FINANCING STATEMENTS. No financing statement covering the Unencumbered Collateral is or will be on file in any public office except a financing statement filed by Lender pursuant to this Agreement.

3.2   OWNERSHIP. Borrower owns the Unencumbered Collateral absolutely and free of any setoff, claim, restriction, lien, security interest, or encumbrance. Borrower has the unencumbered and unrestricted right to pledge the Unencumbered Collateral. No consent or approval of any governmental authority or other person that has not been obtained was or is necessary to the validity of this pledge or the enforcement of Lender's rights and remedies hereunder.

3.3   POWER AND AUTHORITY. Borrower and Pledgor have the full power and authority to make and deliver this Agreement. This Agreement constitutes the valid and legally binding obligation of

Borrower and Pledgor, and is enforceable in accordance with its terms.

3.4 MEMBERSHIP INTERESTS. The Collateral constitutes "general intangibles," as defined in the Uniform Commercial Code as in effect in the State of Delaware (the "**UCC**"), and this Agreement constitutes a security agreement under the UCC.

3.5 LITIGATION. As of the date hereof, there are no Material Actions, as defined below, against Borrower, Pledgor, or Guarantor, or any entity (i) directly or indirectly controlled or managed by Guarantor or (ii) directly or indirectly owned by Guarantor in whole or in part with respect to which Guarantor receives notices in the ordinary course of business (each of (i) and (ii), a "**Guarantor Entity**"), in each except as follows: (1) Case No. 22-cv-00392-JFH-CDL in the United States District Court for the Northern District of Oklahoma; and (2) Case No. CJ-2024-35 in the District Court of Adair County, Oklahoma. This statement is being made by Pledgor under the penalty of perjury. For purposes of this Section, "**Material Action**" means any pending litigation against Borrower, Pledgor, Guarantor, or any Guarantor Entity that (x) is not a landlord-tenant dispute and (y) if such lawsuit were adversely adjudicated against such entity or person, such entity or person would have liability that exceeds $150,000.

3.6 CURRENT DEFAULT. As of the date hereof, neither Borrower, Pledgor, Guarantor, nor any Guarantor Entity (x) is to Pledgor's knowledge in material breach or default of, or (y) has been notified in writing of any material breach or default, in each case under any loan agreement taken by Borrower, Pledgor, Guarantor, or such entity (each, an "**Other Loan Default**").

3.7 Due Diligence Materials. The .xlsx file titled "Vesta Master Spreadsheet -02022025" which Borrower emailed to Lender on February 2, 2025 together with the other materials provided by Borrower to Lender via a dropbox hyperlink¹ delivered on February 14, 2025, including five "zip files" - file names "KBST&M Returns"; "Mortgage stmts"; "Neuman, Pollak"; "PWC TR"; and "Siples" – and a .xlsx file titled "T12 – Income Statement – Consolidated", which have an aggregate file size of approximately 79.58 Megabytes are true and correct as of this date, and there have been no material changes since the date that they were provided to Lender. which have an aggregate file size of approximately 79.58 Megabytes, and include but are not limited to 2023 tax returns, certain mortgage agreements and current loan balances, summary sheets, and TLO reports related to certain Collateral pledged in the Agreement are true and correct as of this date, and there have been no Material Changes since the date that they were provided to Lender. In the event of a change to Guarantor, Borrower, Pledgor, any Guarantor Entity or any asset owned by, or any liability of, any Guarantor Entity, that would have a material adverse effect on Guarantor, Borrower, Pledgor, any Guarantor Entity (a "**Material Change**"), Borrower shall provide Lender with written notice of the same, and such Material Change shall be deemed a default of this Agreement.

4. COVENANTS. Borrower and Pledgor shall promptly perform all of its covenants in this Agreement, including the covenants in this section.

4.1 OWNERSHIP OF UNENCUMBERED COLLATERAL. Borrower shall not further transfer, sell, pledge, assign, or encumber any of the Unencumbered Collateral. Borrower shall keep the Unencumbered Collateral free from any liens, claims, encumbrances, or security interests except the security interest created hereby and shall preserve the priority of all security interests in the Unencumbered Collateral in favor of Lender. Lender shall have no duty to preserve such security but may do so at the expense of Borrower without waiving any default hereunder.

---

¹ Accessible as of February 18, 2025 via the following hyperlink: https://www.dropbox.com/scl/fo/0nvozc8k07witgga8z5ed/ADakWoyvFtgP9emDas7rvBQ?rlkey=gc5mto1sbrm cfbwtimwmbc0qg&e=1&st=j01p1kik&dl=0)

4.2 COSTS. Borrower and Pledgor shall pay all costs that are reasonably necessary to obtain, preserve, perfect, defend, and enforce the security interests created by this Agreement, and to preserve, defend, enforce, and collect the Collateral.

4.3 DEBT OBLIGATIONS. So long as the Payoff Amount remains outstanding, Borrower and Pledgor shall alert Lender of any debt in excess of $50,000 that is taken by Borrower, Guarantor, or any entity directly or indirectly controlled by Guarantor and provide a summary of the same, including the name of the party owed, the amount, and a summary of the purpose or cause of the debt. This Section shall not apply to any future loan arising from the Right of First Offer (as defined in the Guaranty).

4.4 OTHER LOAN DEFAULT AND MATERIAL ACTIONS. So long as the Payoff Amount remains outstanding, Borrower and Pledgor shall notify Lender within two (2) business days after (i) an Other Loan Default occurs or (ii) receiving notice of a Material Action, which notice shall be delivered to:

> YSA Investments 1, LLC
> C/O Capital Fund Law Group, P.C.
> Attn: Christopher Rogers
> 405 Lexington Ave, 26th Floor
> New York, New York 10174
> email: crogers@capitalfundlaw.com

This notice will include a summary of the default and, with respect to any action, the summary shall include the court in which it is filed, the plaintiff(s) and defendant(s), case number, and summary of the claims being brought. A copy of any notice pursuant to this section shall also be delivered to Lender.

4.5 RIGHT OF LENDER TO NOTIFY OTHERS. While an Event of Default exists, Lender may (i) notify persons obligated on any Collateral to make payments directly to Lender, (ii) take control of all proceeds of any Collateral (subject to any other secured lenders' interests in the Pledgor Collateral), and (iii) take any other steps that Lender deems necessary with respect to the Collateral that are permissible in accordance with applicable law. Until Lender elects to exercise such rights, Borrower and Pledgor, as trustees for the benefit of Lender, shall collect and enforce all payments owed on the Collateral pledged by Borrower and Pledgor.

4.6 POWER OF ATTORNEY. Borrower and Pledgor each appoint Lender as its/his/her/their attorney-in-fact with full power in Borrower's and Pledgor's name and behalf to do every act that Borrower and Pledgor are obligated to do or may be required to do hereunder or to do all other things which Lender is permitted to do under this Agreement or any other Loan Documents or are necessary to carry out this Agreement or the other Loan Documents; however, nothing in this section shall be construed to obligate Lender to take any action hereunder. Through exercise of this irrevocable power of attorney, Lender may take whatever steps that it deems necessary in its sole discretion to secure and protect its interests, including but not limited to filing any action and doing whatever else is necessary to protect its interests, enforce its rights, and collect all amounts due to Lender. This shall include but not be limited to taking any action against any of the Collateral or any real or personal property owned by the Collateral. The power of attorney hereby created is a power coupled with an interest, and shall be irrevocable. Neither Lender nor any of its officers, managers, employees or agents of Lender will be liable for any acts of commission or omission nor for any error in judgment or mistake of fact or law unless the same shall have resulted from gross negligence or willful misconduct. Notwithstanding anything to the contrary above, Lender shall not exercise the foregoing power of attorney unless an Event of Default exists and only as long as an Event of Default exists.

4.7 NO WAIVER BY LENDER. No renewal or extension of or any other indulgence with respect to the

Obligations or any part thereof, no release of any security, no release of any person (including any maker, endorser, guarantor or surety) liable on the Obligations, no delay in enforcement of payment, and no delay or omission or lack of diligence or care in exercising any right or power with respect to the Obligations or any security therefor or guaranty thereof or under this Agreement shall in any manner impair or affect the rights of Lender under the law, hereunder or under any other agreement pertaining to security for the Obligations. Borrower and Pledgor waive any right to the benefit of or to require or control application of any other security or proceeds thereof and agree that Lender shall have no duty or obligation to Borrower or Pledgor to apply to the Obligations any such other security or proceeds thereof.

4.8 INDEMNIFICATION. In addition to any other indemnifications expressly provided for herein, Borrower will save, indemnify, and hold Lender harmless from and against all actual expenses, losses, or damages suffered by reason of any (a) wrongful interference (i.e., interference in bad faith) by Borrower with the exercise of any rights or remedies by Lender under this Agreement, or (b) Event of Default. The foregoing obligation of Borrower and Pledgor to indemnify Lender shall not extend to any suit, proceeding, or action arising out of the gross negligence or willful misconduct of Lender.

4.9 TRAILING REPORTS. By or before February 28, 2025, Borrower shall provide Lender with individual and consolidated trailing three-month reports ("T3 Reports") of all entities owned and/or controlled by Guarantor, Pledgor, and/or Borrower which shall report an aggregate net operating income of no less than $5,300,000 in accordance with accrual accounting principles. Deviation between the consolidated and individual T3 Reports shall not exceed 1/10th of a percent.

4.10 DOMO REPORTING ACCESS. By or before February 20, 2025, Borrower and Pledgor shall provide Lender with a link to Borrower's financial reporting generated via its "DOMO" software subscription. This link will provide Lender with monthly annualized, three-month annualized, and twelve-month annualized reporting of all entities owned and/or controlled by Guarantor, Borrower, and Pledgor (directly or indirectly) and shall be refreshed no less frequently than once every business day. Lender may request that Borrower provide additional information and data related to the same, and Borrower shall make a good faith effort to provide such information and data to Lender.

5. DEFAULT.

5.1 EVENTS OF DEFAULT. Each of the following shall be an "**Event of Default**" by Borrower and Pledgor hereunder:

(a) a levy on, seizure, or attachment of the Collateral by any third party, and same is not fully removed within thirty (30) days thereafter;

(b) a failure to pay any amount that becomes due under this Agreement, and neither Borrower nor Pledgor cures such failure within ten (10) days thereafter;

(c) a default in the performance or observance of any other term or condition in this Agreement, and neither Borrower nor Pledgor cures such default within ten (10) days after Lender notifies Borrower thereof;

(d) a breach of any warranty or representation under this Agreement, and neither Borrower nor Pledgor cures such breach within ten (10) days after Lender notifies Borrower thereof (provided, however, that no cure period shall apply if the cause of such breach is fraud in the inducement);

(e) Borrower or Pledgor makes a general assignment for the benefit of its creditors, or Borrower or Pledgor consents to an application for the appointment of a trustee, receiver,

or other custodian for Borrower or Pledgor, as applicable, or the institution of any proceeding by Borrower or Pledgor, as applicable, under any federal or state laws providing for the relief of debtors or otherwise alleging that Borrower or Pledgor, as applicable, is insolvent, bankrupt, or unable to pay its debts generally as they become due, and same is not dismissed within ninety (90) days of filing; or

(f) an Event of Default occurs under the Note or any other Loan Document.

5.2 REMEDIES UPON DEFAULT. While an Event of Default exists, Lender may, without notice or demand to Borrower or Pledgor, enforce payment of the Obligations then due (whether due by acceleration in whole or part or otherwise), and may exercise any rights under the UCC, rights and remedies of Lender under this Agreement, or otherwise, including but not limited to taking any action against the Collateral or any of the Collateral's real or personal property. Upon any Event of Default, Lender shall further be entitled to its attorney's fees, costs, and any other damages that may be available to it. Without limiting the foregoing, (i) Lender may file a financing statement against Borrower to perfect Lender's lien on the Collateral, and (ii) Lender may conduct a private sale as written below.

(a) Borrower and Pledgor recognize that Lender may be unable to effect a public sale of any or all of the Collateral, by reason of certain prohibitions contained in the Securities Act of 1933, as amended (the "**Securities Act**"), and applicable state securities laws or otherwise, and may be compelled to resort to one or more private sales thereof to a restricted group of purchasers who will be obliged to agree, among other things, to acquire such securities for their own account for investment and not with a view to the distribution or resale thereof. Borrower and Pledgor (i) acknowledge and agree that any such private sale may result in prices and other terms less favorable to Lender than if such sale were a public sale, and (ii) notwithstanding such circumstances, agrees that any such private sale shall not be deemed to have been made in a commercially unreasonable manner solely by virtue of being a private sale. Lender shall be under no obligation to delay a sale of any of the Collateral for the period of time necessary to permit any Entity, Borrower, or Pledgor to register such securities for public sale under the Securities Act, or under applicable state securities laws, even if such Entity, Pledgor, or Borrower would agree to do so.

(b) Further, Borrower and Pledgor shall use commercially reasonable efforts to do or cause to be done all such other acts as may be reasonably necessary to make any sale or sales of all or any portion of the Collateral pursuant to this section valid and binding and in compliance with any and all other requirements of applicable law. Borrower and Pledgor further agree that a breach of any of the covenants contained in this section will cause irreparable injury to Lender, that Lender has no adequate remedy at law in respect of such breach, and, as a consequence, that each and every covenant contained in this section shall be specifically enforceable against Borrower and Pledgor; and Borrower and Pledgor hereby waive and agree not to assert any defenses against an action for specific performance of such covenants except for a defense that no Event of Default has occurred, or any defense relating to Lender's willful misconduct or gross negligence.

(c) Lender shall not incur any liability as a result of the sale of any Collateral, or any part thereof, at any private sale conducted in a commercially reasonable manner, it being agreed that some or all of the Collateral is or may be of one or more types that threaten to decline speedily in value and that are not customarily sold in a recognized market. Borrower and Pledgor hereby waive any claims against Lender arising by reason of the fact that the price at which any of the Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale or was less than the aggregate amount of the Obligations, provided that Lender has acted in a commercially reasonable manner in conducting such private sale.

(d)     It is acknowledged that the UCC states that a lender is able to purchase collateral only if it is sold at a public sale. Lender has advised Borrower and Pledgor that Securities and Exchange Commission ("SEC") staff personnel have issued various No-Action Letters describing procedures that, in the view of the SEC staff, permit a foreclosure sale of securities to occur in a manner that is public for purposes of Article 9 of the UCC, yet not public for purposes of §4(2) of the Securities Act. It is also acknowledged that the UCC permits Borrower and Pledgor to agree on the standards for determining whether a lender has complied with its obligations under Article 9 of the UCC. Pursuant to the UCC, Borrower and Pledgor specifically agree that (x) they shall not raise any objection to Lender's purchase of the Collateral (through bidding on the obligations or other commercially reasonable means), and (y) a sale conducted in conformity with the principles set forth in the No-Action Letters (i) shall be considered to be a "public" sale for purposes of the UCC, (ii) will be considered commercially reasonable notwithstanding that Lender has not registered or sought to register the Collateral under the Securities Laws, even if Borrower, Pledgor, or any Entity agrees to pay all costs of the registration process, and (iii) shall not be considered to be commercially unreasonable solely because Lender purchases the Collateral at such a sale.

(e)     Borrower and Pledgor agree that Lender shall not have any general duty or obligation to make any effort to obtain or pay any particular price for any Collateral sold by Lender pursuant to this Agreement. Lender, in its sole discretion, may decide to approach or not to approach any potential purchasers provided that the method of sale is commercially reasonable. Without in any way limiting Lender's right to conduct a sale in any manner that is considered commercially reasonable, Borrower and Pledgor hereby agree that any sale conducted in accordance with the following provisions shall be considered a commercially reasonable sale and hereby irrevocably waives any right to contest any such sale:

    (i)     Lender conducts the sale in the State of Delaware;

    (ii)    the sale is conducted in accordance with the laws of the State of Delaware;

    (iii)   at least ten (10) days in advance of the sale, Lender notifies Borrower or Pledgor, as applicable, of the time and place of the sale;

    (iv)    the sale is conducted by an auctioneer licensed in the State of Delaware on any Business Day between the hours of 9:00 a.m. and 5:00 p.m. Eastern Time;

    (v)     the notice of the date, time and location of the sale is published in the auction section of the Sunday edition of a local newspaper at least five (5) days prior to the date of the sale; and

    (vi)    Lender sends notification of the sale to all secured parties identified as a result of a search of the UCC financings statements in the filing offices located in the state(s) of residence of Borrower(s) or Pledgor(s), as applicable, conducted not later than twenty (20) days and not earlier than thirty (30) days before such notification date.

(f)     Upon a sale of the Collateral, Borrower and Pledgor hereby give their consent to the admission of the purchaser of the Collateral as a member of the applicable Entity, notwithstanding any provision of the operating agreement of such Entity to the contrary. Such consent shall be irrevocable as long as any Obligation remains unpaid.

6.      **LIMITATION AS TO PLEDGOR.**

6.1 OTHER INTERESTS. Lender acknowledges and agrees to the following matters: (i) security interests exist on the Encumbered Interests as of the date hereof; and Pledgor may grant additional security interests from time to time on the Encumbered Interests (collectively, "**Other Interests**"); (ii) Pledgor and the Encumbered Interests have entered into this Agreement merely as an accommodation to Lender; and (iii) Lender may be unable to foreclose on, sell, or otherwise exercise its remedies in this Agreement with respect to the Encumbered Interests.

6.2 LIMITATION. Accordingly, and notwithstanding anything to the contrary in this Agreement, at law, in equity, or otherwise, (i) any security interest in the Encumbered Interests that Lender has under this Agreement shall be subordinate to each Other Interest, whether any such Other Interest (a) was created before the date hereof or (b) is created after the date hereof, (ii) the existence or creation of any Other Interest from time to time shall not be a breach of this Agreement, and (iii) any inability of Lender to foreclose on, sell, or otherwise exercise its remedies in this Agreement with respect to the Encumbered Interests shall not constitute a breach of this Agreement.

7. MISCELLANY.

7.1 CONFIDENTIALITY. Each party hereto shall keep confidential the existence of the Loan and the terms of this Agreement and the other Loan Documents, except in each case to the extent that disclosing such information may be (a) required by law or other governmental requirement or (b) reasonably required in connection with entering into or enforcing the Loan, including disclosures to a party's owners (whether direct or indirect), service professionals (including lawyers, accountants, advisors, and consultants), and lenders.

7.2 PARTIES BOUND. Lender's rights and interests hereunder shall inure to the benefit of its successors and assignees (and any subsequent successor or assignee). In the event of any assignment or transfer of any of the Obligations or the Collateral, the assignor or transferor, as applicable, shall be fully discharged from any responsibility with respect to the Collateral so assigned or transferred, but the assignor or transferor, as applicable, shall retain all rights and powers hereby given with respect to any of the Obligations or Collateral not so assigned or transferred. All representations, warranties, and agreements of Borrower and Pledgor shall be joint and several and shall be binding upon their successors and assignees. Time is of the essence of this Agreement.

7.3 WAIVER. No delay of Lender in exercising any power or right shall operate as a waiver or modification thereof, nor shall any single or partial exercise of any power or right preclude other or further exercise thereof or the exercise of any other power or right. No waiver by Lender of any right hereunder or of any default by Borrower or Pledgor shall be binding upon Lender unless in writing, and no failure by Lender to exercise any power or right hereunder or waiver of any default by Borrower or Pledgor shall operate as a waiver of any other or further exercise of such right or power or of any further default.

7.4 TERMINATION OF SECURITY INTEREST. Upon the full and indefeasible payment of all of the Obligations, Lender shall release the security interests granted herein.

7.5 CHOICE OF LAW; VENUE. This Agreement shall in all respects be governed by and enforced in accordance with the laws of the State of Delaware. Each party hereto waives trial by jury in any action, proceeding, or claim pertaining to this Agreement. Any chancery court in Delaware shall have exclusive jurisdiction to hear and determine any and all claims, actions, and proceedings brought by Borrower or Pledgor and pertaining to or arising from this Agreement, the Loan Documents, their negotiation, execution, or performance, or the transactions described herein; provided, however, that if such claim, action, or proceeding cannot be brought in a chancery court in Delaware, the state and federal courts of Delaware shall have exclusive jurisdiction with respect to such claim, action, or proceeding. Lender may bring any and all claims, actions, and proceedings pertaining to or arising from this Agreement, the Loan Documents, their negotiation,

execution, or performance, or the transactions described herein in any court of competent jurisdiction. In connection with any claim, action, or proceeding that is against a party hereto and pertains to this Agreement (including any document or agreement executed in connection herewith), the substantially prevailing party therein shall be entitled to receive, and shall be awarded, all its court costs, collection costs, and reasonable attorneys' fees. Notwithstanding anything in this Agreement to the contrary, the Parties agree that any Event of Default will result in irreparable harm to the injured Party. In case any Event of Default occurs and is not waived, the injured Party will be entitled to the issuance of an injunction, restraining order, or other equitable relief in its favor as a result of the breach, and the breaching Party will be deemed to have consented to the granting of an application for the same without any prior notice to the breaching Party and without the injured Party being required to furnish a bond or other undertaking in connection with the application. Upon an Event of Default, Borrower and Pledgor further waive and are estopped from asserting any defense to expedited or pre-judgment relief by Lender and waives any defense or protection mechanism that may be available to Borrower or Pledgor, in each case excluding the defense of full performance.

7.6     CLAIMS UNDER SEAL.   Any claim, whether made in arbitration or a court of competent jurisdiction, shall be filed under seal.

7.7     DEFAULT BY LENDER.  Lender shall not be liable for any action or inaction arising out of this Agreement and the other Loan Documents except for (a) Lender's failure to pay to Borrower the Principal Amount minus the Origination Fee, as defined in the Note, and/or (b) Lender's gross negligence or willful misconduct.

7.8     ADDITIONAL  WAIVERS.    BORROWER  AND  PLEDGOR  EXPRESSLY  AND UNCONDITIONALLY WAIVE, IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING BROUGHT BY LENDER ON THIS AGREEMENT, ANY AND EVERY RIGHT HE, SHE, IT OR THEY MAY HAVE TO (i) INTERPOSE ANY COUNTERCLAIM THEREIN  UNLESS  UNDER  THE  APPLICABLE  RULES  OF  COURT  SUCH COUNTERCLAIM MUST BE ASSERTED IN SUCH PROCEEDING, OR (ii) HAVE THE SAME CONSOLIDATED WITH ANY OTHER OR SEPARATE SUIT, ACTION OR PROCEEDING UNLESS UNDER THE APPLICABLE RULES OF COURT SUCH SUIT, ACTION OR PROCEEDING MUST BE CONSOLIDATED WITH THE PROCEEDING BROUGHT BY LENDER.

7.9     MODIFICATIONS.  No provision hereof shall be modified or limited except by a written agreement expressly referring hereto and to the provisions so modified or limited and signed by Borrower, Pledgor, and Lender.  No modification or limitation may be accomplished by course of conduct, usage of trade, or by the law merchant.

7.10    SEVERABILITY.   In the event any provision (or any part of any provision) contained in this Agreement shall for any reason be finally held by a court of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision (or remaining part of the affected provision, or application of the provision to other circumstances) but this Agreement shall be construed as if such invalid, illegal or unenforceable provision (or part thereof) had never been contained herein, but only to the extent it is invalid, illegal or unenforceable.

7.11    FURTHER ASSURANCES.  Borrower and Pledgor shall execute and deliver, or cause to be executed and delivered, such further assurances, including financing statements, as Lender from time to time may reasonably request, to accomplish the provisions of, and carry out the intent of, this Agreement.

7.12    LIMITATIONS OF LAW.  If any law prohibits or limits any charge or expense provided for in this Agreement in connection with any Obligations secured hereby, then such charge or expense will

not be made or incurred in connection with such Obligations beyond the limits permitted by such law.

7.13    NOTICES. Any notice, request, demand, approval, consent, and other communication that pertains to this Agreement shall be delivered in accordance with the Note.

7.14    INTERPRETATION. Whenever the context of any provisions hereof shall require it, words in the singular shall include the plural, words in the plural shall include the singular, and pronouns of any gender shall include the other gender. Captions and headings in this Agreement are for convenience only and shall not affect the construction of the Agreement. All references in this Agreement to Schedules, articles, sections, subsections, paragraphs, and subparagraphs refer to the respective subdivisions of this Agreement, unless such reference specifically identifies another document. The terms "herein," "hereof," "hereto," "hereunder" and similar terms refer to this Agreement and not to any particular section or subsection of this Agreement. The terms "include" and "including" shall be interpreted as if followed by the words "without limitation." All references in this Agreement to sums denominated in dollars or with the symbol "$" refer to the lawful currency of the United States of America unless such reference specifically identifies another currency. For purposes of this Agreement, "person" or "persons" shall include firms, associations, partnerships (including limited partnerships), joint ventures, trusts, corporations, limited liability companies, and other legal entities, including governmental bodies, agencies, or instrumentalities, as well as natural persons. Provisions of this Agreement, unless by their terms exclusive, shall be in addition to other agreements between the parties. Unless the context indicates otherwise, definitions in the UCC apply to words and phrases in this Agreement; if UCC definitions conflict, then Chapter 9 definitions shall apply.

7.15    EXECUTION AND STORAGE.

(a)    This Agreement may be executed in counterpart signature pages. Electronic and other non-original signatures on this Agreement shall be permitted, shall be deemed to be original signatures, and shall be as effective as originals for all purposes. Without limiting the foregoing, this Agreement may be executed, accepted, and/or agreed to through the use of an electronic signature in accordance with the Electronic Signatures in Global and National Commerce Act, Title 15, United States Code, §§7001 et seq., the Uniform Electronic Transaction Act, and any applicable state law. Any Agreement that is executed, accepted, and/or agreed to in conformity with such laws shall be binding on the parties hereto as though such Agreement had been physically executed using so-called "wet ink" signatures.

(b)    A copy of this Agreement may be stored by each party using any electronic or digital storage method or process, and each party may destroy any original Agreement so stored. All parties hereto agree and stipulate that any reproduction of this Agreement that has been electronically or digitally stored shall be admissible in evidence as the original itself in any judicial, arbitration, or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made by each party in the regular course of business), and that any further reproduction of such reproduction shall likewise be admissible in evidence.

[signature pages follow]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the first date written above.

**BORROWER**

ASSET HOLDER, LLC, an Oklahoma limited liability company

By: _____
Name: Marc Kulick
Title: Manager

**PLEDGOR**

VESTA HOLDINGS LLC, an Oklahoma limited liability company

By: _____
Name: Marc Kulick
Title: Manager

STATE OF OKLAHOMA  )
                   )
COUNTY OF TULSA    )

This instrument was acknowledged before me on February 18th, 2025 by Marc Kulick, as the Manager of each of Asset Holder, LLC, an Oklahoma limited liability company, and Vesta Holdings, LLC, an Oklahoma limited liability company.

_____
(Signature of notarial officer)

My Commission Expires: 10/07/2025

Commission No.: 21013210

CHANDLER RAE PHILLIPS
Notary Public, State of Oklahoma
Commission # 21013210
My Commission Expires 10-07-2025

(STAMP SEAL ABOVE)

[signature pages continue]

**LENDER**

YSA INVESTMENTS 1, LLC, a Delaware limited liability company

By: *Robert Miley*

Name:   Robert Miley

Title:   Authorized Representative

## JOINDER OF BORROWER-AFFILIATED ENTITIES

The undersigned, as a manager, member or other authorized person of any and all Guarantor Entities, and any other entities in which the undersigned does now own or control or may herein after own or control during the term of that certain Collateral Pledge and Security Agreement dated February 18, 2025 (the "**Collateral Pledge and Security Agreement**"), hereby agrees to jointly and severally assume all obligations of Pledgor under the Collateral Pledge and Security Agreement for all purposes thereof on the terms set forth therein and to be bound by the terms of the Collateral Pledge and Security Agreement as fully as if the undersigned had personally and individually executed and delivered the Collateral Pledge and Security Agreement as of the date thereof.

By: _____
Name: Marc Kulick
Date:


STATE OF OKLAHOMA    )
                            )
COUNTY OF TULSA       )

This instrument was acknowledged before me on February 18th 2025 by Marc Kulick, as and individual.

_____
(Signature of notarial officer)

My Commission Expires: 10/07/2025

Commission No.: 21013210

CHANDLER RAE PHILLIPS
Notary Public, State of Oklahoma
Commission # 21013210
My Commission Expires 10-07-2025

(STAMP SEAL ABOVE)

## GUARANTY AND ROFO

February 18, 2025

MARC KULICK, an individual ("**Guarantor**") having an address for notices of % Vesta Realty, 6911 S. 66th E. Ave., Suite 100, Tulsa, OK 74133, hereby makes this Guaranty and ROFO (this "**Guaranty**") in favor of YSA INVESTMENTS 1, LLC, a Delaware limited liability company, having an address of 8325 NE 2nd Ave, Miami, FL 33138, Email: robert@vdacquisitions.com ("**Lender**"). Any defined term that is used herein and not defined herein shall have its meaning in the Promissory Note of even date herewith (the "**Note**") between Asset Holder, LLC, an Oklahoma limited liability company (the "**Company**") and Lender.

1.  GUARANTY. Guarantor guarantees, unconditionally and absolutely, to Lender the full and faithful keeping, performance, observance, and payment of all of the Company's obligations, representations, and warranties in the Note and the full and faithful keeping, performance and observance of all of the obligations, representations, and warranties of the Company and Vesta Holdings LLC, an Oklahoma limited liability company ("**Pledgor**"), in the Collateral Pledge and Security Agreement ("**Agreement**") by and between the Company, Pledgor, and Lender (collectively, the "**Obligations**").

2.  CERTAIN WAIVERS AND REQUIREMENTS.

    a.  The obligations of Guarantor hereunder shall not be affected by any of the following: (a) the release or discharge of the Company or Pledgor in any creditors', receivership, bankruptcy, reorganization, insolvency, or other proceedings; (b) the rejection or disaffirmance in any such proceeding of the Note or Agreement or any portion thereof; (c) the impairment or modification of the Note or Agreement or any portion thereof, any remedy for the enforcement thereof, or the estate of the Company or Pledgor in bankruptcy that results from any present or future federal or state bankruptcy law or any other law of any kind or from the decision or order of any court or other governmental authority; (d) any defense of the Company or Pledgor; (e) the cessation of the liability of the Company or Pledgor for any cause whatsoever; or (f) any disability or defense of any kind of Guarantor now existing with respect to any of the Obligations or any provision of this Guaranty.

    b.  Guarantor, with respect to its liabilities and obligations under this Guaranty, hereby waives (i) any requirement of notice of non-payment, non-keeping, non-performance, or non-observance by the Company, (ii) any proof of notice or demand to the Company, and (iii) any right to require that any action be first brought against the Company.

    c.  If this Guaranty is held ineffective or unenforceable by any court of competent jurisdiction, then, at the election of Lender, Guarantor shall be deemed to be part of the "Company" and "Pledgor" under the Note or Agreement (as applicable) with the same force and effect as if Guarantor were expressly named therein with joint and several liability.

    d.  Guarantor hereby agrees that Guarantor may be joined in any action against the Company and/or Pledgor in connection with the Note and/or Agreement, and recovery may be had against Guarantor in such action or in any independent action against Guarantor without Lender first pursuing or exhausting any remedy or claim against the Company or Pledgor. Guarantor also agrees that it will be conclusively bound by the judgment in any such action by Lender against the Company or Pledgor as if Guarantor were a party to such action even though Guarantor is not joined as a party in such action.

    e.  Guarantor's obligations under this Guaranty shall not be terminated or affected in any way or manner whatsoever by (a) Lender's resort, or Lender's omission to resort, to any summary or other proceedings, actions, or remedies for the enforcement of any of Lender's rights under the Note or Agreement, or (b) any extensions of time or indulgences granted by Lender.

    f.  Insofar as the payment by the Company of any sums of money to Lender is involved, this Guaranty is a guaranty of payment and not of collection, and shall remain in full force and

(1)

effect until the Obligations are satisfied.

g.    Guarantor hereby subordinates any claims of Guarantor against the Company or Pledgor of any kind to Guarantor's obligations under this Guaranty and to any other claims of Lender against the Company, the Company's assets, Pledgor, or the Pledgor's assets. Upon any notice by Lender to the Company or Pledgor of any default under the Note or Agreement, Guarantor shall enforce any of their claims as a trustee for Lender, and shall cause any receipts to be paid over to Lender on account of the Note and Agreement without affecting in any manner the liability of Guarantor under this Guaranty (except to the extent of such payment). As long as no such notice of default has been given, Guarantor may apply to its own account any payments made to Guarantor by the Company or Pledgor.

3.    **RIGHT OF FIRST OFFER.**

    a.    **CERTAIN DEFINITIONS.**

        i.    "**Loan**" shall mean between the Funding Date (as defined in the Note) and the Termination Date (defined below), any loan that Guarantor or any entity that Guarantor controls (whether directly or indirectly) desires to obtain for depositing earnest money in connection with a purchase of commercial real estate by Guarantor or any entity that Guarantor controls (whether directly or indirectly).

        ii.    "**Opportunity Notice**" shall mean a notice from Guarantor to Lender that contains Guarantor's proposed terms to Lender for providing a Loan, including (without limitation) the amount, duration, funding date, and interest rate of such Loan. Notwithstanding the foregoing, regardless of the interest rate or any other terms or conditions stated in the Opportunity Notice, if Lender agrees to make such Loan on the terms and conditions herein, then the Opportunity Notice shall be deemed to have an interest rate of sixty percent (60%) per annum, based on a three-hundred-sixty (360)-day year and compounded annually.

    b.    **ROFO.**

        i.    Offer. With respect to each Loan, Guarantor shall first offer Lender the right to make such Loan as provided herein (the "**ROFO**"). In connection with each Loan, Guarantor shall deliver an Opportunity Notice to Lender.

        ii.    Response. If, within two (2) business days after receiving an Opportunity Notice, Lender does not notify Guarantor that Lender will make such Loan on the terms in the Opportunity Notice (or such other terms as Lender and Guarantor may have negotiated), then Lender shall be deemed to have declined to make such Loan. If within two (2) business days after receiving an Opportunity Notice Lender notifies Guarantor that Lender will make such Loan, then within four (4) business days after receiving such Opportunity Notice, Lender and Guarantor (and/or their applicable affiliates) shall enter into loan documents that reflect the terms of the Opportunity Notice and are otherwise substantively identical to the Loan Documents (as defined in the Note). If such parties do not execute and deliver such loan documents within such period and the cause thereof is not Guarantor's failure to act in good faith and with commercially reasonable efforts, then Lender shall be deemed to have declined to make such Loan.

    c.    RENEWED RIGHT. If (i) Lender declines (or is deemed to have declined) a Loan, and (ii) subsequently, Guarantor is willing to enter into such Loan on terms that are materially more favorable to the lender thereof, then the ROFO shall again apply; Guarantor shall deliver a new Opportunity Notice to Lender with such terms; and the process in §3(b) shall be followed

with respect thereto.

d.    TERMINATION. The ROFO shall terminate upon the first to occur of the following events: (a) Lender declines (or is deemed to have declined) two (2) consecutive Loans with an aggregate lending amount of $1,000,000 or less while no loan between Lender and Guarantor (or an entity that Guarantor controls, whether directly or indirectly) is outstanding at the time of each such decline and Guarantor (or an entity that Guarantor controls, whether directly or indirectly) obtains each such Loan; or (b) the third anniversary of the date hereof.

4.    REPRESENTATIONS AND WARRANTIES. Guarantor represents and warrants to Lender the matters listed below.

a.    This Guaranty constitutes a valid and legally binding agreement of Guarantor that is enforceable in accordance with its terms.

b.    Neither the execution and delivery of this Guaranty nor the compliance with any of its terms or conditions will violate any presently existing law, regulation, order, writ, injunction, or decree to which Guarantor is bound or result in a breach of or default under any other agreement to which Guarantor is a party.

c.    As of the date hereof, there are no Material Actions, as defined below, against Borrower, Pledgor, Guarantor, or any entity (i) directly or indirectly controlled or managed by Guarantor or (ii) directly or indirectly owned by Guarantor in whole or in part with respect to which Guarantor receives notices in the ordinary course of business (each of (i) and (ii), a "**Guarantor Entity**"), in each except as follows: (1) Case No. 22-cv-00392-JFH-CDL in the United States District Court for the Northern District of Oklahoma; and (2) Case No. CJ-2024-35 in the District Court of Adair County, Oklahoma. This statement is being made by Guarantor under the penalty of perjury. For purposes of this Section, "**Material Action**" means any pending litigation against Borrower, Pledgor, Guarantor, or any Guarantor Entity that (x) is not a landlord-tenant dispute and (y) if such lawsuit were adversely adjudicated against such entity or person, such entity or person would have liability that exceeds $150,000.

d.    As of the date hereof, neither Borrower, Pledgor, Guarantor, nor any Guarantor Entity (x) is to Guarantor's knowledge in material breach or default of, or (y) has been notified in writing of any material breach or default, in each case under any loan agreement taken by Borrower, Pledgor, Guarantor, or such entity (each, an "**Other Loan Default**").

e.    The items provided by Guarantor to Lender via a dropbox hyperlink[1] delivered on February 14, 2025, including five "zip files" - file names "KBST&M Returns"; "Mortgage stmts"; "Neuman, Pollak"; "PWC TR"; and "Siples" – and a .xlsx file titled "T12 – Income Statement – Consolidated", which have an aggregate file size of approximately 79.58 Megabytes, and include but are not limited to 2023 tax returns, certain mortgage agreements and current loan balances, summary sheets, and TLO reports related to certain Collateral pledged in the Agreement are true and correct as of this date, and there have been no Material Changes since the date that they were provided to Lender. In the event of a change to Guarantor, Borrower, Pledgor, any Guarantor Entity or any asset owned by, or any liability of, any Guarantor Entity, that would have a material adverse effect on Guarantor (a "Material Change"), Borrower, Pledgor, any Guarantor Entity, Guarantor shall provide Lender with written notice of the same, and such Material Change shall be deemed a default of this Guaranty.

---

[1] Accessible as of February 18, 2025 via the following hyperlink:
https://www.dropbox.com/scl/fo/0nvoze8k07witgga8z5cd/ADakWoyvFtgP9emDas7rvBQ?rlkey=pc5mfo1sbrmefbwtimwmbc0qg&e=1&st=j01p1kik&dl=0)

COVENANTS.

a.  OTHER LOAN DEFAULT AND MATERIAL ACTIONS. So long as the Payoff Amount remains outstanding, Guarantor covenants that if an Other Loan Default occurs or if Guarantor receives notice of a Material Action, then Guarantor shall notify Lender within two (2) business days thereafter, which notice shall be delivered to:

> YSA Investments I, LLC
> C/O Capital Fund Law Group, P.C.
> Attn: Christopher Rogers
> 405 Lexington Ave, 26th Floor
> New York, New York 10174
> email: crogers@capitalfundlaw.com

This notice will include a summary of the default and, with respect to any action, the summary shall include the court in which it is filed, the plaintiff(s) and defendant(s), case number, and summary of the claims being brought. A copy of any notice pursuant to this section shall also be delivered to Lender.

b.  DEBT OBLIGATIONS. So long as the Payoff Amount remains outstanding, Guarantor shall alert Lender of any debt in excess of $50,000 that is taken by Borrower, Guarantor, or any Guarantor Entity and provide a summary of the same, including the name of the party owed, the amount, and a summary of the purpose or cause of the debt. This Section shall not apply to any future loan arising from the Right of First Offer.

c.  SCHEDULE OF REAL ESTATE OWNED. By February 28, 2025, Guarantor shall deliver to Lender a true, correct, and complete schedule of real estate and entities owned (whether directly or indirectly, and whether wholly or partly) by Guarantor; provided, however, that in the event that the schedule of real estate as of February 28, 2025 is identical to the schedule of real estate most recently provided by Guarantor to Lender, then Guarantor may instead email Lender confirmation that the schedule of real estate provided as of [Date] remains true, correct, and complete as of February 14, 2025 in lieu of resubmitting the schedule of real estate. The same schedule shall provide the percentage of ownership attributable to Guarantor with respect to such real estate and entities and, with respect to real estate, identify which entity the real estate is owned through. Upon delivering same to Lender, Guarantor shall be deemed to have represented and warranted that such schedule is true, correct, and complete as of the date thereof.

d.  TRAILING REPORTS. By or before February 28, 2025, Guarantor shall provide Lender with individual and consolidated trailing three-month reports ("T3 Reports") of all entities owned and/or controlled by Guarantor, Pledgor, and/or Borrower which shall report an aggregate net operating income of no less than $5,300,000 in accordance with accrual accounting principles. Deviation between the consolidated and individual T3 Reports shall not exceed $1/10^{th}$ of a percent.

e.  DOMO REPORTING ACCESS. By or before February 20, 2025, Guarantor shall provide Lender with a link to Borrower's reporting generated by "DOMO". This link will provide Lender with monthly annualized, three month annualized, and twelve month annualized reporting of all entities owned and/or controlled by Guarantor, Borrower, and Pledgor (directly or indirectly). Lender may request that Guarantor provide additional information and data related to the same, and Guarantor shall make a good faith effort to provide such information and data to Lender.

6.  EVENT OF DEFAULT. Any breach by Guarantor of its representations, warranties, and obligations provided in this Guaranty that is not cured within ten (10) days after Lender notifies Guarantor thereof

(provided, however, that no cure period shall apply if the cause of such breach is fraud in the inducement) shall constitute an "**Event of Default.**" Any Event of Default shall constitute an irreparable harm to Lender for which injunctive relief may be sought. Additionally, in connection with any Event of Default, Lender shall have all rights and remedies that may be available to it at law, in equity, or otherwise and shall be entitled to attorney's fees and any other costs and damages that may be available to it. All of Lender's rights and remedies under this Guaranty shall be distinct, separate, and cumulative.

7.     <u>MISCELLANY</u>.

a.     All notices, requests, consents, approvals, demands and other communications required or allowed under this Guaranty (y) *must be* (i) in writing, (ii) delivered to the address/addresses written in the preamble of this Guaranty (or to such other address/addresses as either party may from time to time specify in a notice to the other in accordance with this subsection), and (iii) delivered by email, personal delivery, or a national overnight courier; and (z) shall be effective when delivered or delivery is refused (whether affirmatively or due to the recipient failing to maintain a current address for receiving notices with the sender).

b.     Any amendment or other modification to the Note or Agreement shall not affect the Obligations. Guarantor waives any right to approve, consent, or be notified of any renewal, extension, amendment, or other modification to the Note or Agreement.

c.     No waiver of any term, provision, condition, covenant, or agreement in this Guaranty shall be effective unless set forth in a writing signed by Lender and Guarantor, and any such waiver shall be effective only to the extent set forth in such writing. No failure to exercise or delay in exercising by Lender of any right, power, or privilege in this Guaranty shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege preclude any other or further exercise thereof or the exercise of any other right or remedy provided by law, in equity, or otherwise. No notice or demand on any Guarantor in any case shall entitle Guarantor to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of Lender to any other or further action in any circumstances without notice or demand. No consent or waiver, whether expressed or implied, by Lender to or of any breach or default by any Guarantor in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance of the same or any other obligations of Guarantor hereunder. Any failure by Lender to complain of any acts, or any failure to act or to declare a default under this Guaranty, irrespective of the length of such failure, shall not constitute a waiver by Lender of its rights hereunder or impair any rights, powers, or remedies on account of any default by Guarantor.

d.     In connection with any claim, action, or proceeding that is against a party hereto and pertains to this Guaranty, the substantially prevailing party shall be entitled to receive, and shall be awarded, all its court costs, collection costs, and reasonable attorneys' fees.

e.     Headings and titles in this Guaranty are for convenience only. Time is of the essence in this Guaranty, except that if any deadline or similar date herein falls on a non-business day, then such deadline shall be extended to the next business day. The invalidity or unenforceability of any provision of this Guaranty shall not affect or impair any other provisions of this Guaranty.

f.     This Guaranty—along with any and all claims or causes of action (whether in contract, tort, or statute) that may be based upon, arise from, or relate to this Guaranty, its negotiation, execution, or performance, or the transactions described herein—shall in all respects be governed by and enforced in accordance with the internal laws of the State of Delaware (including its statutes of limitations), without regard to its conflict-of-law provisions or

borrowing statutes. Any chancery court in Delaware shall have exclusive jurisdiction to hear and determine any and all claims, actions, and proceedings brought by Guarantor and pertaining to or arising from this Guaranty, the Loan Documents, their negotiation, execution, or performance, or the transactions described herein; provided, however, that if such claim, action, or proceeding cannot be brought in a chancery court in Delaware, the state and federal courts of Delaware shall have exclusive jurisdiction with respect to such claim, action, or proceeding. Lender may bring any and all claims, actions, and proceedings pertaining to or arising from this Guaranty, the Loan Documents, their negotiation, execution, or performance, or the transactions described herein in any court of competent jurisdiction. Each of Guarantor and Lender waives trial by jury in any action, proceeding, or claim brought by it against the other party that pertains to or arises from this Guaranty. Notwithstanding anything in this Agreement to the contrary, Guarantor acknowledges that any Event of Default will result in irreparable harm to the injured Party. In case any Event of Default occurs and is not waived, the injured Party will be entitled to the issuance of an injunction, restraining order, or other equitable relief in its favor as a result of the breach, and the breaching Party will be deemed to have consented to the granting of an application for the same without any prior notice to the breaching Party and without the injured Party being required to furnish a bond or other undertaking in connection with the application. Upon a breach by Guarantor, Guarantor further waives and is estopped from asserting any defense to expedited or pre-judgment relief by Lender and waives any defense or protection mechanism that may be available to Guarantor, in each case excluding the defense of full performance.

g. Any claim, whether made in arbitration or a court of competent jurisdiction, shall be filed under seal.

h. Guarantor appoints Lender as its/his/her attorney-in-fact with full power in Guarantor's name and behalf to do every act that Guarantor is obligated to do or may be required to do hereunder; however, nothing in this section shall be construed to obligate Lender to take any action hereunder. The power of attorney hereby created is a power coupled with an interest and shall be irrevocable. Through exercise of this irrevocable power of attorney, Lender may take whatever steps that it deems necessary in its sole discretion to secure and protect its interests, including but not limited to filing any action and doing whatever else is necessary to protect its interests, enforce its rights, and collect all amounts due to Lender. The power of attorney hereby created is a power coupled with an interest, and shall be irrevocable. Neither Lender nor any of its officers, managers, employees or agents of Lender will be liable for any acts of commission or omission nor for any error in judgment or mistake of fact or law unless the same shall have resulted from gross negligence or willful misconduct. Notwithstanding anything to the contrary above, Lender shall not exercise the foregoing power of attorney unless an Event of Default exists and only as long as an Event of Default exists.

i. This Guaranty shall be binding on and inure to the benefit of each party's successors, assignees, and legal representatives; provided, however, that except by operation of law in connection with death, neither party may assign, delegate, or otherwise transfer any of its rights or obligations under this Guaranty without the other party's prior approval.

j. This Guaranty is the complete and entire agreement between Lender and Guarantor with respect to the subject matter hereof, and it supersedes all prior discussions, understandings, and agreements (whether oral or written) between the parties hereto with respect to the subject matter hereof.

k. This Guaranty may be executed in counterparts, each of which shall be considered an original and all of which together shall constitute the same instrument. Counterparts to this Guaranty may be delivered by email or facsimile, each of which shall be as effective as originals for all purposes.

[signature pages follow]

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the first date written above.

GUARANTOR

_____

MARC KULICK, an individual

STATE OF OKLAHOMA )
                  )
COUNTY OF TULSA   )

This instrument was acknowledged before me on February 18Th, 2025 by Marc Kulick, an individual.

_____
(Signature of notarial officer)

My Commission Expires: 10/07/2025

Commission No.: 21013210

CHANDLER RAE PHILLIPS
Notary Public, State of Oklahoma
Commission # 21013710
My Commission Expires 10-07-2025

(STAMP SEAL ABOVE)

[signature pages continue]

## JOINDER

Lender joins this Guaranty for the sole purpose of acknowledging and agreeing to §3 hereof.

YSA Investments I, LLC, a Delaware limited liability company

By: _Robert Miley_

Name: ___Robert Miley___

Title: ___Authorized Representative___

# EXHIBIT 6

EXHIBIT 6

## GUARANTY AND ROFO

February 18, 2025

    MARC KULICK, an individual ("**Guarantor**") having an address for notices of % Vesta Realty, 6911 S. 66th E. Ave., Suite 100, Tulsa, OK 74133, hereby makes this Guaranty and ROFO (this "**Guaranty**") in favor of YSA INVESTMENTS I, LLC, a Delaware limited liability company, having an address of 8325 NE 2nd Ave, Miami, FL 33138, Email: robert@vdacquisitions.com ("**Lender**"). Any defined term that is used herein and not defined herein shall have its meaning in the Promissory Note of even date herewith (the "**Note**") between Asset Holder, LLC, an Oklahoma limited liability company (the "**Company**") and Lender.

1.    GUARANTY. Guarantor guarantees, unconditionally and absolutely, to Lender the full and faithful keeping, performance, observance, and payment of all of the Company's obligations, representations, and warranties in the Note and the full and faithful keeping, performance and observance of all of the obligations, representations, and warranties of the Company and Vesta Holdings LLC, an Oklahoma limited liability company ("**Pledgor**"), in the Collateral Pledge and Security Agreement ("**Agreement**") by and between the Company, Pledgor, and Lender (collectively, the "**Obligations**").

2.    CERTAIN WAIVERS AND REQUIREMENTS.

    a.    The obligations of Guarantor hereunder shall not be affected by any of the following: (a) the release or discharge of the Company or Pledgor in any creditors', receivership, bankruptcy, reorganization, insolvency, or other proceedings; (b) the rejection or disaffirmance in any such proceeding of the Note or Agreement or any portion thereof; (c) the impairment or modification of the Note or Agreement or any portion thereof, any remedy for the enforcement thereof, or the estate of the Company or Pledgor in bankruptcy that results from any present or future federal or state bankruptcy law or any other law of any kind or from the decision or order of any court or other governmental authority; (d) any defense of the Company or Pledgor; (e) the cessation of the liability of the Company or Pledgor for any cause whatsoever; or (f) any disability or defense of any kind of Guarantor now existing with respect to any of the Obligations or any provision of this Guaranty.

    b.    Guarantor, with respect to its liabilities and obligations under this Guaranty, hereby waives (i) any requirement of notice of non-payment, non-keeping, non-performance, or non-observance by the Company, (ii) any proof of notice or demand to the Company, and (iii) any right to require that any action be first brought against the Company.

    c.    If this Guaranty is held ineffective or unenforceable by any court of competent jurisdiction, then, at the election of Lender, Guarantor shall be deemed to be part of the "Company" and "Pledgor" under the Note or Agreement (as applicable) with the same force and effect as if Guarantor were expressly named therein with joint and several liability.

    d.    Guarantor hereby agrees that Guarantor may be joined in any action against the Company and/or Pledgor in connection with the Note and/or Agreement, and recovery may be had against Guarantor in such action or in any independent action against Guarantor without Lender first pursuing or exhausting any remedy or claim against the Company or Pledgor. Guarantor also agrees that it will be conclusively bound by the judgment in any such action by Lender against the Company or Pledgor as if Guarantor were a party to such action even though Guarantor is not joined as a party in such action.

    e.    Guarantor's obligations under this Guaranty shall not be terminated or affected in any way or manner whatsoever by (a) Lender's resort, or Lender's omission to resort, to any summary or other proceedings, actions, or remedies for the enforcement of any of Lender's rights under the Note or Agreement, or (b) any extensions of time or indulgences granted by Lender.

    f.    Insofar as the payment by the Company of any sums of money to Lender is involved, this Guaranty is a guaranty of payment and not of collection, and shall remain in full force and

effect until the Obligations are satisfied.

g.    Guarantor hereby subordinates any claims of Guarantor against the Company or Pledgor of any kind to Guarantor's obligations under this Guaranty and to any other claims of Lender against the Company, the Company's assets, Pledgor, or the Pledgor's assets. Upon any notice by Lender to the Company or Pledgor of any default under the Note or Agreement, Guarantor shall enforce any of their claims as a trustee for Lender, and shall cause any receipts to be paid over to Lender on account of the Note and Agreement without affecting in any manner the liability of Guarantor under this Guaranty (except to the extent of such payment). As long as no such notice of default has been given, Guarantor may apply to its own account any payments made to Guarantor by the Company or Pledgor.

3.    RIGHT OF FIRST OFFER.

a.    CERTAIN DEFINITIONS.

i.    "Loan" shall mean between the Funding Date (as defined in the Note) and the Termination Date (defined below), any loan that Guarantor or any entity that Guarantor controls (whether directly or indirectly) desires to obtain for depositing earnest money in connection with a purchase of commercial real estate by Guarantor or any entity that Guarantor controls (whether directly or indirectly).

ii.    "Opportunity Notice" shall mean a notice from Guarantor to Lender that contains Guarantor's proposed terms to Lender for providing a Loan, including (without limitation) the amount, duration, funding date, and interest rate of such Loan. Notwithstanding the foregoing, regardless of the interest rate or any other terms or conditions stated in the Opportunity Notice, if Lender agrees to make such Loan on the terms and conditions herein, then the Opportunity Notice shall be deemed to have an interest rate of sixty percent (60%) per annum, based on a three-hundred-sixty (360)-day year and compounded annually.

b.    ROFO.

i.    Offer. With respect to each Loan, Guarantor shall first offer Lender the right to make such Loan as provided herein (the "ROFO"). In connection with each Loan, Guarantor shall deliver an Opportunity Notice to Lender.

ii.    Response. If, within two (2) business days after receiving an Opportunity Notice, Lender does not notify Guarantor that Lender will make such Loan on the terms in the Opportunity Notice (or such other terms as Lender and Guarantor may have negotiated), then Lender shall be deemed to have declined to make such Loan. If within two (2) business days after receiving an Opportunity Notice Lender notifies Guarantor that Lender will make such Loan, then within four (4) business days after receiving such Opportunity Notice, Lender and Guarantor (and/or their applicable affiliates) shall enter into loan documents that reflect the terms of the Opportunity Notice and are otherwise substantively identical to the Loan Documents (as defined in the Note). If such parties do not execute and deliver such loan documents within such period and the cause thereof is not Guarantor's failure to act in good faith and with commercially reasonable efforts, then Lender shall be deemed to have declined to make such Loan.

c.    RENEWED RIGHT. If (i) Lender declines (or is deemed to have declined) a Loan, and (ii) subsequently, Guarantor is willing to enter into such Loan on terms that are materially more favorable to the lender thereof, then the ROFO shall again apply; Guarantor shall deliver a new Opportunity Notice to Lender with such terms; and the process in §3(b) shall be followed

with respect thereto.

d.   TERMINATION. The ROFO shall terminate upon the first to occur of the following events: (a) Lender declines (or is deemed to have declined) two (2) consecutive Loans with an aggregate lending amount of $1,000,000 or less while no loan between Lender and Guarantor (or an entity that Guarantor controls, whether directly or indirectly) is outstanding at the time of each such decline and Guarantor (or an entity that Guarantor controls, whether directly or indirectly) obtains each such Loan; or (b) the third anniversary of the date hereof.

4.   REPRESENTATIONS AND WARRANTIES. Guarantor represents and warrants to Lender the matters listed below.

a.   This Guaranty constitutes a valid and legally binding agreement of Guarantor that is enforceable in accordance with its terms.

b.   Neither the execution and delivery of this Guaranty nor the compliance with any of its terms or conditions will violate any presently existing law, regulation, order, writ, injunction, or decree to which Guarantor is bound or result in a breach of or default under any other agreement to which Guarantor is a party.

c.   As of the date hereof, there are no Material Actions, as defined below, against Borrower, Pledgor, Guarantor, or any entity (i) directly or indirectly controlled or managed by Guarantor or (ii) directly or indirectly owned by Guarantor in whole or in part with respect to which Guarantor receives notices in the ordinary course of business (each of (i) and (ii), a "**Guarantor Entity**"), in each except as follows: (1) Case No. 22-cv-00392-JFH-CDL in the United States District Court for the Northern District of Oklahoma; and (2) Case No. CJ-2024-35 in the District Court of Adair County, Oklahoma. This statement is being made by Guarantor under the penalty of perjury. For purposes of this Section, "**Material Action**" means any pending litigation against Borrower, Pledgor, Guarantor, or any Guarantor Entity that (x) is not a landlord-tenant dispute and (y) if such lawsuit were adversely adjudicated against such entity or person, such entity or person would have liability that exceeds $150,000.

d.   As of the date hereof, neither Borrower, Pledgor, Guarantor, nor any Guarantor Entity (x) is to Guarantor's knowledge in material breach or default of, or (y) has been notified in writing of any material breach or default, in each case under any loan agreement taken by Borrower, Pledgor, Guarantor, or such entity (each, an "**Other Loan Default**").

e.   The items provided by Guarantor to Lender via a dropbox hyperlink[1] delivered on February 14, 2025, including five "zip files" - file names "KBST&M Returns"; "Mortgage stmts"; "Neuman, Pollak"; "PWC TR"; and "Siples" – and a .xlsx file titled "T12 – Income Statement – Consolidated", which have an aggregate file size of approximately 79.58 Megabytes, and include but are not limited to 2023 tax returns, certain mortgage agreements and current loan balances, summary sheets, and TLO reports related to certain Collateral pledged in the Agreement are true and correct as of this date, and there have been no Material Changes since the date that they were provided to Lender. In the event of a change to Guarantor, Borrower, Pledgor, any Guarantor Entity or any asset owned by, or any liability of, any Guarantor Entity, that would have a material adverse effect on Guarantor (a "Material Change"), Borrower, Pledgor, any Guarantor Entity, Guarantor shall provide Lender with written notice of the same, and such Material Change shall be deemed a default of this Guaranty.

---

[1] Accessible as of February 18, 2025 via the following hyperlink:
https://www.dropbox.com/scl/fo/0nvoze8k07witgga8z5cd/ADakWoyvFtgP9emDas7rvBQ?rlkey=pe5mto1sbrmefbwtimwmbc0qg&e=1&st=j01p1kik&dl=0)

**COVENANTS.**

a.    OTHER LOAN DEFAULT AND MATERIAL ACTIONS. So long as the Payoff Amount remains outstanding, Guarantor covenants that if an Other Loan Default occurs or if Guarantor receives notice of a Material Action, then Guarantor shall notify Lender within two (2) business days thereafter, which notice shall be delivered to:

> YSA Investments I, LLC
> C/O Capital Fund Law Group, P.C.
> Attn: Christopher Rogers
> 405 Lexington Ave, 26th Floor
> New York, New York 10174
> email: crogers@capitalfundlaw.com

This notice will include a summary of the default and, with respect to any action, the summary shall include the court in which it is filed, the plaintiff(s) and defendant(s), case number, and summary of the claims being brought. A copy of any notice pursuant to this section shall also be delivered to Lender.

b.    DEBT OBLIGATIONS. So long as the Payoff Amount remains outstanding, Guarantor shall alert Lender of any debt in excess of $50,000 that is taken by Borrower, Guarantor, or any Guarantor Entity and provide a summary of the same, including the name of the party owed, the amount, and a summary of the purpose or cause of the debt. This Section shall not apply to any future loan arising from the Right of First Offer.

c.    SCHEDULE OF REAL ESTATE OWNED. By February 28, 2025, Guarantor shall deliver to Lender a true, correct, and complete schedule of real estate and entities owned (whether directly or indirectly, and whether wholly or partly) by Guarantor; provided, however, that in the event that the schedule of real estate as of February 28, 2025 is identical to the schedule of real estate most recently provided by Guarantor to Lender, then Guarantor may instead email Lender confirmation that the schedule of real estate provided as of [Date] remains true, correct, and complete as of February 14, 2025 in lieu of resubmitting the schedule of real estate. The same schedule shall provide the percentage of ownership attributable to Guarantor with respect to such real estate and entities and, with respect to real estate, identify which entity the real estate is owned through. Upon delivering same to Lender, Guarantor shall be deemed to have represented and warranted that such schedule is true, correct, and complete as of the date thereof.

d.    TRAILING REPORTS. By or before February 28, 2025, Guarantor shall provide Lender with individual and consolidated trailing three-month reports ("T3 Reports") of all entities owned and/or controlled by Guarantor, Pledgor, and/or Borrower which shall report an aggregate net operating income of no less than $5,300,000 in accordance with accrual accounting principles. Deviation between the consolidated and individual T3 Reports shall not exceed $1/10^{th}$ of a percent.

e.    DOMO REPORTING ACCESS. By or before February 20, 2025, Guarantor shall provide Lender with a link to Borrower's reporting generated by "DOMO". This link will provide Lender with monthly annualized, three-month annualized, and twelve-month annualized reporting of all entities owned and/or controlled by Guarantor, Borrower, and Pledgor (directly or indirectly). Lender may request that Guarantor provide additional information and data related to the same, and Guarantor shall make a good faith effort to provide such information and data to Lender.

6.    EVENT OF DEFAULT. Any breach by Guarantor of its representations, warranties, and obligations provided in this Guaranty that is not cured within ten (10) days after Lender notifies Guarantor thereof

(provided, however, that no cure period shall apply if the cause of such breach is fraud in the inducement) shall constitute an "**Event of Default**." Any Event of Default shall constitute an irreparable harm to Lender for which injunctive relief may be sought. Additionally, in connection with any Event of Default, Lender shall have all rights and remedies that may be available to it at law, in equity, or otherwise and shall be entitled to attorney's fees and any other costs and damages that may be available to it. All of Lender's rights and remedies under this Guaranty shall be distinct, separate, and cumulative.

7.  MISCELLANY.

a.  All notices, requests, consents, approvals, demands and other communications required or allowed under this Guaranty (y) *must be* (i) in writing, (ii) delivered to the address/addresses written in the preamble of this Guaranty (or to such other address/addresses as either party may from time to time specify in a notice to the other in accordance with this subsection), and (iii) delivered by email, personal delivery, or a national overnight courier; and (z) shall be effective when delivered or delivery is refused (whether affirmatively or due to the recipient failing to maintain a current address for receiving notices with the sender).

b.  Any amendment or other modification to the Note or Agreement shall not affect the Obligations. Guarantor waives any right to approve, consent, or be notified of any renewal, extension, amendment, or other modification to the Note or Agreement.

c.  No waiver of any term, provision, condition, covenant, or agreement in this Guaranty shall be effective unless set forth in a writing signed by Lender and Guarantor, and any such waiver shall be effective only to the extent set forth in such writing. No failure to exercise or delay in exercising by Lender of any right, power, or privilege in this Guaranty shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege preclude any other or further exercise thereof or the exercise of any other right or remedy provided by law, in equity, or otherwise. No notice or demand on any Guarantor in any case shall entitle Guarantor to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of Lender to any other or further action in any circumstances without notice or demand. No consent or waiver, whether expressed or implied, by Lender to or of any breach or default by any Guarantor in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance of the same or any other obligations of Guarantor hereunder. Any failure by Lender to complain of any acts, or any failure to act or to declare a default under this Guaranty, irrespective of the length of such failure, shall not constitute a waiver by Lender of its rights hereunder or impair any rights, powers, or remedies on account of any default by Guarantor.

d.  In connection with any claim, action, or proceeding that is against a party hereto and pertains to this Guaranty, the substantially prevailing party shall be entitled to receive, and shall be awarded, all its court costs, collection costs, and reasonable attorneys' fees.

e.  Headings and titles in this Guaranty are for convenience only. Time is of the essence in this Guaranty, except that if any deadline or similar date herein falls on a non-business day, then such deadline shall be extended to the next business day. The invalidity or unenforceability of any provision of this Guaranty shall not affect or impair any other provisions of this Guaranty.

f.  This Guaranty—along with any and all claims or causes of action (whether in contract, tort, or statute) that may be based upon, arise from, or relate to this Guaranty, its negotiation, execution, or performance, or the transactions described herein—shall in all respects be governed by and enforced in accordance with the internal laws of the State of Delaware (including its statutes of limitations), without regard to its conflict-of-law provisions or

borrowing statutes. Any chancery court in Delaware shall have exclusive jurisdiction to hear and determine any and all claims, actions, and proceedings brought by Guarantor and pertaining to or arising from this Guaranty, the Loan Documents, their negotiation, execution, or performance, or the transactions described herein; provided, however, that if such claim, action, or proceeding cannot be brought in a chancery court in Delaware, the state and federal courts of Delaware shall have exclusive jurisdiction with respect to such claim, action, or proceeding. Lender may bring any and all claims, actions, and proceedings pertaining to or arising from this Guaranty, the Loan Documents, their negotiation, execution, or performance, or the transactions described herein in any court of competent jurisdiction. Each of Guarantor and Lender waives trial by jury in any action, proceeding, or claim brought by it against the other party that pertains to or arises from this Guaranty. Notwithstanding anything in this Agreement to the contrary, Guarantor acknowledges that any Event of Default will result in irreparable harm to the injured Party. In case any Event of Default occurs and is not waived, the injured Party will be entitled to the issuance of an injunction, restraining order, or other equitable relief in its favor as a result of the breach, and the breaching Party will be deemed to have consented to the granting of an application for the same without any prior notice to the breaching Party and without the injured Party being required to furnish a bond or other undertaking in connection with the application. Upon a breach by Guarantor, Guarantor further waives and is estopped from asserting any defense to expedited or pre-judgment relief by Lender and waives any defense or protection mechanism that may be available to Guarantor, in each case excluding the defense of full performance.

g.    Any claim, whether made in arbitration or a court of competent jurisdiction, shall be filed under seal.

h.    Guarantor appoints Lender as its/his/her attorney-in-fact with full power in Guarantor's name and behalf to do every act that Guarantor is obligated to do or may be required to do hereunder; however, nothing in this section shall be construed to obligate Lender to take any action hereunder. The power of attorney hereby created is a power coupled with an interest and shall be irrevocable. Through exercise of this irrevocable power of attorney, Lender may take whatever steps that it deems necessary in its sole discretion to secure and protect its interests, including but not limited to filing any action and doing whatever else is necessary to protect its interests, enforce its rights, and collect all amounts due to Lender. The power of attorney hereby created is a power coupled with an interest, and shall be irrevocable. Neither Lender nor any of its officers, managers, employees or agents of Lender will be liable for any acts of commission or omission nor for any error in judgment or mistake of fact or law unless the same shall have resulted from gross negligence or willful misconduct. Notwithstanding anything to the contrary above, Lender shall not exercise the foregoing power of attorney unless an Event of Default exists and only as long as an Event of Default exists.

i.    This Guaranty shall be binding on and inure to the benefit of each party's successors, assignees, and legal representatives; provided, however, that except by operation of law in connection with death, neither party may assign, delegate, or otherwise transfer any of its rights or obligations under this Guaranty without the other party's prior approval.

j.    This Guaranty is the complete and entire agreement between Lender and Guarantor with respect to the subject matter hereof, and it supersedes all prior discussions, understandings, and agreements (whether oral or written) between the parties hereto with respect to the subject matter hereof.

k.    This Guaranty may be executed in counterparts, each of which shall be considered an original and all of which together shall constitute the same instrument. Counterparts to this Guaranty may be delivered by email or facsimile, each of which shall be as effective as originals for all purposes.

[signature pages follow]

IN WITNESS WHEREOF, Guarantor has executed this Guaranty as of the first date written above.

GUARANTOR

_____

MARC KULICK, an individual

STATE OF OKLAHOMA    )
                                )

COUNTY OF TULSA        )

This instrument was acknowledged before me on February 18th, 2025 by Marc Kulick, an individual.

_____
(Signature of notarial officer)

My Commission Expires: 10/07/2025

Commission No.: 21013210

CHANDLER RAE PHILLIPS
Notary Public, State of Oklahoma
Commission # 21013210
My Commission Expires 10-07-2025

(STAMP SEAL ABOVE)

[signature pages continue]

# **COMPOSITE**

# **EXHIBIT 7**

COMPOSITE EXHIBIT 7

## COLLATERAL PLEDGE AND SECURITY AGREEMENT

This Collateral Pledge and Security Agreement (this "**Agreement**") is made as of February 18, 2025 by and among **YSA INVESTMENTS 1 LLC**, a Delaware limited liability company ("**Lender**"), **ASSET HOLDER, LLC**, an Oklahoma limited liability company ("**Borrower**"), and **VESTA HOLDINGS, LLC**, an Oklahoma limited liability company ("**Pledgor**").

## RECITALS

A. Concurrently herewith, Lender is making a loan (the "**Loan**") to Borrower. The Loan is evidenced by documents that include a Promissory Note of even date herewith by Borrower in favor of Lender (as same may be amended, renewed, extended, substituted for, amended and restated, or otherwise modified from time to time, the "**Note**"). Any defined term that is used herein and not defined herein shall have its meaning in the Note.

B. Borrower holds the rights, title, and interests (collectively, the "**Unencumbered Interests**") in and to each of the following entities (each, a "**Borrower Entity**"): (1) a membership interest in Capitol on 28th Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000); (2) a membership interest in Remington Ranch Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000); (3) a membership interest in Copperfield Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000); (4) a membership interest in Putnam Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000).

C. Pledgor holds the following rights, title, and interests (collectively, the "**Encumbered Interests**") in and to each of the following entities (each, a "**Pledgor Entity**"): (1) a membership interest in WoodScape Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Four Hundred Thousand Dollars ($400,000); (2) a membership interest in Barcelona Best Living, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Three Hundred Thousand Dollars ($300,000); (3) a membership interest in Riverpark Best Living Investors, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Eighty-Nine Thousand Three Hundred Dollars ($189,300); (4) a membership interest in Montgomery Vesta Investors, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (5) a membership interest in Fairfax Holding Company, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (6) a membership interest in OKC3 Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (7) a membership interest in Eton Investor, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (8) a membership interest in Eaton Place Investor, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Fifty Thousand Dollars ($150,000); (9) a membership interest in W.O. Holding Co., LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Thousand Dollars ($100,000); (10) a membership interest in Regency Holdings, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Thousand Dollars ($100,000); (11) a membership interest in Woodland Manor Holdings, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of One Hundred Thousand Dollars ($100,000); (12) a membership interest in 727-Classen Best Living Investors, LLC, a Delaware limited liability company, which includes (*inter alia*) a capital contribution of Fifty Thousand Dollars ($50,000); and (13) a membership interest in Muntage Vesta Investors, LLC, a Kansas limited liability company, which includes (*inter alia*) a capital contribution of Forty-Nine Thousand Two Hundred Seventy-Five Dollars ($49,275).

D. Together, the Unencumbered Interests and Encumbered Interests comprise the "**Interests**".

| 1

E.   Together, the Borrower Entities and Pledgor Entities comprise the "**Entities**".

F.   In connection with the Loan, Pledgor and Borrower have agreed to pledge the Interest to Lender on the terms and conditions herein.

## AGREEMENTS

NOW, THEREFORE, for and in consideration of the direct benefits to be realized by Borrower (which will indirectly benefit Pledgor) from the Loan, the mutual covenants hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower, Pledgor, and Lender hereby agree as written below.

1.   PLEDGE.

1.1   SECURITY INTEREST.

(a)   Borrower and Pledgor pledge, grant, and assign to Lender a security interest in and lien upon the Collateral (defined below) to secure the payment and the performance of the Obligations (defined below). "**Collateral**" shall mean the Interest and any and all other interests in any Entity that are now owned or hereafter acquired by Borrower or Pledgor, as applicable, in or to any Entity, together with (i) all additional membership interests or other equity interests in any Entity now or hereafter acquired by Borrower or Pledgor, as applicable, and (1) all options, warrants, and other rights now or hereafter acquired by Borrower or Pledgor, as applicable, in respect of such membership interests or other equity interests in any Entity (whether in connection with any capital increase, recapitalization, reclassification, or reorganization of such Entity or otherwise), and (2) all other property, rights or instruments of any description at any time issued or issuable as an addition to or in substitution for such membership interests or other equity interests in any Entity; (ii) any certificates, instruments, or other writings representing or evidencing membership interests or other ownership interests in any Entity now or hereafter acquired by Borrower or Pledgor, as applicable, and all accounts and general intangibles arising out of, or in connection with, the membership interests in any Entity now or hereafter acquired by Borrower or Pledgor, as applicable; (iii) any and all monies or property due and to become due to Borrower or Pledgor, as applicable, now or in the future in respect of its membership interests or other ownership interests in any Entity, or to which Borrower or Pledgor, as applicable, may now or in the future be entitled in its capacity as a member or other equity holder of any Entity, whether by way of a dividend, distribution, return of capital or otherwise; (iv) all other claims that Borrower or Pledgor, as applicable, now has or may in the future acquire in its capacity as a member, partner, shareholder, or other equity holder of any Entity against such Entity and its property; and (v) all rights of Borrower or Pledgor, as applicable, under any Entity's organizational documents (and all other agreements, if any, to which Borrower is a party from time to time which relate to its ownership of the membership interests or other ownership interests in any Entity), including all voting and consent rights of Borrower or Pledgor, as applicable, arising thereunder or otherwise in connection with Borrower's or Pledgor's, as applicable, ownership of the membership interests or other equity interests in any Entity (provided, however, that any time an Event of Default (defined below) does not exist, Borrower or Pledgor, as applicable, may exercise all rights of Borrower or Pledgor, as applicable, under each Entity's organizational documents, including all voting rights). With respect to the Unencumbered Interests comprising the Collateral, the same may be referred to hereafter as the "**Unencumbered Collateral**". With respect to the Encumbered Interests comprising the Collateral, the same may be referred to hereafter as the "**Pledgor Collateral**".

(b)   For clarity, it is acknowledged and agreed that the Collateral does not include a personal

|2

residence.

1.2 ATTACHMENT. The foregoing security interest shall attach automatically to any interests in any Entity that Borrower or Pledgor, as applicable, may at any time in the future acquire without any further action by Borrower or Lender; provided, however, that as a condition to Lender's consent to any such transfer, Lender may require Borrower to execute a modification to this Agreement or a supplementary collateral pledge and security agreement.

1.3 UNENCUMBERED COLLATERAL. The Unencumbered Collateral is and will remain unencumbered by any debt or other payment obligation. The Parties further agree that in its sole discretion, Lender may at any time file a financing statement against the Unencumbered Collateral in the form of a UCC-1 or UCC-3, as applicable, filed pursuant to the Uniform Commercial Code, but Lender's failure to do so shall not impair the validity or enforceability of this Agreement.

2. OBLIGATIONS.

2.1 SECURITY. The following obligations (the "**Obligations**") are secured by this Agreement: (i) all payment and performance duties, liabilities, and obligations of Borrower under the Note; and (ii) all reasonable costs incurred by Lender to obtain, preserve, perfect, and enforce this Agreement and security interest, collect the Obligations, and maintain, preserve, collect, and enforce the Collateral, including taxes, assessments, insurance premiums, attorneys' fees and legal expenses, and expenses of sale.

2.2 DIRECT. The obligations of Borrower and Pledgor under this Agreement shall be direct and immediate and not conditional or contingent upon the pursuit of any remedies against any other person or entity (including the other entities that comprise Borrower or Pledgor, as applicable) nor against the security or liens or encumbrances available to Lender. Borrower and Pledgor waive any right to require that an action be brought against any other person or entity or to require that resort be had to any security or to any balance of any account or credit on the books of Lender in favor of any other person or entity prior to any exercise of rights or remedies hereunder. No renewal or extension of or any other indulgence with respect to the Obligations or any part thereof, no release of any security, no release of any person (including any maker, endorser, guarantor or surety) liable on the Obligations, no delay in enforcement of payment, and no delay or omission or lack of diligence or care in exercising any right or power with respect to the Obligations or any security therefor or guaranty thereof or under this Agreement shall in any manner impair or affect the rights of Lender under this Agreement, applicable law, or any other agreement pertaining to security for the Obligations. Borrower and Pledgor (i) waive any right to the benefit of, or to require or control application of, any other security or proceeds thereof, and (ii) agree that Lender shall have no duty or obligation to Borrower or Pledgor to apply to the Obligations any such other security or proceeds thereof.

3. REPRESENTATIONS AND WARRANTIES. Borrower and Pledgor represent and warrant as follows:

3.1 FINANCING STATEMENTS. No financing statement covering the Unencumbered Collateral is or will be on file in any public office except a financing statement filed by Lender pursuant to this Agreement.

3.2 OWNERSHIP. Borrower owns the Unencumbered Collateral absolutely and free of any setoff, claim, restriction, lien, security interest, or encumbrance. Borrower has the unencumbered and unrestricted right to pledge the Unencumbered Collateral. No consent or approval of any governmental authority or other person that has not been obtained was or is necessary to the validity of this pledge or the enforcement of Lender's rights and remedies hereunder.

3.3 POWER AND AUTHORITY. Borrower and Pledgor have the full power and authority to make and deliver this Agreement. This Agreement constitutes the valid and legally binding obligation of

Borrower and Pledgor, and is enforceable in accordance with its terms.

3.4 MEMBERSHIP INTERESTS. The Collateral constitutes "general intangibles," as defined in the Uniform Commercial Code as in effect in the State of Delaware (the "**UCC**"), and this Agreement constitutes a security agreement under the UCC.

3.5 LITIGATION. As of the date hereof, there are no Material Actions, as defined below, against Borrower, Pledgor, or Guarantor, or any entity (i) directly or indirectly controlled or managed by Guarantor or (ii) directly or indirectly owned by Guarantor in whole or in part with respect to which Guarantor receives notices in the ordinary course of business (each of (i) and (ii), a "**Guarantor Entity**"), in each except as follows: (1) Case No. 22-cv-00392-JFH-CDL in the United States District Court for the Northern District of Oklahoma; and (2) Case No. CJ-2024-35 in the District Court of Adair County, Oklahoma. This statement is being made by Pledgor under the penalty of perjury. For purposes of this Section, "**Material Action**" means any pending litigation against Borrower, Pledgor, Guarantor, or any Guarantor Entity that (x) is not a landlord-tenant dispute and (y) if such lawsuit were adversely adjudicated against such entity or person, such entity or person would have liability that exceeds $150,000.

3.6 CURRENT DEFAULT. As of the date hereof, neither Borrower, Pledgor, Guarantor, nor any Guarantor Entity (x) is to Pledgor's knowledge in material breach or default of, or (y) has been notified in writing of any material breach or default, in each case under any loan agreement taken by Borrower, Pledgor, Guarantor, or such entity (each, an "**Other Loan Default**").

3.7 Due Diligence Materials. The .xlsx file titled "Vesta Master Spreadsheet -02022025" which Borrower emailed to Lender on February 2, 2025 together with the other materials provided by Borrower to Lender via a dropbox hyperlink[1] delivered on February 14, 2025, including five "zip files" - file names "KBST&M Returns"; "Mortgage stmts"; "Neuman, Pollak"; "PWC TR"; and "Siples" – and a .xlsx file titled "T12 – Income Statement – Consolidated", which have an aggregate file size of approximately 79.58 Megabytes are true and correct as of this date, and there have been no material changes since the date that they were provided to Lender. which have an aggregate file size of approximately 79.58 Megabytes, and include but are not limited to 2023 tax returns, certain mortgage agreements and current loan balances, summary sheets, and TLO reports related to certain Collateral pledged in the Agreement are true and correct as of this date, and there have been no Material Changes since the date that they were provided to Lender. In the event of a change to Guarantor, Borrower, Pledgor, any Guarantor Entity or any asset owned by, or any liability of, any Guarantor Entity, that would have a material adverse effect on Guarantor, Borrower, Pledgor, any Guarantor Entity (a "**Material Change**"), Borrower shall provide Lender with written notice of the same, and such Material Change shall be deemed a default of this Agreement.

4. COVENANTS. Borrower and Pledgor shall promptly perform all of its covenants in this Agreement, including the covenants in this section.

4.1 OWNERSHIP OF UNENCUMBERED COLLATERAL. Borrower shall not further transfer, sell, pledge, assign, or encumber any of the Unencumbered Collateral. Borrower shall keep the Unencumbered Collateral free from any liens, claims, encumbrances, or security interests except the security interest created hereby and shall preserve the priority of all security interests in the Unencumbered Collateral in favor of Lender. Lender shall have no duty to preserve such security but may do so at the expense of Borrower without waiving any default hereunder.

---

[1] Accessible as of February 18, 2025 via the following hyperlink: https://www.dropbox.com/scl/fo/0nvozc8k07witgga8z5cd/ADakWoyvFtgP9emDas7rvBQ?rlkey=gc5mto1sbrmefbwtimwmbc0qg&e=1&st=j01p1kik&dl=0)

4.2     COSTS. Borrower and Pledgor shall pay all costs that are reasonably necessary to obtain, preserve, perfect, defend, and enforce the security interests created by this Agreement, and to preserve, defend, enforce, and collect the Collateral.

4.3     DEBT OBLIGATIONS. So long as the Payoff Amount remains outstanding, Borrower and Pledgor shall alert Lender of any debt in excess of $50,000 that is taken by Borrower, Guarantor, or any entity directly or indirectly controlled by Guarantor and provide a summary of the same, including the name of the party owed, the amount, and a summary of the purpose or cause of the debt. This Section shall not apply to any future loan arising from the Right of First Offer (as defined in the Guaranty).

4.4     OTHER LOAN DEFAULT AND MATERIAL ACTIONS. So long as the Payoff Amount remains outstanding, Borrower and Pledgor shall notify Lender within two (2) business days after (i) an Other Loan Default occurs or (ii) receiving notice of a Material Action, which notice shall be delivered to:

         YSA Investments 1, LLC
         C/O Capital Fund Law Group, P.C.
         Attn: Christopher Rogers
         405 Lexington Ave, 26th Floor
         New York, New York 10174
         email: crogers@capitalfundlaw.com

This notice will include a summary of the default and, with respect to any action, the summary shall include the court in which it is filed, the plaintiff(s) and defendant(s), case number, and summary of the claims being brought. A copy of any notice pursuant to this section shall also be delivered to Lender.

4.5     RIGHT OF LENDER TO NOTIFY OTHERS. While an Event of Default exists, Lender may (i) notify persons obligated on any Collateral to make payments directly to Lender, (ii) take control of all proceeds of any Collateral (subject to any other secured lenders' interests in the Pledgor Collateral), and (iii) take any other steps that Lender deems necessary with respect to the Collateral that are permissible in accordance with applicable law. Until Lender elects to exercise such rights, Borrower and Pledgor, as trustees for the benefit of Lender, shall collect and enforce all payments owed on the Collateral pledged by Borrower and Pledgor.

4.6     POWER OF ATTORNEY. Borrower and Pledgor each appoint Lender as its/his/her/their attorney-in-fact with full power in Borrower's and Pledgor's name and behalf to do every act that Borrower and Pledgor are obligated to do or may be required to do hereunder or to do all other things which Lender is permitted to do under this Agreement or any other Loan Documents or are necessary to carry out this Agreement or the other Loan Documents; however, nothing in this section shall be construed to obligate Lender to take any action hereunder. Through exercise of this irrevocable power of attorney, Lender may take whatever steps that it deems necessary in its sole discretion to secure and protect its interests, including but not limited to filing any action and doing whatever else is necessary to protect its interests, enforce its rights, and collect all amounts due to Lender. This shall include but not be limited to taking any action against any of the Collateral or any real or personal property owned by the Collateral. The power of attorney hereby created is a power coupled with an interest, and shall be irrevocable. Neither Lender nor any of its officers, managers, employees or agents of Lender will be liable for any acts of commission or omission nor for any error in judgment or mistake of fact or law unless the same shall have resulted from gross negligence or willful misconduct. Notwithstanding anything to the contrary above, Lender shall not exercise the foregoing power of attorney unless an Event of Default exists and only as long as an Event of Default exists.

4.7     NO WAIVER BY LENDER. No renewal or extension of or any other indulgence with respect to the

Obligations or any part thereof, no release of any security, no release of any person (including any maker, endorser, guarantor or surety) liable on the Obligations, no delay in enforcement of payment, and no delay or omission or lack of diligence or care in exercising any right or power with respect to the Obligations or any security therefor or guaranty thereof or under this Agreement shall in any manner impair or affect the rights of Lender under the law, hereunder or under any other agreement pertaining to security for the Obligations. Borrower and Pledgor waive any right to the benefit of or to require or control application of any other security or proceeds thereof and agree that Lender shall have no duty or obligation to Borrower or Pledgor to apply to the Obligations any such other security or proceeds thereof.

4.8 INDEMNIFICATION. In addition to any other indemnifications expressly provided for herein, Borrower will save, indemnify, and hold Lender harmless from and against all actual expenses, losses, or damages suffered by reason of any (a) wrongful interference (i.e., interference in bad faith) by Borrower with the exercise of any rights or remedies by Lender under this Agreement, or (b) Event of Default. The foregoing obligation of Borrower and Pledgor to indemnify Lender shall not extend to any suit, proceeding, or action arising out of the gross negligence or willful misconduct of Lender.

4.9 TRAILING REPORTS. By or before February 28, 2025, Borrower shall provide Lender with individual and consolidated trailing three-month reports ("T3 Reports") of all entities owned and/or controlled by Guarantor, Pledgor, and/or Borrower which shall report an aggregate net operating income of no less than $5,300,000 in accordance with accrual accounting principles. Deviation between the consolidated and individual T3 Reports shall not exceed 1/10th of a percent.

4.10 DOMO REPORTING ACCESS. By or before February 20, 2025, Borrower and Pledgor shall provide Lender with a link to Borrower's financial reporting generated via its "DOMO" software subscription. This link will provide Lender with monthly annualized, three-month annualized, and twelve-month annualized reporting of all entities owned and/or controlled by Guarantor, Borrower, and Pledgor (directly or indirectly) and shall be refreshed no less frequently than once every business day. Lender may request that Borrower provide additional information and data related to the same, and Borrower shall make a good faith effort to provide such information and data to Lender.

5. DEFAULT.

5.1 EVENTS OF DEFAULT. Each of the following shall be an "**Event of Default**" by Borrower and Pledgor hereunder:

(a) a levy on, seizure, or attachment of the Collateral by any third party, and same is not fully removed within thirty (30) days thereafter;

(b) a failure to pay any amount that becomes due under this Agreement, and neither Borrower nor Pledgor cures such failure within ten (10) days thereafter;

(c) a default in the performance or observance of any other term or condition in this Agreement, and neither Borrower nor Pledgor cures such default within ten (10) days after Lender notifies Borrower thereof;

(d) a breach of any warranty or representation under this Agreement, and neither Borrower nor Pledgor cures such breach within ten (10) days after Lender notifies Borrower thereof (provided, however, that no cure period shall apply if the cause of such breach is fraud in the inducement);

(e) Borrower or Pledgor makes a general assignment for the benefit of its creditors, or Borrower or Pledgor consents to an application for the appointment of a trustee, receiver,

16

or other custodian for Borrower or Pledgor, as applicable, or the institution of any proceeding by Borrower or Pledgor, as applicable, under any federal or state laws providing for the relief of debtors or otherwise alleging that Borrower or Pledgor, as applicable, is insolvent, bankrupt, or unable to pay its debts generally as they become due, and same is not dismissed within ninety (90) days of filing; or

(f)     an Event of Default occurs under the Note or any other Loan Document.

5.2     REMEDIES UPON DEFAULT. While an Event of Default exists, Lender may, without notice or demand to Borrower or Pledgor, enforce payment of the Obligations then due (whether due by acceleration in whole or part or otherwise), and may exercise any rights under the UCC, rights and remedies of Lender under this Agreement, or otherwise, including but not limited to taking any action against the Collateral or any of the Collateral's real or personal property. Upon any Event of Default, Lender shall further be entitled to its attorney's fees, costs, and any other damages that may be available to it. Without limiting the foregoing, (i) Lender may file a financing statement against Borrower to perfect Lender's lien on the Collateral, and (ii) Lender may conduct a private sale as written below.

(a)     Borrower and Pledgor recognize that Lender may be unable to effect a public sale of any or all of the Collateral, by reason of certain prohibitions contained in the Securities Act of 1933, as amended (the "**Securities Act**"), and applicable state securities laws or otherwise, and may be compelled to resort to one or more private sales thereof to a restricted group of purchasers who will be obliged to agree, among other things, to acquire such securities for their own account for investment and not with a view to the distribution or resale thereof. Borrower and Pledgor (i) acknowledge and agree that any such private sale may result in prices and other terms less favorable to Lender than if such sale were a public sale, and (ii) notwithstanding such circumstances, agrees that any such private sale shall not be deemed to have been made in a commercially unreasonable manner solely by virtue of being a private sale. Lender shall be under no obligation to delay a sale of any of the Collateral for the period of time necessary to permit any Entity, Borrower, or Pledgor to register such securities for public sale under the Securities Act, or under applicable state securities laws, even if such Entity, Pledgor, or Borrower would agree to do so.

(b)     Further, Borrower and Pledgor shall use commercially reasonable efforts to do or cause to be done all such other acts as may be reasonably necessary to make any sale or sales of all or any portion of the Collateral pursuant to this section valid and binding and in compliance with any and all other requirements of applicable law. Borrower and Pledgor further agree that a breach of any of the covenants contained in this section will cause irreparable injury to Lender, that Lender has no adequate remedy at law in respect of such breach, and, as a consequence, that each and every covenant contained in this section shall be specifically enforceable against Borrower and Pledgor; and Borrower and Pledgor hereby waive and agree not to assert any defenses against an action for specific performance of such covenants except for a defense that no Event of Default has occurred, or any defense relating to Lender's willful misconduct or gross negligence.

(c)     Lender shall not incur any liability as a result of the sale of any Collateral, or any part thereof, at any private sale conducted in a commercially reasonable manner, it being agreed that some or all of the Collateral is or may be of one or more types that threaten to decline speedily in value and that are not customarily sold in a recognized market. Borrower and Pledgor hereby waive any claims against Lender arising by reason of the fact that the price at which any of the Collateral may have been sold at such a private sale was less than the price which might have been obtained at a public sale or was less than the aggregate amount of the Obligations, provided that Lender has acted in a commercially reasonable manner in conducting such private sale.

17

(d) It is acknowledged that the UCC states that a lender is able to purchase collateral only if it is sold at a public sale. Lender has advised Borrower and Pledgor that Securities and Exchange Commission ("**SEC**") staff personnel have issued various No-Action Letters describing procedures that, in the view of the SEC staff, permit a foreclosure sale of securities to occur in a manner that is public for purposes of Article 9 of the UCC, yet not public for purposes of §4(2) of the Securities Act. It is also acknowledged that the UCC permits Borrower and Pledgor to agree on the standards for determining whether a lender has complied with its obligations under Article 9 of the UCC. Pursuant to the UCC, Borrower and Pledgor specifically agree that (x) they shall not raise any objection to Lender's purchase of the Collateral (through bidding on the obligations or other commercially reasonable means), and (y) a sale conducted in conformity with the principles set forth in the No-Action Letters (i) shall be considered to be a "public" sale for purposes of the UCC, (ii) will be considered commercially reasonable notwithstanding that Lender has not registered or sought to register the Collateral under the Securities Laws, even if Borrower, Pledgor, or any Entity agrees to pay all costs of the registration process, and (iii) shall not be considered to be commercially unreasonable solely because Lender purchases the Collateral at such a sale.

(e) Borrower and Pledgor agree that Lender shall not have any general duty or obligation to make any effort to obtain or pay any particular price for any Collateral sold by Lender pursuant to this Agreement. Lender, in its sole discretion, may decide to approach or not to approach any potential purchasers provided that the method of sale is commercially reasonable. Without in any way limiting Lender's right to conduct a sale in any manner that is considered commercially reasonable, Borrower and Pledgor hereby agree that any sale conducted in accordance with the following provisions shall be considered a commercially reasonable sale and hereby irrevocably waives any right to contest any such sale:

(i) Lender conducts the sale in the State of Delaware;

(ii) the sale is conducted in accordance with the laws of the State of Delaware;

(iii) at least ten (10) days in advance of the sale, Lender notifies Borrower or Pledgor, as applicable, of the time and place of the sale;

(iv) the sale is conducted by an auctioneer licensed in the State of Delaware on any Business Day between the hours of 9:00 a.m. and 5:00 p.m. Eastern Time;

(v) the notice of the date, time and location of the sale is published in the auction section of the Sunday edition of a local newspaper at least five (5) days prior to the date of the sale; and

(vi) Lender sends notification of the sale to all secured parties identified as a result of a search of the UCC financings statements in the filing offices located in the state(s) of residence of Borrower(s) or Pledgor(s), as applicable, conducted not later than twenty (20) days and not earlier than thirty (30) days before such notification date.

(f) Upon a sale of the Collateral, Borrower and Pledgor hereby give their consent to the admission of the purchaser of the Collateral as a member of the applicable Entity, notwithstanding any provision of the operating agreement of such Entity to the contrary. Such consent shall be irrevocable as long as any Obligation remains unpaid.

6. **LIMITATION AS TO PLEDGOR.**

6.1 OTHER INTERESTS. Lender acknowledges and agrees to the following matters: (i) security interests exist on the Encumbered Interests as of the date hereof, and Pledgor may grant additional security interests from time to time on the Encumbered Interests (collectively, "**Other Interests**"); (ii) Pledgor and the Encumbered Interests have entered into this Agreement merely as an accommodation to Lender; and (iii) Lender may be unable to foreclose on, sell, or otherwise exercise its remedies in this Agreement with respect to the Encumbered Interests.

6.2 LIMITATION. Accordingly, and notwithstanding anything to the contrary in this Agreement, at law, in equity, or otherwise, (i) any security interest in the Encumbered Interests that Lender has under this Agreement shall be subordinate to each Other Interest, whether any such Other Interest (a) was created before the date hereof or (b) is created after the date hereof, (ii) the existence or creation of any Other Interest from time to time shall not be a breach of this Agreement, and (iii) any inability of Lender to foreclose on, sell, or otherwise exercise its remedies in this Agreement with respect to the Encumbered Interests shall not constitute a breach of this Agreement.

7. MISCELLANY.

7.1 CONFIDENTIALITY. Each party hereto shall keep confidential the existence of the Loan and the terms of this Agreement and the other Loan Documents, except in each case to the extent that disclosing such information may be (a) required by law or other governmental requirement or (b) reasonably required in connection with entering into or enforcing the Loan, including disclosures to a party's owners (whether direct or indirect), service professionals (including lawyers, accountants, advisors, and consultants), and lenders.

7.2 PARTIES BOUND. Lender's rights and interests hereunder shall inure to the benefit of its successors and assignees (and any subsequent successor or assignee). In the event of any assignment or transfer of any of the Obligations or the Collateral, the assignor or transferor, as applicable, shall be fully discharged from any responsibility with respect to the Collateral so assigned or transferred, but the assignor or transferor, as applicable, shall retain all rights and powers hereby given with respect to any of the Obligations or Collateral not so assigned or transferred. All representations, warranties, and agreements of Borrower and Pledgor shall be joint and several and shall be binding upon their successors and assignees. Time is of the essence of this Agreement.

7.3 WAIVER. No delay of Lender in exercising any power or right shall operate as a waiver or modification thereof, nor shall any single or partial exercise of any power or right preclude other or further exercise thereof or the exercise of any other power or right. No waiver by Lender of any right hereunder or of any default by Borrower or Pledgor shall be binding upon Lender unless in writing, and no failure by Lender to exercise any power or right hereunder or waiver of any default by Borrower or Pledgor shall operate as a waiver of any other or further exercise of such right or power or of any further default.

7.4 TERMINATION OF SECURITY INTEREST. Upon the full and indefeasible payment of all of the Obligations, Lender shall release the security interests granted herein.

7.5 CHOICE OF LAW; VENUE. This Agreement shall in all respects be governed by and enforced in accordance with the laws of the State of Delaware. Each party hereto waives trial by jury in any action, proceeding, or claim pertaining to this Agreement. Any chancery court in Delaware shall have exclusive jurisdiction to hear and determine any and all claims, actions, and proceedings brought by Borrower or Pledgor and pertaining to or arising from this Agreement, the Loan Documents, their negotiation, execution, or performance, or the transactions described herein; provided, however, that if such claim, action, or proceeding cannot be brought in a chancery court in Delaware, the state and federal courts of Delaware shall have exclusive jurisdiction with respect to such claim, action, or proceeding. Lender may bring any and all claims, actions, and proceedings pertaining to or arising from this Agreement, the Loan Documents, their negotiation,

| 9

execution, or performance, or the transactions described herein in any court of competent jurisdiction. In connection with any claim, action, or proceeding that is against a party hereto and pertains to this Agreement (including any document or agreement executed in connection herewith), the substantially prevailing party therein shall be entitled to receive, and shall be awarded, all its court costs, collection costs, and reasonable attorneys' fees. Notwithstanding anything in this Agreement to the contrary, the Parties agree that any Event of Default will result in irreparable harm to the injured Party. In case any Event of Default occurs and is not waived, the injured Party will be entitled to the issuance of an injunction, restraining order, or other equitable relief in its favor as a result of the breach, and the breaching Party will be deemed to have consented to the granting of an application for the same without any prior notice to the breaching Party and without the injured Party being required to furnish a bond or other undertaking in connection with the application. Upon an Event of Default, Borrower and Pledgor further waive and are estopped from asserting any defense to expedited or pre-judgment relief by Lender and waives any defense or protection mechanism that may be available to Borrower or Pledgor, in each case excluding the defense of full performance.

7.6 CLAIMS UNDER SEAL. Any claim, whether made in arbitration or a court of competent jurisdiction, shall be filed under seal.

7.7 DEFAULT BY LENDER. Lender shall not be liable for any action or inaction arising out of this Agreement and the other Loan Documents except for (a) Lender's failure to pay to Borrower the Principal Amount minus the Origination Fee, as defined in the Note, and/or (b) Lender's gross negligence or willful misconduct.

7.8 ADDITIONAL WAIVERS. BORROWER AND PLEDGOR EXPRESSLY AND UNCONDITIONALLY WAIVE, IN CONNECTION WITH ANY SUIT, ACTION OR PROCEEDING BROUGHT BY LENDER ON THIS AGREEMENT, ANY AND EVERY RIGHT HE, SHE, IT OR THEY MAY HAVE TO (i) INTERPOSE ANY COUNTERCLAIM THEREIN UNLESS UNDER THE APPLICABLE RULES OF COURT SUCH COUNTERCLAIM MUST BE ASSERTED IN SUCH PROCEEDING, OR (ii) HAVE THE SAME CONSOLIDATED WITH ANY OTHER OR SEPARATE SUIT, ACTION OR PROCEEDING UNLESS UNDER THE APPLICABLE RULES OF COURT SUCH SUIT, ACTION OR PROCEEDING MUST BE CONSOLIDATED WITH THE PROCEEDING BROUGHT BY LENDER.

7.9 MODIFICATIONS. No provision hereof shall be modified or limited except by a written agreement expressly referring hereto and to the provisions so modified or limited and signed by Borrower, Pledgor, and Lender. No modification or limitation may be accomplished by course of conduct, usage of trade, or by the law merchant.

7.10 SEVERABILITY. In the event any provision (or any part of any provision) contained in this Agreement shall for any reason be finally held by a court of competent jurisdiction to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision (or remaining part of the affected provision, or application of the provision to other circumstances) but this Agreement shall be construed as if such invalid, illegal or unenforceable provision (or part thereof) had never been contained herein, but only to the extent it is invalid, illegal or unenforceable.

7.11 FURTHER ASSURANCES. Borrower and Pledgor shall execute and deliver, or cause to be executed and delivered, such further assurances, including financing statements, as Lender from time to time may reasonably request, to accomplish the provisions of, and carry out the intent of, this Agreement.

7.12 LIMITATIONS OF LAW. If any law prohibits or limits any charge or expense provided for in this Agreement in connection with any Obligations secured hereby, then such charge or expense will

| 10

not be made or incurred in connection with such Obligations beyond the limits permitted by such law.

7.13 NOTICES. Any notice, request, demand, approval, consent, and other communication that pertains to this Agreement shall be delivered in accordance with the Note.

7.14 INTERPRETATION. Whenever the context of any provisions hereof shall require it, words in the singular shall include the plural, words in the plural shall include the singular, and pronouns of any gender shall include the other gender. Captions and headings in this Agreement are for convenience only and shall not affect the construction of the Agreement. All references in this Agreement to Schedules, articles, sections, subsections, paragraphs, and subparagraphs refer to the respective subdivisions of this Agreement, unless such reference specifically identifies another document. The terms "herein," "hereof," "hereto," "hereunder" and similar terms refer to this Agreement and not to any particular section or subsection of this Agreement. The terms "include" and "including" shall be interpreted as if followed by the words "without limitation." All references in this Agreement to sums denominated in dollars or with the symbol "$" refer to the lawful currency of the United States of America unless such reference specifically identifies another currency. For purposes of this Agreement, "person" or "persons" shall include firms, associations, partnerships (including limited partnerships), joint ventures, trusts, corporations, limited liability companies, and other legal entities, including governmental bodies, agencies, or instrumentalities, as well as natural persons. Provisions of this Agreement, unless by their terms exclusive, shall be in addition to other agreements between the parties. Unless the context indicates otherwise, definitions in the UCC apply to words and phrases in this Agreement; if UCC definitions conflict, then Chapter 9 definitions shall apply.

7.15 EXECUTION AND STORAGE.

(a) This Agreement may be executed in counterpart signature pages. Electronic and other non-original signatures on this Agreement shall be permitted, shall be deemed to be original signatures, and shall be as effective as originals for all purposes. Without limiting the foregoing, this Agreement may be executed, accepted, and/or agreed to through the use of an electronic signature in accordance with the Electronic Signatures in Global and National Commerce Act, Title 15, United States Code, §§7001 et seq., the Uniform Electronic Transaction Act, and any applicable state law. Any Agreement that is executed, accepted, and/or agreed to in conformity with such laws shall be binding on the parties hereto as though such Agreement had been physically executed using so-called "wet ink" signatures.

(b) A copy of this Agreement may be stored by each party using any electronic or digital storage method or process, and each party may destroy any original Agreement so stored. All parties hereto agree and stipulate that any reproduction of this Agreement that has been electronically or digitally stored shall be admissible in evidence as the original itself in any judicial, arbitration, or administrative proceeding (whether or not the original is in existence and whether or not such reproduction was made by each party in the regular course of business), and that any further reproduction of such reproduction shall likewise be admissible in evidence.

[signature pages follow]

| 11

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the first date written above.

**BORROWER**

**ASSET HOLDER, LLC**, an Oklahoma limited liability company

By: _____
Name: Marc Kulick
Title: Manager

**PLEDGOR**

**VESTA HOLDINGS LLC**, an Oklahoma limited liability company

By: _____
Name: Marc Kulick
Title: Manager

STATE OF OKLAHOMA    )
                     )
COUNTY OF TULSA      )

This instrument was acknowledged before me on February 18th, 2025 by Marc Kulick, as the Manager of each of Asset Holder, LLC, an Oklahoma limited liability company, and Vesta Holdings, LLC, an Oklahoma limited liability company.

_____
(Signature of notarial officer)

My Commission Expires: 10/07/2025

Commission No.: 21013210

CHANDLER RAE PHILLIPS
Notary Public, State of Oklahoma
Commission # 21013210
My Commission Expires 10-07-2025

(STAMP SEAL ABOVE)

[signature pages continue]

| 12