



 **CITY OF TULSA** | **CODE ENFORCEMENT**

**CITY OF TULSA**
Code Enforcement

## NOTICE OF VIOLATION – PROPERTY MAINTENANCE - MULTI-FAMILY

To: YSA INVESTMENTS 1 LLC
8325 NE 2ND AVE
MIAMI , FL 33138

Date: 7/20/2026
Case: 129160

Compliance Date: 7/27/2026

Dear Property Owner and/or Occupant,

You are hereby notified of code violations at: (legal)   JORDAN ADDN (20800) Legal: LTS 1 & 2 LESS BEG SWC LT 1 TH NE10.13 NW20.65 S20.62 POB FOR RD BLK 2 Section: 30 Township: 19 Range: 13

City of Tulsa,   Tulsa          County   State of Oklahoma; And located at the address of:
2001 E SKELLY DR S TULSA 74105

### Violations:

| | | |
|---|---|---|
| ☐ Moisture | ☐ Interior Surfaces | ☐ Sidewalks, driveways, parking lots |
| ☒ Cooling standards | ☐ Unfit for human occupancy | ☐ Clothes Dryer Exhaust |
| ☒ Sewer issues | ☐ Unsafe equipment | ☐ Exterior in disrepair |
| ☐ Storm drainage | ☐ Heating & Cooling | ☐ Handrails and guards |
| ☐ Electrical issues | ☒ Pest elimination | ☐ Window(s) in disrepair |
| ☒ Kitchen Appliance | ☐ Graffiti | ☐ Door(s) in disrepair |
| ☐ Unsafe structure | ☐ Accessory structure(s) | ☐ Roof in disrepair |
| ☐ Unlawful structure | ☐ Stair and/or porches in disrepair | ☐ Guttering drainage |

Additional comments, descriptions, or directions:   **See Exhibit A for more information**

You still have time to fix your property, but if you fail to correct any violation(s) by the compliance date, the City of Tulsa may issue a placard to the property making the property Unfit for Human Occupancy.  Placarding the property will result in the ability to issue criminal citations of not more than $1,200, or by imprisonment for a period not exceeding 180 days, or both by fine and imprisonment.

You must take the necessary steps to include, but not limited to:
- Correct all violations prior to the compliance date listed on this notice

Your property is an important investment for you and the community. I urge you to make the necessary corrections to eliminate all violations so that no further enforcement will be necessary.

Please understand that it is ultimately the responsibility of the owner to ensure these violations are corrected.  Any civil agreements or rental agreements do not alleviate the owner of this responsibility.

Thank you,

*Brian Antwine*
B.ANTWNE
918-596-9666
BANTWINE@CITYOFTULSA.ORG

**Appeals:** The property owner or his agent may appeal this notice within 10 days of the mailing of the notice by filing in writing with the Code Official and the Nuisance Hearing Officer a notice of appeal stating the grounds thereof.

**SEE BACK FOR IMPORTANT INFORMATION**

Page 1 of 2

| Date | Unit # | WORK Order PARTS ONLY!! | | |
|------|--------|------|------|------|
| | | Parts Needed | your NAME | NOTES |
| May 13 | 4921-201 | Dishwasher | Dakota | Cut Back |
| May 20 | 2125-105 | Whirlpool dryer Belt | Dakota | 6 - 15 - 26 |
| | 1910-49-115 | Kitchen LED | Dakota | NEW MAKE |
| May | | | Jesse | READY |
| May 29 | 2115-TH9 | | | |
| | 4920-203 | 10x10 3R PVC BOX 6 1" 2 screw conectors | Jesse | 4815-106 |
| | 1929-TH3 | Whirlpool cluster Board for washer | Jesse | |
| June 2 | | Bucket of Sheatrock MUD | Jesse | |
| | | Bath tub calking | | |

























10:47





88

Bradley Sn.

**+1 (918) 891-5990** ›

Hey Bradley, I know we have plumbers out there today. I think they are working to solve the boiler situation! Praying they can find the problem and fix it!

They have been messing with those boilers for eight years from what I've been told. This is the only place anywhere near here that uses these boilers. I was actually told that case got out of here because of these boilers, not trying to sound like a curmudgeon. I'm sure they'll get them running for a while because that's what always happens. Thank you for your continued communication. Have a good weekend.

Today 10:46 AM

Jack,

Thank you again this morning. I took my first hot shower in two days.

Capital 2
Vesta.  0

Great! I'm glad to hear they got

 iMessage

Delivered



11:43      5G

< 15    **GW** **PD**

2 People >

**Today** 10:50 AM

Greg Wright

From a resident at one eton square



10:47

Jack, I don't know if you can pull a second miracle but building 8107 still does not have hot water.

< 14

Bradley Sn... +1 (918) 891-5990 >

> Hey Bradley, I know we have plumbers out there today. I think they are working to solve the boiler situation! Praying they can find the problem and fix it!

They have been messing with those boilers for eight years from what I've been told. This is the only place anywhere near here that uses these boilers. I was actually told that case got out of here because of these boilers, not trying to sound like a curmudgeon. I'm sure they'll get them running for a while because that's what always happens. Thank you for your continued communication. Have a good weekend.

Today 10:46 AM

Jack,

Thank you again this morning. I took my first hot shower in two days.

Capital 2
Vesta.  0

> Great! I'm glad to hear they got

+   iMessage

Parker Detweiler

Wow

Greg Wright

Residents are in one eton square office crying and thanking our manager!

+   iMessage

# EXHIBIT 16

# 26.08.03 - Vesta Louis Investments BK Trustee Hearing (Transcript)

**Judge Jernigan** This morning in all the related cases. Seven twenty seven Lofts Best Living Remington Ranch Lofts at North Penn Ave Village Creek owner Barcelona, Best Living, Lewis Investments, Woodland Manor Ridge. Best living. Um, I'd like to start by getting appearances from the lawyers in the courtroom who plan to say anything this morning. Mr. McCall.

**Speaker 2** Kevin McCullough, Rochelle McCullough, proposed counsel for Daniel Sherman, chapter eleven trustee, who's also in the courtroom. Okay. Good morning, Lauren, sort with us, who is clerking with us this summer.

**Judge Jernigan** Okay. We recognize Lauren from, uh, I think Judge Larson. You heard for her this summer. Good to see you. Good morning, Your Honor.

**Speaker 3** Liz Young and Asher Butler for the U.S. trustee.

**Judge Jernigan** Thank you.

**Marc Platt** Good morning, Your Honor. Marc Platt from Gibbons for creo Q r S and P LLC in the loss of North Penn Best Living LLC case and creo q r s v c LLC in the a v Village Creek LLC case.

**Speaker 2** Thank you. Your honor, Steve Moriarty for Q zero one eight retention LLC. Uh, Baker, uh, we're appearing in the seven twenty seven, both seven twenty seven cases. And with me today is Bob Richards with Dentons as co-counsel.

**Judge Jernigan** Okay. Thank you.

**Speaker 2** Thank you. Robert. Good morning, Your Honor. Eli Columbus with Haynes and Boone. Um, we represent the senior secured lender in the Woodland Manors Best Living LLC case. The Woodland Manor Tick Won LLC case and the Ridge Best Living LLC case. Uh, our co-counsel is Crowe and Dunleavy. I think Mr. William Hawk is on the WebEx meeting, uh, from Oklahoma City, Your Honor.

**Judge Jernigan** All right, and who is your client leader?

**Speaker 2** It's a mouthful. So, in the Woodland Manor, best living and Woodland Manor cases, our client is term fund B.

**Judge Jernigan** Okay.

**Speaker 2** For m r a seller LLC. And in the Ridge best Living LLC case, our client is term fund three m r a seller LLC. So all from here on out they'll be the senior lenders in those cases.

**Judge Jernigan** Okay. That that will be perfectly fine. Thank you. Thank you.

**Speaker 5** Good morning, Your Honor. Clay Taylor with Spencer Fain appearing on behalf of G. A m Chestnut Properties, LLC. And they are a tenant in common with Barcelona best living. And we're appearing in that case.

**Judge Jernigan** Thank you. Good morning, Your Honor.

**Eli Columbus** John Lozano with Bracewell LLP on behalf of Yamato OKC lender, LLC. And we're lender in the Barcelona Barcelona case.

**Judge Jernigan** Okay. Thank you. Your honor. Joyce Lindauer here on behalf of the debtors and and all of the cases this morning. I don't anticipate saying much unless the court has any questions of me, but. But I wanted to make an appearance. Thank you. Thank you.

**Speaker 7** Good morning, Your Honor. For John Alex Upperman Illini Holdings, LLC. Thrive Real Estate LLC, Wildwood Assets, LLC to properties LLC, both Oak Lending LLC and Oak Street Capital, LLC. Okay. Good morning.

**Judge Jernigan** All right. I know we have lots of people on the video. I don't know how many are observing versus plan to speak. Um, if, if you want to announce your appearance because you plan to speak, uh, you may do so at this time. All right. Well, Your Honor. Oh go ahead.

**Erick Johnson** Erica Johnson from Bayard, PA, I'm Delaware bankruptcy counsel for Wise Investments, and I may potentially address the court. Thank you, Your Honor. Okay.

**Judge Jernigan** I'm glad you're here, because we do have lots of questions about the bankruptcy filing. Uh, in the middle of a hearing, uh, we had last week, uh, involving. Yeah. All right. Anyone else?

**Eli Columbus** Good morning, your honor. This is Robert Nunley on behalf of the city of Stillwater, Oklahoma, in connection with the Remington Ranches. Best living writer.

**Judge Jernigan** Thank you.

**Eli Columbus** Mr. Hardcastle. Was the Oklahoma Council all right?

**Judge Jernigan** Thank you. Anyone else? All right.

**Speaker 9** Yes, this is Janice Schiff. We're calling tonight on behalf of our back opportunity Funds.

**Judge Jernigan** All right. Thank you. All right. Well, Mr. McCullough, I'm glad you're here. Oh, wait. Did we have someone else? Miss Stevenson? Sorry. My apologies, Your Honor, I was I had myself muted. Um, I'm here for David Rhodes, the prepetition receiver for Woodland Manor, best Living, LLC. Okay. Thank you. Thank you. All right. Well, Mr. McCullough, I'm glad you are here. I'm glad Mr. Sherman has accepted the US trustee's appointment. Uh, for any of you who don't know, he's, I guess, the longest tenured, most experienced trustee we have in the Northern District of Texas. And I'm never.

**Speaker 2** It's never a good sign when the.

**Marc Platt** Trustee's office.

**Speaker 2** Thank you for taking it.

**Judge Jernigan** Well, and you have probably dipped your toe in this enough to know this has been, uh, chaotic and unorganized, to say the least. Uh, so much so that, um, well, we can elaborate as we go today as appropriate. But needless to say, the court has huge concerns about, uh, lots of people getting caught in the fray of the unorganized series of filings. So what what can you tell us is based on I don't know how long you've been involved, but probably a few hours, maybe days.

**Speaker 2** Yeah, this weekend and I tried to get up to speed as much with the public filings that I had and some stuff that Miss Lindauer was kind enough to, to send over to get my learning curve as quick as possible. And it probably raised more questions the more I read than than less. But I'm not hearing a lot of issues with first lien holder positions.

**Judge Jernigan** So you're not hearing a lot as far as just challenging.

**Speaker 2** I'm disputing, so I'm not sure there's going to be a lot of that. Um, I'm not I don't have a clear picture on which properties have equity and which ones don't. I don't have a clear picture on who's operating them and why. Um, and this is kind of an equity fight in my opinion. in this case, not over the equity, over actual ownership type issues, which is unusual and not normal. To see that type of uncertainty in what I consider to be just single asset real estate. What should be a very simple case is probably as complicated as one I've ever seen with relating to just apartment complexes. Um, overlay that with all of the venue problems that we have. Um, and I'm not sure where we go from for that. Uh, in my perfect world, it would all be in one court and we would have one decider of what would happen because there's still who knows, but we're going to need an adult to cut the cord on certain issues. Um, and we're going to need, and I, I don't want venue games being played. Well.

**Judge Jernigan** We may already have had that. So the question is what do we do. and and you're getting up to speed. And we also have some new lawyer faces. So just so everyone is clear, what we have, we had by our last count or case for bankruptcy cases filed in Oklahoma. I think it was, I want to say Western District of Oklahoma, but I'm not sure I'm right about that. That's what I read, but I don't I'm not sure that was correct.

**Speaker 2** I stopped at Oklahoma. That's all I know so well.

**Judge Jernigan** Anyway, just for somewhere in Oklahoma. Then we had, I think by last count, ten different chapter elevens filed in the Northern District of Texas, but not all at once spread out over about two or three weeks.

**Speaker 2** And I'm not sure why on that.

**Judge Jernigan** But, well, you know, an experience, an experience judge and trustee might jump to conclusions. Okay. Um, and I don't think it's simple, as simple as, you know, right on the eve of I. Well, anyway, so for then at least ten by last count, although the last time we heard last week in court, we heard there might be more coming. Um, then we had one bankruptcy in Maryland and then we had, uh, just as Deborah Raleigh was about to testify at four forty nine p m last Tuesday, the entity he controls was a that claimed to first have second liens on all of these Mark Kulich properties and then through a power of attorney, transferred title allegedly, uh, to say. Uh, then you say filed bankruptcy and we'll hear from their counsel, but my staff has been monitoring and nothing has happened as far as debtor activity since Tuesday.

**Speaker 2** My understanding is the creditor body in that case is for law firms.

**Judge Jernigan** That's what we saw. So obviously. I wait for evidence. I wait for evidence. But this looks like a chaotic, unorganized pattern of filing cases here, there and everywhere to thwart the first lien holders. Okay. Including. I don't even know if Mr. Kulick and Mr. Devereaux are, for lack of a better term, in cahoots on this. You know it. Just a person might believe that. That it's all about hoarding the first lien holders. I am very concerned. But then we heard about bat infestations. We heard about roach infestations. We heard about water being cut off. We heard about a building that burned down on one, uh, one property. And it's just kind of sitting there. We heard about swimming pools, empty green. So it's a lot. It's a lot.

**Speaker 2** And I'm still not clear what we're fighting over what at the end of the day, how much equity is there. And, and it can cannot afford the weight of the administrative costs of a bankruptcy. And then at the end of the day, when I'm representing a trustee, I want to know, who am I doing this for?

**Judge Jernigan** Mhm.

**Speaker 2** So I want to meet with all the first lien holders, see if they're willing to carve outs, whether they want to pay the freight, whether there's a benefit being in bankruptcy for them, clearing up title or resolving this equity issue, or would they rather be somewhere else? Um, because it's really their money that we're playing with and what we're putting at risk, in my opinion, from just being in this for just hours, you know, a couple days probably.

**Judge Jernigan** Apparently there are a lot of investors who would hope you're wrong about that.

**Speaker 2** And I hope I'm wrong too. But I've been through enough of these where, um, the best the story ever is, is the first time you hear it. Mhm. So as we get into this further and further, it's just going to get messier and messier and more and more expensive. And when you come into these bankruptcies without a plan and you're just, it just doubles the cost. Um, so not having a well thought out, not having a game plan in place and us just playing catch up. I don't like being reactive in a case like being proactive. So it's, it's starting off as a nightmare, and I don't want to be coming back to this court on an emergency basis every other day asking for relief that you're not comfortable with, or it's an emergency and it's just putting out fires. And then who am I doing it for?

**Judge Jernigan** So yeah, it may very well be that they're, you know, as you say, uh, will help the secured lenders clear up title issues if they get orders from of course, are they going to have to get orders from this court and the Delaware court? Right. Um, but as far as others out there, I mean, there may be causes of action, massive causes of action to pursue against insiders, but maybe they aren't going to be the as we always say, the juice won't be worth the squeeze, right?

**Speaker 2** There's always with this type of activity, you can't help but think there's a piano can't help but think there's a pretty strong transfer point. I think this you know, I'm an open book on things. I think the most valuable asset in the Delaware bankruptcy is the privilege. I think if you can get a trustee up there that owns the privilege, that will break the logjam in this case. MM.

**Judge Jernigan** Okay. Well. Did you have anything at this early juncture you wanted to report to the court? I, you know, insurance. I don't know if that's something near and dear to your heart as well as the I understand.

**Speaker 2** I haven't seen any other policy. My understanding I reviewed any of them is that there is insurance on all the properties. The Fannie Mae properties have forced place insurance. Um, but I don't know what the.

**Judge Jernigan** That's what we heard, but I don't think we ever had documents. Yeah.

**Speaker 2** I don't know when they expire. I don't know any of the details of it. And I apologize for that.

**Judge Jernigan** All right. Well, you're very new on the scene. Um, well, I'll just jump to that right now because we've got a problem if there's no insurance.

**Speaker 3** Thank you, Your Honor. The short answer is yes. We have insurance. Okay. We still don't know all of the world of insurance that we have, and especially for I think it's undisputed that the two Fannie Mae properties just have Fannie Mae forced placed insurance, which may result in some other concerns we have about whether or not that's going to be sufficient, because I do believe I think it's just would have to look at the documents may just be property insurance, not liability insurance. And again, trying to keep all of these properties straight. I don't know if these are ones that have tenants where certainly, I think we would want to ensure that there is some kind of liability insurance, and some of this may be able to be addressed by the trustee and a go forward basis. If these are properties that are worth keeping in bankruptcy, or we may have to kind of go through in a much more with a scalpel and figure out what we can carve out. We have received copies of property and liability insurance for the other policies. Some are just certificates of insurance, and so we need to make sure that they are fully bound and not just a certificate that we have received. We do need the actual policies again, just to make sure that the estates are going to be protected. We received the copies of those policies, I believe, Thursday and Friday of last week. So we are still on our end, going through and figuring out what what concerns we may have about insurance. And, and then obviously the the big question would be, who has the money to pay for insurance on a go forward basis? So if these are installment plans, do we are we covered through the month of August? But we may be back here with September because the policies have lapsed due to non-payment, because there's no money in some of these estates because of all of these. You know, to quote Mr. McCullough, all of the questions on who actually owns these properties and where the rents may be being deposited on a go forward basis. So. So yes, we have insurance. We're still working through some of those nuances. But I can say that there is we have been provided, I think, everything that the debtors had. Um, again, not sure it's going to be sufficient for us, but there is some insurance in place.

**Judge Jernigan** Okay. Thank you. Um, I want to make sure the trustee knows and you, you you probably know, but. Among the chaotic facts we have is we have two different property managers, one capital assets which was retained by y a on I forget how many several of the properties for. Okay. Mr. Taylor, I think he's been in on these hearings from the beginning. Uh, so four of the properties have, uh, capital assets retained by Y s a, and then I guess all the remaining ones still have the Mark. Kulick controlled property manager, Vesta Realty. I guess we hit the first of the month over the weekend. I don't know if anyone knows where all of those rents have gone.

**Speaker 2** And I and I had a brief discussion on that issue in the hallway. And, um, once again, there are five steps ahead of me on the chess board. They have identified a property management group that they are all happy with. Oh, that could be more independent. And it wouldn't be beholden to one side or the other. So that will be the first test, um, to the parties on whether they're going to be reasonable negotiations. Can we all agree on just one property manager that will be independent.

**Judge Jernigan** Okay. All right. So I'm glad that people are in that loop. And since cash flow is involved, I I'm not surprised people are involved. Well, does anyone else in the courtroom wish to speak in any way? Um, all right. Well, I want to talk to Miss Johnson, uh, in Delaware, who filed the bankruptcy case for wise investments. Um, you know, what would you like to tell me? But what I would like to hear is what is going on with that bankruptcy? No motions to use cash collateral, no normal first day motions. Uh, the we looked at the voluntary petition because when we were told, after two long days of hearings involving Issa that they had suddenly filed bankruptcy, we felt like we needed to verify it. And we see for creditors, for law firms listed. And yet we see five hundred million to one billion dollars worth of liabilities. So what can you tell me about that case at this juncture?

**Erick Johnson** Thank you, Your Honor. Erica Johnson from Bayer on behalf of YSA Investments. I do want to note that there's been a lot of assumptions and a lot of speculation, I think, being said this morning that aren't supported by evidence. Um, you know, including kind of casting aspersions about why Essa and Issa's involvement with Kulick and I just wanted to spell and dispute any notion that they're acting in cahoots or that this is something that was perpetrated to negatively affect the first lien lenders. The bankruptcy was precipitated because of the chaos of what's going on, and Cook's statement that even more bankruptcies could potentially be filed. Your honor, there are cases pending in Oklahoma. And those cases, the US trustee has moved to dismiss the cases for improperly being filed for lack of corporate authorization. We understand that the trustee is seeking a hearing in mid-August. You know, on those cases, and you're correct, there's also a case that was pending in Maryland. And then the cases that were filed before, Your Honor, in Texas. And then there's a question in terms of whether that venue, um, you know, was manufactured or not, uh, if there's truly a tie within Texas. But frankly, why I say, you know, could not continue litigation costs in multiple venues without an end in sight with potentially more filings, uh, Occurring in the case. So while there haven't been a lot of filings in the bankruptcy case, there is work being done behind the scenes, Your Honor. There was appointed filings.

**Judge Jernigan** Let me stop you. Well, you said while there have not been a lot filings, there have been no filings by the debtor in six days.

**Erick Johnson** That's correct, Your Honor. And that's not unusual in a case that does not have operations itself. It does not have employees. It does not have its own lease. Affiliated entities have lease. So it doesn't have utilities. It doesn't owe taxes. So first day motions are only needed if there's Pre-petition asserts.

**Judge Jernigan** It asserts that it owns dozens of apartment complexes. That is the position it has taken in this court.

**Erick Johnson** It does, Your Honor, but it's not the direct liability of Ysaye to pay the Prepetition claims. Those are covered right now under an order in Maryland, as well as an order that Your Honor entered in terms of the chapter eleven trustee appointment and keeping the current management in place, at least until the chapter eleven trustee was in a position to make decisions, and we wanted to honor that request and actually understand.

**Judge Jernigan** I really want to drill down on this. I don't understand what you're saying. Why is a after having it second, liens basically validated on thirty something properties. It it, it took a power of attorney. It had from Mark Kulick and using that did deeds in lieu of foreclosure on I understood thirty two or something properties. Okay. Why they took the position in this court that it owns thirty two or so. I'm not sure that's the exact number. I'm not sure if it if it executed and filed the deeds in lieu on all of the properties or just many, many, many of them. So right now, it's claiming to be the owner of several apartment complexes in which thousands of residents reside. You're telling me that it doesn't have much, and it doesn't need to file any motions to use cash, collateral or other operating type? Chapter eleven motions.

**Erick Johnson** No, Your Honor. What I said was that there was no immediate need for paying pre-petition amounts, which is why you didn't see the traditional first day motions filed. I don't dispute that there needs to be a cash collateral.

**Judge Jernigan** Okay. Go ahead. Continue. Maybe you're about to address what I was going to ask.

**Erick Johnson** I believe I'm trying to address what the court's asking, but there will need to be a cash collateral order that's put in place with respect to use of rents. Right now for the properties, there's ten of them that Issa has. It's third party, not controlled by way, say, a third party property management company, which I think, Your Honor, heard testimony from its principal. That's handling that right is not controlled.

**Judge Jernigan** Why do you say not controlled by. Why is that.

**Erick Johnson** Meaning that it's not an insider or affiliate? It does have a contractual agreement with the third party vendor, but it's not like an insider related affiliate that's in place. So that property management company in August would start collecting the rent for the August for ten of the properties, not for all of the properties, as Your Honor knows. And those are being held in segregated accounts separated by property. And I've had some conversation with some of the first lien lenders that have a council. Um, and that money is only being

used for regular maintenance and upkeep of those properties. That's consistent with an order that was entered by the Maryland courts and consistent with Your Honor's order in terms of maintaining the status quo until chapter eleven, trustee can make decisions with respect to the property. Our intent was to try to confer with the chapter eleven trustee that's appointed in order to try and figure out a path forward. We do agree that it may make sense for the cases to be in one venue, to decide some of the issues going forward, and to determine on a property by property basis which ones have equity. But this is not just an equity, you know, dispute. Why I say it's also a lender and predator in certain of the cases. Um, and it is a threshold issue in terms of which properties have equity value, which ones don't. There are some also in addition to these bankruptcy cases that are enmeshed in receivership type disputes, as well as other state court litigation that's going on. So why is the primary creditors really are the law firms at the moment, which is why for general unsecured creditors, you saw primarily law firms listed in the top twenty predators, but there are numerous secured creditors that are involved as well, Your Honor, involved whose interests are at stake. Your honor, there's some that I've had communications with. I haven't been able to talk to all the secured lenders at this point to determine how obviously, they have a say in how the cases progress. Um, you know, one option and one thought in terms of if I had a say.

**Judge Jernigan** They have a say in how the case progresses, your client doesn't have authority to do a darn thing with their cash collateral unless they consent. And it sounds like you're saying you've talked to some of them and they've consented, or unless you have a court order and you haven't even filed a motion to get a court order.

**Erick Johnson** You're not. Your honor, I haven't said that anyone has consented. There's existing orders from the courts to maintain the status quo. And that's what we're operating under currently. We're trying to negotiate a consensual cash collateral order that would impact all of the first lien lenders. Obviously, we would like to do that first with the input of those lenders, and that's what we're trying to do first.

**Judge Jernigan** Why haven't you filed a motion? Why have you not filed a motion?

**Erick Johnson** We do intend to file a motion this week. We're trying to identify who the lenders are.

**Judge Jernigan** As everyone knows, the normal protocol in a single asset real estate case is to immediately file your motion to use cash collateral. And then if you, you know, hope to negotiate something consensual, that's sort of the impetus to get everyone focused.

**Erick Johnson** Agreed, Your honor, in a typical case, that's how it would be done. This case was filed without the benefit of having time to plan and prepare for it. Given the multitudes and chaos of all these filings going all around the country with various disputes, including whether or not the cases should even remain in bankruptcy. So understandably, why, I say was distracted in being able to kind of plan before it filed. However, there are, which is also unusual orders that are in place to maintain the status quo from various courts. And so and no cash collateral is being used. Your honor, at this point, to be clear, that's wonderful. Wonderful.

**Judge Jernigan** We have thousands of residents and no one is spending money on normal operating needs.

**Erick Johnson** Only pursuant to the existing orders. Would would cash collateral be spent? To be clear, why is hey hasn't had the management control of the properties with any rents coming in until August one. Not an issue where Y is control.

**Judge Jernigan** Control. Several weeks ago of certain of these properties.

**Erick Johnson** The rents the eight collected with the property management company did not start until August one.

**Judge Jernigan** All right. Well, I guess time will tell on that. So when when do we expect things to start happening in your case?

**Erick Johnson** Your honor this week part of the issue too is having the debt financing, which will be scheduled for this week for at least the is a control properties. And of course, we would like to talk with the chapter eleven trustee as well in the Texas cases to try to develop a path forward.

**Judge Jernigan** You have a debt financing lined up for Y. S.A. and the Y. S.A. controlled properties.

**Erick Johnson** Their marketing for outside lending. But it sounds like it's going to need to be an insider. Given all the litigation that is occurring, it would likely be an insider loan to help the process.

**Judge Jernigan** And it. Would it be a loan?

**Erick Johnson** No, Your Honor, that's not that's not what's been discussed.

**Judge Jernigan** Okay.

**Erick Johnson** But the negotiations have not finished. I know they're in the process of retaining counsel.

**Judge Jernigan** Okay. Well. That's a rather surprising report. Anything else?

**Erick Johnson** I think, Your Honor, we will have more to report once we've had a chance to confer with the lenders and the chapter eleven trustee.

**Judge Jernigan** You have had a chance. You have had a chance to confer. It's been six days.

**Erick Johnson** The chapter eleven trustee, Your Honor, was just appointed, and we have not had a chance to confer with the chapter eleven trustee. Okay.

**Judge Jernigan** But what about the lenders?

**Erick Johnson** I've spoken with two of them.

**Judge Jernigan** Okay. Well. Do you have anything else? I do have Mr. Moriarty getting up.

**Erick Johnson** No, Your Honor, not unless the court has further questions or there's something raised by any other party.

**Judge Jernigan** Okay. We'll see. All right, Mr. Moriarty.

**Eli Columbus** Thank you, Your Honor. Steve Moriarty. We have the baker and the seven twenty seven cases. I was just a little confused on what? To ask the court for some clarification. I was almost hearing you say bankruptcy counsel trying to bootstrap authority to spend rents on your order to maintain the status quo. And I didn't think that that was Your Honor's order.

**Judge Jernigan** Yeah, I don't have it in front of me. But but I was I was just concerned because we had thousands of residents in. I wanted some clarity on who the property managers for now were true, but I don't think I said anything about no use of cash collateral.

**Eli Columbus** So I just wanted that clarification on the record. That order does not authorize rents to be paid to maintain the properties.

**Judge Jernigan** Okay. Thank you. Would you like to respond to that, Miss Johnson?

**Erick Johnson** Yes, Your honor. The last paragraph of your order says that the current property management companies would remain in place, and that rents would only be used for maintenance of the properties. And there was a separate cash collateral order negotiated with respect to seven hundred twenty seven with the court. So I think Your Honor's order states that status quo in terms of only necessary expenses, should be paid to maintain the properties for the tenants.

**Judge Jernigan** Okay. At the very least, we need clarifying orders, I think. Uh, but. Is someone going to say the automatic stay of your bankruptcy is being violated? If this court enters order that an order that addresses these properties.

**Erick Johnson** I don't believe, Your Honor, that we dispute that regular maintenance needs to be done at the properties. Number of the properties have code violations from before is a um had their property manager come into into play here. And we also agree that these tenants need to be looked after and the rent need to be stabilized in the properties managed. So why I say doesn't intend to stand in the way of regular, you know, property maintenance or cutting the grass, making sure the trash is taken out. Um, those types of expenditures, the property management company is actually putting together budgets by property in terms of what we think this is going to cost, um, with respect to each property, given that there's multiple lenders, it can't be a consolidated budget.

**Judge Jernigan** Okay. I'm not sure I heard an answer to my question. In all of that, is someone going to say I'm violating the automatic stay of why say, bankruptcy if I enter orders more particular on usage of cash collateral?

**Erick Johnson** Your honor, I have not been able to speak to my clients specifically with respect to that question. Okay. But I have not.

**Judge Jernigan** That's all your question. That's a lawyer question.

**Erick Johnson** I have not spoken with the my counsel or my clients. So it's a mixture of a lawyer recommendation as well as client involvement. On that, I don't believe that would be something that's argued. They've consented to enter a similar order in Maryland. So I don't believe it's an issue. But without speaking to, you know, my client, I don't want to definitively say yes or no.

**Judge Jernigan** Okay. This is untenable, to say the least. Who else wishes to speak?

**Eli Columbus** Your honor. Eli Columbus with Haynes and Boone. With respect to the Woodland Manor. Best living and best living and Woodland Manor. Cases. Um, so they're only one. One of our cases had a cash collateral motion filed in it, and it showed a budget with start starting cash of negative twenty four thousand and ending cash of negative fifty four thousand. So we had some serious concerns about that budget and serious concerns about the use of cash collateral. Obviously that was never set for hearing the other case. No cash collateral motion was ever filed. Our position is it may be we have an assignment of rents under Oklahoma law in those cases, which may be absolute assignment. So that may actually be our rents, but we do have concerns about the use of cash at the property level and that it's appropriately done through a appropriate court order with with third party independent supervision. So we don't think my essay can use it unilaterally. And we think a court order has to be entered to to use our collateral. So we are concerned about that, Your Honor. And that's something we were going to get with the trustee and his the chapter eleven trustee in our cases and his counsel to try to sort out kind of the interim short term issue, and then we'll work on the longer term issue going forward. There's also a threshold issue in our cases of corporate authority. What was it proper corporate authority, how these cases were filed. And we'll have to sort through that. Uh, we had a receiver appointed in one of our cases. We'd have to talk to the trustee about whether it's more appropriate to put that back in, in the hands of the local independent fiduciary, especially if there wasn't proper corporate authority to file the chapter eleven petition in the first case. But these are the things we're now going to sort through with the chapter eleven trustee and his counsel, Your Honor, and hopefully, again, get a short term game plan put together and then a longer term game plan on how to stabilize the property properties and move forward, your Honor.

**Judge Jernigan** And in the lack of corporate authority, um, can you elaborate at all? Is that because of this is a mess or something more than that?

**Eli Columbus** Well, in at least in one of our cases, I believe a chapter under the LLC agreements, as I understand them. And I'm pretty new to this. Yes, but as I understand the LLC agreement, I think for at least one of the debtor required, there was an independent manager, kind of like an independent board member. Um, and it required consent by that independent, uh, manager to file a bankruptcy petition. We don't see anywhere that that consent was given. It just looked like the principal just filed it without, without going through the proper and formal corporate authority issues on the LLC side, I think it required independent manager consent and maybe another party or entity consent that we didn't see was on in included in the petition filings for the chapter eleven case here. So again, something we'll have to sort through. We now have an independent fiduciary here to work with on those issues.

**Judge Jernigan** Okay. I do remember seeing evidence sometime Monday or Tuesday on, I don't know if I got all of the LLC agreements or just certain ones, but I do remember seeing an independent manager and Mr. Kulick actually testified a bit like he said, oh, that only matters in bankruptcy. He said something sort of vague about, uh, that. So. All right.

**Eli Columbus** But again, the use of cash and what's happening and oversight of that is critical to us right now. And again, our first step would be talk to the trust trustee and his counsel on where we go from here.

**Judge Jernigan** Mhm. On that last point, my law clerk handed me the sort of status quo order. Um, well, it was the order, the suit sponte order appointing or directing the appointment of a chapter eleven trustee. But the last paragraph we've kind of hinted at, it reads ordered that all property managers for these debtors parentheses, Vesta Realty and Capital Assets, Inc. close parentheses shall remain in place and only exercise property management duties in the ordinary course of business until otherwise directed by the chapter eleven trustee or this court. Okay, so I did not specifically say may only use cash collateral, uh, in the ordinary course of business. Now, you know, maybe it wasn't worded as perfectly as it could be on that point. Only exercise property management duties in the ordinary course. But. That refreshes my memory and I hope everyone else's memory. I kind of contemplated there would be future cash, collateral orders or consent.

**Eli Columbus** Yeah.

**Judge Jernigan** Okay, Mr. Platt. Thank you, Mr. Columbus.

**Marc Platt** Uh, Your honor, Marc Platt again for for the Creole, entities. Uh, just to be clear, we filed something in the USA case, making it clear that we do not consent to the use of of our cash collateral. Uh, as, as you will recall, we have, uh, we have means in two separate entities, one of which is, is currently being managed by capital assets. Uh, the is a beholden entity. Uh, and the other one is, is being managed by, by, uh, Mr. Cook's entity. Uh, so it's certainly more focused on the, on the village creek one that, uh, that, that is being managed by the capital assets entity. And we made it very clear in that filing, we do not consent. Um, and, and so, uh, I do not see how your order, uh, filed in, in, uh, in these cases where you say is not the debtor, uh, could be used as a basis for the authority to use cash collateral. And if she's attempting to use the Maryland order, that is, that order was specific to the jinx best living case, and it certainly does not apply to any other debtors. So it's that that is equally baffling to me, Your Honor, that that, uh, your order, uh, that, that you entered last week, uh, directing the US trustee to appoint a chapter eleven trustee and the order in Maryland, uh, could be used as a, as a basis for authority to use cash flow. We absolutely disagree with that. And, um, and again, we thought our, our objection and we will obviously be available to discuss with, with chapter eleven trustee and, and, uh, and his counsel and, and, uh, Miss Johnson, at any time.

**Judge Jernigan** When did you file your objection up in Delaware on Friday. On Friday. Okay. All right.

**Erick Johnson** Yes, your honor, it was Friday evening, and I did reach out to their Delaware counsel and hope to be able to speak with them today.

**Judge Jernigan** Okay. Mr. Morgan. Thank you, Your Honor.

**Eli Columbus** One more thing I'd like to bring to the court's attention. It really doesn't have anything to do with what's in front of you. But I do think it's indicative of this morass that we're stuck in. It's our understanding that even though Issa claims ownership of these properties, they don't have any insurance.

**Judge Jernigan** Wow. Can you address that? Miss Johnson.

**Erick Johnson** Your honor, I don't have definitive guidance on general liability insurance. I know that they're getting quotes and have received quotes for that insurance on Fridays, so I know that's being put in place for the properties. So I know that seven two seven had reached out to ask about property Level insurance and we're looking at that. But, you know, more importantly too, was general liability insurance. So I asked the company about it. So I don't have a definitive answer for Your Honour. We know it's something that we need to have in place. Um, I know some of the properties are covered by the prior insurance, but we don't have a clear picture either on where those stand under its control. And so we're in the process of getting independent insurance in place if it wasn't already done late Friday.

**Judge Jernigan** Okay. A lot of things are in the process as opposed to where I think they should be.

**Erick Johnson** Agreed, your honor, it's been a disorganized, admittedly disorganized filing and situation. But, you know, part of that was precipitated by so much litigation in various jurisdictions and really needing to get control over what was happening and just the litigation cost kind of going forward and trying to create like a path forward, which I think ultimately may be a sale process with some of the disputes being resolved in terms of ownership and everything else with respect to the process. But but, Your Honor, that's something we would like to talk to the chapter eleven trustee and lenders about.

**Judge Jernigan** Okay. Um, Mr. Sherman, um, I'm going to ask if you remember something. I, I think this was your case I mentioned, I mentioned last week when I heard that at least one of the properties in Oklahoma was on so-called fire Watch. Fire watch because their equipment wasn't working. Okay. You know, there, I don't know. Fire alarms. Smoke detectors. What? And I said that brought back really bad memories. And I said I had a case, and I still remembered that it was May two thousand thirteen. It may have been twenty fourteen that there was a property. I think you were the trustee or maybe you were counsel to Trustee Jim Cunningham. Miss young remembers there was a property, I think it was right on the Garland Dallas City border, and one of the properties burned to the ground. And there was a Dallas fire, uh, fighter killed that. Were you representing the trustee in that?

**Speaker 7** I don't remember.

**Marc Platt** Whether.

**Speaker 7** I was or not. I remember.

**Marc Platt** The incident.

**Judge Jernigan** Okay. I, I feel like it was Jim Cunningham because I vividly remember him coming in very emotionally destroyed. And I was thinking maybe because you, you put together a transaction in the end where the whole darn thing was just torn down. And then we had to divvy out who got proceeds. But anyway, I, I didn't mean to pick on you, but I kind of feel like there might be human beings who don't understand why I am so concerned, because this is nothing to take lightly. Thousands of residents out there with property where there's no clear, you know, usage of cash collateral and, you know, not to mention the first lien holders who. Anyway, you you can sort of benignly call this unorganized, chaotic. But again, this is not just me being speculative. I heard days of evidence, days of evidence. The transcripts, you know, are probably going to be available soon if they're not out there. I think I think this is by design, I really do. I think it's by design at the at a minimum, to thwart these first lien lien holders, make it hard for them. Do they get a northern district of Texas or a motion to stay. Oklahoma, Maryland, Delaware. All of the above. Maybe some of them have. You know, it's, it's really disturbing. And, and I it creates an aura of bad faith. Okay. So what do we do about it? Well.

**Speaker 2** This is highly unusual. One thing I was thinking of over the weekend, I've never seen it before, but is a, a four court status conference. So we're all on the same page. If a judge has a concern about something, we all get to hear it. And that judges get to all hear what's going on at the same time. The logistics of that.

**Judge Jernigan** Or a motion to transfer venue. And I said the other day, I don't care if they're transferred here, Oklahoma or where.

**Speaker 2** Exactly.

**Judge Jernigan** But that seems more cumbersome than it need be. I happen to be good friends with Brendan Shannon in Delaware. I happen to be good friends with Michelle Harmer in Maryland, but we're not talking because we don't consider that, you know, the appropriate thing to do, I guess, unless parties ask us to. I don't know who the Oklahoma judge is. I don't know if it's one or multiple judges. But I truly believe based on evidence, not speculation, this this was not just an organized clients and lawyers reacting to the crisis of the day. I think it's designed to thwart all these first line lenders.

**Speaker 2** It feels like a lot of gamesmanship, and nobody is thinking about the tenants or the properties or the long term value diminution you're going to have from such an exercise.

**Judge Jernigan0** Mhm.

**Judge Jernigan** So where do we go from here? No one has authority to use cash collateral unless they have an order or consent, which I would hope they get in writing from a secured lender. Um. You're the point person for the debtors in these cases. And I don't know who the point person is for the other cases, but it's an untenable situation where we might have four different point people. Uh, keep in mind that the is a case was filed at four forty nine central time on Tuesday, right? As it says, uh, control person Ephraim Deborra-lee was about to take the witness stand.

**Speaker 2** Smacks of a litigation tactic.

**Judge Jernigan** It does, it does. Um, all right, so where do we go from here? I know we had besides just general status conferences. Uh, we do have pending motions that can't go anywhere without the trustees embrace of these motions. So does it make sense to have another status conference in a week or. I'll, I'll give anyone a hearing if they think some emergency is looming before that. But it seems like you've.

**Speaker 2** I think a week, a week would work. And in the meantime, you know, we may have to move quick on some of them and may not have as much due diligence done, um, to bring to this court on why we're making the decision. We are, but we will have an explanation for what we think is the best course of action for each of the properties.

**Judge Jernigan** Okay. All right. Well, your business judgment on that means a lot. You know, everything that is probably going through your brain. You know, I've thought about is this, you know, did this first lien secured lenders have all the value here. And, you know, would it end up being just a series of orders lifting stay. I don't know. You know, I, I know there have to be causes of action. Uh, are they those worth chasing or not? This is where, you know, an experienced trustee can do. Okay. Alright. So Hawaii, you're doing double duty today. Should they just call you or email you about our availability next Monday? Or do you know. Okay. Um. Next Monday, nine thirty. Okay. So we'll, um, we'll just do a minute entry order so you don't have to do a notice of hearing when you don't know.

**Speaker 2** What will be.

**Speaker 7** Said.

**Judge Jernigan** What will be said. Yes. All right. Um. Okay. Any anyone else? Mr. Clark?

**Marc Platt** On that point. As you noted, there are some pending motions. I think some of them might have hearing dates before the tenth. To the extent that that is the case, should those just be set for status conference on that date? To the extent that we can work things out with with the trustee.

**Judge Jernigan** And you have motions to use cash collateral.

**Marc Platt** We have we have we yes, we have a motion to use cash flow. Our motion, our our cash collateral motion, I believe was reset for status today. Um, and I suppose that's being reset for status, uh, for, for next Monday. But then we also had a pending motion, uh, in the village Creek case that I believe is set, uh, between now and, and the tenth. Does that sound right? It's not okay.

**Judge Jernigan** It's not.

**Marc Platt** Okay. Maybe. Perhaps I'm addressing an issue that, uh, that is not a concern. And so, um, so we're just, we're just moving everything from today to next to next Monday.

**Judge Jernigan** Yes. And, you know. A motion to lift stay emotion to use cash collateral. We have this wrinkle of the why do you need an order in both. Uh, yes, I. I said it last time. I'm going to say it again. I have my doubts how long that case is going to be pending. And that's just based on they don't seem to be filing things that are normal to be filed in cases like these. And the timing of the filing, right. As Mr. Devore was about to take the witness stand, I, I just, you know, time will tell. But, um, we'll see. We'll see if it's still pending a week from now. Alright. Miss young, did you have something?

**Speaker 3** I just did want to, uh, Miss Lindauer did send her a chart over to us, so I just wanted to kind of highlight what the hearings and three forty ones we've got in the next week, just to make sure this is all on the record. Uh, in the if you give me one moment, uh, in the a v village creek, there was a cash collateral hearing set on August fifth at two thirty. And then in the. Uh, Lewis Investments, there was the motion to appoint a chapter eleven trustee on August seventh at nine thirty, which is obviously moot. Uh, what we have over the course of the next week are three, three, forty one meetings, uh, that will need to be commenced and continued. Uh, and what will anticipate doing is commencing and continuing all of the currently set three forty one to a time where it is convenient for Mr. Sherman and Mr. McCullough to be able to attend those as well. But we have the seven twenty seven lofts, best living, seven twenty seven Lofts Holding and Remington Ranches Best Living LLC, all of which are set currently for August fourth, and there are two set on August eleventh as well. So we'll we'll need to do is probably go ahead, at least continue the August fourth ones, and we may just have to reset the rest. Again. We'll have to look at the timing. We may need to commence and

continue some of these to the sort of global. Three forty one date. But that's, I think, our anticipated path forward with those. But I just want to alert the court that those are what is at least hearing, court wise, coming down the pipeline in the next week before the status conference.

**Judge Jernigan** Just curious, the chart, is it just the ten or I guess it's still ten, uh, bankruptcies in the Northern District, or is it the whole In. Nationwide. Oklahoma. Maryland. Delaware.

**Speaker 3** Just the Oklahoma and Texas cases. We don't have any of the information on the case is not included. I think that would be a little bit different anyway. And I do not have the Maryland case included in the chart. I'm just not. So not sure if Miss Lindauer was handling the Maryland case as well, so I'm not sure if she would have been monitoring those developments.

**Judge Jernigan** Yeah, I think we were told that. I can't remember which group of investors precipitated that.

**Speaker 3** And it looks like for the at least the for Oklahoma. Yes. For the Oklahoma cases. They're all pending before Judge Hall. Uh, and the notes say that there is a continued hearing on the motion to dismiss that for August eighteenth.

**Judge Jernigan** Okay.

**Speaker 3** Just to make sure that, again, this is the best information that we have as to what's going forward in, in Texas and Oklahoma.

**Judge Jernigan0** Mhm.

**Judge Jernigan** Okay. Thank you.

**Speaker 2** Okay.

**Marc Platt** Just to close the loop on that, Miss Young, uh, reminded me that, yes, August fifth was the hearing date for the Village Creek cash. Collateral. Uh, motion. I believe the the, uh, I don't know if it was going to be final or next interim, but I guess the question is, can can we move that to Monday as part of the status?

**Judge Jernigan0** Certainly.

**Marc Platt** Thank you.

**Judge Jernigan** Why don't we just say all pending motions are set for status conference on Monday. So I'll I'll just do an order on that maybe instead of a minute entry. Anything else, Miss Lindauer? Anything you want to say? No, not really, but I'll say a couple of things. So, um, I did spend the greater part of Friday on the phone with Mr. Sherman and Mr. McCullough. We've, uh, dropbox our entire files to them so they wouldn't have to recreate anything. They have our list as they as I we pointed out with all the dates and deadlines and everything. Um, Mr. Taylor was concerned about authorizations on the cases. Um, in the documents that we delivered to Mr. Sherman and Mr. McCullough, there were independent director approvals for every case that required one. So, um, so those are in the files that Mr. Sherman and Mr. McCullough have. If they, uh, only some cases require that and not all. I yeah, I don't remember off the top of my head, but I know the ones that did require them. We got them and we had confirmation from the independent directors before those cases were filed. Um, I don't remember. And again, I would have to just go back and look and see if there were any that didn't require that. But if they did require it, we did get it before we filed the case. Otherwise the case would not have been filed. Um, what I want you to understand, Your Honor, and I know, I know this seems helter skelter, and I apologize for that. But a lot of these cases were filed on the eve of foreclosures. Um, Oklahoma does their foreclosures differently than Texas. They don't necessarily have a foreclosure on a particular date. They can. So a lot of these cases, for example, right. For example, um, I think seven, I'd have to go back and look, Your Honor, I wouldn't want all of them had a precipitating event, let's put it that way. Either there was a foreclosure or there was an appointment of a receiver that was fixing to happen. And that's why the case was filed. Okay. Um, there have been no additional cases filed because I don't think there's any authority now to file any additional cases. Um, because if you remember, Louis Investments was the overarching entity. It's in bankruptcy. Um, there's a question why I say claims they own Lewis Investments, if you remember, they provided you that change in operating agreement. Um, and you also have now a trustee over Lewis Investments. So I don't anticipate that there'll be any additional properties filed unless the trustee were to approve it or you say were to file it. So so Your Honor, that's that's where we are. Um, cash collateral,

I think of the the ten cases are actually, I believe eight properties. Uh, half of those do have orders in them allowing cash collateral. The other ones should. I was surprised to hear that the Ridge one didn't have a motion filed because I thought we had filed that um they all had filed schedules. Now every case has filed schedules and statement of affairs. Okay. I only looked yesterday for Lewis. Okay. In the first few pages, there's some sort of glitch where you can't see assets. In fact, um, why don't we check this. Yes, Your Honor. Well, now that you raised that, I'll go back and double check, but all the schedules and statements were filed. Now, if there's some sort of technical problem. I wasn't aware of that, but we'll look at that. Okay. So, Emily, check to see if it was just my operator error or my laptop, but like the first eight pages or something were not. The case right now? No. I will look at Lewis Lewis investments. I know that it showed like a billion dollars of debt. Plus, I don't know what happened on that. What do you mean? We'll definitely take a look at that. But what what I wanted to be clear though, is we have spent and we will continue to spend time with the trustee, getting them up to speed and getting them good files and getting them whatever information I have. We've already Dropbox to them, so they won't have to go on the docket and print things out that we already have. That doesn't seem like a good use of trustee time. I will mention. Yeah. Joyce. Hang on, hang on. Mark. Hang on. Mark. I will mention that the dip financer we mentioned before has asked to meet with the chapter eleven trustee. Um and I don't know if that's been set up or not, but I know there is a move afoot to do that, um and visit and see if something can be worked out. We have two or three investors who have also expressed an interest in working with the trustee. So, so I think there are still no anonymous. Well I don't know if it's anonymous. The papers were given to the trustee. I'm not sure that's. Well yeah. So lenders care about this. Yeah. So since we heard it was going to be priming. Yeah. I Mark is that can can the the disclosure of who the lender be made at this time. I, I don't know that. So I heard Mr. Hewitt make a comment. I wasn't sure if he I will uh, so I'll answer that first. Um, I mean our fear of disclosing the name of the lender was, as the court can see, whenever you say has information, they use it. Um, the lender, uh, is, is named, um, uh, Annenberg Capital. Okay. Who is that? Who is that? Your honor, it's a group that we were connected to. Um, uh, they're a, they're a private equity firm. Uh, and we were connected to them in, I believe, January or February when we were trying to be prepared if, if, uh, Fannie Mae ended up filing foreclosures against us. And they ultimately did, uh, a number looked at doing, buying the Fannie Mae senior loans, uh, because of complexities, continued complexities with the situation, they couldn't move forward. But they did tell us that if we ever filed eleven, they'd want to be they wanted us to, they wanted to be our first call. Uh, when we did move forward with the eleventh, uh, that was, that was the call we made. And that's how they ended up in our network. I also just wanted to offer there's some of the questions Your Honor has asked that I have absolute answers to, but I don't want to be inappropriate. So if there are if you want me to answer some of the questions that you've asked previously that Miss Lindauer didn't know, I would be happy to do so.

**Speaker 3** Okay.

**Judge Jernigan** Maybe another day. Uh, I hope a nom nom isn't proposing a seven zero zero zero percent interest rate.

**Speaker 2** Can I reach out to their principal on Friday requesting that their counsel contact me? I sent it back.

**Judge Jernigan** Okay. All right. Well, uh, one thing I would like to put on the record is that the few times we have had emergency requests for, uh, things at the properties, I have reached out to the lenders, and I know Mr. Platt approved some emergency expenditures. So, um, we will continue to get those calls and feed them to the trustee, but but so far, if we've had those situations come about, um, so far the secured lenders have been very helpful in approving those. We do have those in writing that those expenses have been approved. So, so I want the court to know that to the extent that there are tenants, uh, that we are aware of, if there is an issue for this instance, involves something with their gas and we needed to get their gas addressed. It was addressed within like twenty four hours. Uh, Mr. Platt approved the expense and it was repaired. So, uh, so those things are being taken care of. I want you to know that. Well, on some level, that's comforting. But of course, this is no way to operate in chapter eleven. Understood. Your honor, I understand this is, um. Again, we we see unorganized, chaotic filings a lot. That's why we even have this term free fall bankruptcy. Okay. That's kind of a term of art that bankruptcy lawyers have come up with over the years, because it's either a soft landing or a freefall. Uh, this is so much. More than a freefall. Okay. It is. To say it's unacceptable isn't even enough. I mean, when it is this bad. When it is. Four cases in Oklahoma, ten cases in Texas, one in Maryland. And then the is a in Delaware, it looks strategic. The question is who all is in on the, uh, strategic effort, I think, to thwart the first lien lenders. Um, you know, I'm. Again, I'm not just speculating. Okay. I heard

testimony and I see the pattern here, and it's just it's too bad to assume it's just, oh, we're unorganized. Okay. So that's where I am. We'll see where it goes. We'll see you in a week. Did your did your clerk pull up the Lewis case? Um, I.

**Erick Johnson** Think that.

**Judge Jernigan** Does it. Forty five. Okay. Three. Six three three one one three. And I see everything. Okay. Okay. Okay. Good good good good good good. All right. Thank you. Appreciate it. All right.

# EXHIBIT 17

EXHIBIT 17

**DECHERT LLP**
Marcus A. Helt (TX 24052187)
Debbie E. Green (TX 24059852)
Jack G. Haake (TX 24127704)
2651 N. Harwood Street, Suite 120
Dallas, Texas 75201
Telephone: (214) 453-4900
marcus.helt@dechert.com
debbie.green@dechert.com
jack.haake@dechert.com

**DECHERT LLP**
Jerry L. Hall (admitted *pro hac vice*)
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
jerry.hall@dechert.com

*Counsel for YSA Investments 1, LLC*

**IN THE UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **In re:** | |
| **LOUIS INVESTMENTS, LLC,** | **CASE NO. 26-33110-sgj** |
| **Debtor.** | **CHAPTER 11** |
| **LOUIS INVESTMENTS, LLC,** | |
| **Plaintiff,** | |
| **v.** | |
| **YSA INVESTMENTS 1, LLC,** | **ADV. PRO. NO.: 26-03071** |
| **Defendant.** | |

**DEFENDANT YSA INVESTMENTS 1, LLC'S RESPONSE TO PLAINTIFF'S**
**EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER**

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................................ 3

PRELIMINARY STATEMENT ...................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND...................................................... 2

    A.    The Various Bankruptcy and Legal Proceedings Involving Plaintiff.................... 2

    B.    The Delaware Court of Chancery Validated YSA's Rights After a Full Trial....... 4

    C.    YSA Exercised the Rights Upheld in Delaware ...................................................... 5

    D.    The Maryland Bankruptcy Court Declined to Disturb YSA's Possession ............. 5

ARGUMENT ................................................................................................................... 6

I.    THE DELAWARE JUDGMENT PRECLUDES RELITIGATION OF THE PREMISE ON WHICH THE MOTION DEPENDS ........................................................................ 6

    A.    Collateral Estoppel Bars Relitigation of the Issues on Which This Motion Depends............................................................................................................... 8

    B.    The Rooker-Feldman Doctrine Independently Counsels Against Relitigation of the Delaware Judgment.............................................................................................. 11

    C.    The Maryland Bankruptcy Court's July 24, 2026 Ruling Confirms That the Appropriate Relief, If Any, Is Preservation—Not Restoration of Vesta Realty............... 12

II.    PLAINTIFF CANNOT MEET THE HEIGHTENED STANDARD FOR THE MANDATORY INJUNCTION IT SEEKS................................................................ 14

    A.    Plaintiff Has Not Made the Clear Showing of Likely Success Required for Mandatory Injunctive Relief.............................................................................. 15

        1.    Louis Investments Has No Cognizable § 541 Estate Interest in the Subject Properties ...................................................................................... 15

        2.    Kulick's Prior Sworn Testimony Contradicts the Evidentiary Foundation of the Motion.................................................................................................. 17

        3.    Louis Investments Fails to Support Its Overbroad Motion with Any Evidence Regarding the Vast Majority of the Subject Properties ....................................... 18

    B.    Plaintiff Has Not Demonstrated Irreparable Harm ............................................. 19

  C.  The Balance of Equities Strongly Favors Maintaining the Existing Legal Status Quo 20

  D.  The Public Interest Favors Preserving the Existing Legal Status Quo Pending a Decision on the Merits ................................................................................................. 21

III.  PLAINTIFF LACKS AUTHORITY TO COMMENCE THIS CASE OR SEEK EXTRAORDINARY EQUITABLE RELIEF ............................................................. 22

IV.  ANY RELIEF SHOULD BE CONDITIONED ON SECURITY UNDER RULE 65(C) 24

CONCLUSION ................................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Amarex, Inc. v. El Paso Natural Gas Co.*, 1987 OK 48 (Okla. 1987) .......................................... 22

*Anyadike v. Vernon Coll.*, 2016 U.S. Dist. LEXIS 3161 (N.D. Tex. Jan. 11, 2016) .................... 19

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005) ........................................ 11

*First Sec. Bank v. W&W Farms, Inc.*, 2020 U.S. Dist. LEXIS 18097 (N.D. Tex. Feb. 4, 2020) . 20

*Hunn v. Dan Wilson Homes, Inc.*, 2014 WL 12584308 (N.D. Tex. Jan. 29, 2014) ..................... 18

*In re Abbott*, 809 F. App'x 200 (5th Cir. 2020) ......................................................................... 14

*In re Chesnut*, 422 F.3d 298 (5th Cir. 2005) ............................................................................... 16

*In re Columbia Pipeline Grp.*, 2021 WL 772562 (Del. Ch. Mar. 1, 2021) ............................ 10, 11

*In re Moran*, 413 B.R. 168 (Bankr. D. Del. 2009) ........................................................................ 8

*In re Three Strokes Ltd. Partnership*, 397 B.R. 804 (Bankr. N.D. Tex. 2008) ............................ 16

*In re WC 1st & Trinity GP, LLC*, 2021 U.S. Dist. LEXIS 252285 (W.D. Tex. Mar. 18, 2021) .. 23

*In re Westec Corp.*, 460 F.2d 1139 (5th Cir. 1972) ...................................................................... 16

*Janvey v. Alguire*, 647 F.3d 585 (5th Cir. 2011) .......................................................................... 19

*Lance v. Dennis*, 546 U.S. 459 (2006) ......................................................................................... 11

*Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373 (1985) ......................................... 8

*Montana v. United States*, 440 U.S. 147 (1979) .......................................................................... 10

*Nat'l Ass'n for Gun Rights, Inc. v. Garland*, 697 F. Supp. 3d 601 (N.D. Tex. 2023) .................. 19

*Savage Tavern, Inc. v. Signature Stag, LLC*, 589 F. Supp. 3d 624 (N.D. Tex. 2022) .................. 22

*Shimon v. Sewerage & Water Bd. of New Orleans*, 565 F.3d 195 (5th Cir. 2009) ......................... 8

*State v. Biden*, 10 F.4th 538 (5th Cir. 2021) ............................................................................... 19

*Taylor v. Sturgell*, 553 U.S. 880 (2008) ...................................................................................... 10

*TitleMax of Tex., Inc. v. City of Dallas*, 142 F.4th 322 (5th Cir. 2025)................................. 14, 15

*Trifinity Sols., LLC v. Seay Money Prods.*, LLC, 2026 U.S. Dist. LEXIS 154941 (N.D. Tex. May

   6, 2026) .............................................................................................................................. 19

*Union Planters Bank, Nat'l Ass'n v. Salih*, 369 F.3d 457 (5th Cir. 2004).................................... 11

*United States v. Lucas*, 338 F. Supp. 3d 139 (W.D.N.Y. 2018) ..................................................... 18

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ............................................................. 14

**Statutes**

11 U.S.C. § 105(a) ......................................................................................................................... 19

11 U.S.C. § 362(k)(1) .................................................................................................................... 19

11 U.S.C. § 541(a)(1)...................................................................................................................... 15

**Other Authorities**

Fed. R. Bankr. P. 7065 ................................................................................................................... 24

Fed. R. Civ. P. 65(c) ...................................................................................................................... 24

Restatement (Second) of Judgments § 41 cmt. e .......................................................................... 11

## PRELIMINARY STATEMENT

Plaintiff Louis Investments, LLC ("Plaintiff" or "Louis Investments") seeks an emergency temporary restraining order that would, in effect, restore operational control of a portfolio of multifamily apartment properties to the very management structure that stands accused of fund misappropriation, fraudulent transfers, Ponzi-like commingling of rents, and the wholesale failure to maintain residential housing for hundreds of tenants across Oklahoma, Kansas, and Arkansas. The Motion is built around the spectacle of a single morning's events at the Riverpark at Kensington property on July 20, 2026—and it largely omits the years-long history that produced those events.

The chronology tells the real story. On November 13, 2025, Marc Kulick and his personal investment vehicles sued YSA in the Delaware Court of Chancery to invalidate the very mortgages and security interests that underlie YSA's claimed rights across the Louis/Vesta portfolio. Kulick sought a preliminary injunction and lost it, the Chancery Court holding that relief would alter rather than preserve the status quo and conditioning any interim relief on security of approximately $22.37 million—security Kulick never posted. The case proceeded to trial. After live testimony from Kulick himself and more than two hundred exhibits, the Delaware Court entered judgment for YSA on June 9, 2026, upholding the authority on which YSA's interests rest. Three days later, a wave of Kulick-affiliated entities commenced bankruptcy filings—first in the Western District of Oklahoma, then here. On July 20, 2026, Louis Investments filed this case and this Motion on the same day, framing YSA's exercise of title rights as a stay violation while concealing that those rights were validated after a full trial.

The Motion fails for four independent reasons. First, YSA holds recorded title to the Subject Properties pursuant to deeds executed and recorded before the petition date—title whose

1

validity was upheld after a full trial in the Delaware Court of Chancery. Plaintiff's automatic-stay theory depends on the premise that those conveyances are void and that Louis Investments retains cognizable estate interests in the Subject Properties, but that premise is, at best, disputed—and the dispute cannot be resolved in Plaintiff's favor on an emergency record where a court of competent jurisdiction has already tried the underlying authority questions and ruled against Kulick. Second, even if the Court reaches the standard TRO factors, Plaintiff seeks mandatory relief that restores an altered status quo, triggering a heightened burden Plaintiff cannot meet. Third, Plaintiff cannot demonstrate irreparable harm where the Bankruptcy Code provides statutory avoidance remedies and where Plaintiff's own management record demonstrates the greater danger to tenants lies in restoring Plaintiff to control. Fourth, the public interest strongly disfavors emergency judicial intervention that would award Plaintiff effective control of a multi-property portfolio before the underlying title and authority questions are adjudicated. The Motion should be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    The Various Bankruptcy and Legal Proceedings Involving Plaintiff

Louis Investments is a Kansas limited liability company purportedly controlled by Marc Kulick. Kulick also manages Vesta Realty, LLC ("Vesta Realty"), the operating arm overseeing approximately 7,492 apartment units across Oklahoma, Kansas, and Arkansas through a network of individual property-owning LLCs. Louis Investments describes itself as the "direct or indirect manager of most of the Title Owners," Mot. ¶ 20, but does not itself hold title—ownership is at the individual property-owner LLC level. Louis Investments was formed as the upstream manager of Riverpark Best Living, LLC, owner of a multifamily apartment complex. Compl. ¶¶ 21–22.

On June 12, 2026, four related Kulick-affiliated debtors filed Chapter 11 cases in the United States Bankruptcy Court for the Western District of Oklahoma: Fairfax Investors, LLC (No. 26-11984); Fairfax Best Living, LLC (No. 26-11985); Woodland Oaks Best Living, LLC

2

(No. 26-11986); and Woodland Oaks Investors, LLC (No. 26-11987). *See* App'x Exs. 1–4. Each debtor is wholly owned by an entity that is believed to be singularly controlled by Marc L. Kulick. See App'x Exs. 5–8 (List of Equity Security Holders—No. 26-11984 (Vesta Fairfax, LLC); No. 26-11985 (Fairfax Holding Company, LLC); No. 26-11986 (W.O. Sole Member, LLC); No. 26-11987 (W.O. Holding Co., LLC)). Kulick has used these entities as "personal investment vehicles" to manage an interconnected, commingled web of investments. *See* App'x Ex. 9 (Post-Trial Mem. Op., Del. Ct. of Chancery, C.A. No. 2025-1319-KSJM) at APP 33, 47 n.107.

Shortly before these Chapter 11 filings, a receiver was appointed over the debtors in Oklahoma County based on trial court findings that Kulick has a habit of siphoning funds for improper use. App'x Ex. 10 (Okla. Receiver Order); App'x Ex. 9 at APP 37 n.107. The Delaware Court of Chancery specifically found—and Kulick admitted—that he commingled personal funds with Vesta's to create a "lending pool" to move cash between properties and pay one property's debts with another's proceeds, a practice confirmed by a forensic accountant's review of his bank accounts. App'x Ex. 9 at APP 37 n.107.

Kulick and certain investment entities were sued on June 25, 2026 in the Northern District of Oklahoma for racketeering, including wire fraud, mail fraud, and money laundering. App'x Ex. 11 (*Upperman v. Kulick*, 4:26-cv-383 (N.D. Okla. June 25, 2026), Verified Compl. ¶¶ 86–100). A forensic accountant (American Fiduciary Services) found account activity "highly correlated with classic Ponzi-like schemes and highly demonstrative of commingled sources and uses of funds," including more than $5 million in transfers to pay personal credit cards and automobile loans, "up to $37,473,988 in credit-card charges with no apparent business purpose; $10,241,940 in net transfers to Kulick-controlled accounts through 93 transactions; and $4,406,608 in disbursements to Raymond James & Associates," among other suspect transactions. *Id.* ¶¶ 34–35.

On June 12, 2026, Fannie Mae sued Kulick and Vesta in the Western District of Oklahoma, similarly alleging that they collect "almost $2 million in rents every month" that is "not being used to maintain the property, make repairs, protect the tenants, or pay off liens . . . but presumably is being diverted for undisclosed purposes," and that Kulick and Vesta are "currently defending more than 15 lawsuits that, in the aggregate, allege he owes the various plaintiffs more than $100 million." App'x Ex. 12 (*Fed. Nat'l Mortg. Ass'n v. Kulick*, 5:26-cv-1400 (W.D. Okla. June 12, 2026), Compl. ¶ 29 & n.1).

Since the Delaware Court of Chancery entered judgment for YSA on June 9, 2026, Kulick-affiliated entities have filed no fewer than fourteen bankruptcy cases across three federal districts—eight in this Court, four in the Western District of Oklahoma, and two in the District of Maryland—all involving properties or entities within the same Vesta/Louis portfolio and all placing YSA's interests at issue. It is against that backdrop that this proceeding was filed on July 20, 2026, seeking to unwind YSA's acquisition of the Riverpark at Kensington Apartments in Tulsa, Oklahoma.

B.     **<u>The Delaware Court of Chancery Validated YSA's Rights After a Full Trial</u>**

On November 13, 2025, Kulick and his personal investment vehicles commenced litigation in the Delaware Court of Chancery seeking to invalidate the second mortgages YSA had recorded against properties in the Louis/Vesta portfolio. Kulick moved for a preliminary injunction and lost; the Court held that the requested relief would alter rather than preserve the status quo and conditioned any interim relief on approximately $22.37 million in security, which Kulick did not post. The case proceeded to trial with live testimony—including from Kulick—and more than two hundred exhibits. The Court of Chancery entered judgment for YSA on June 9, 2026, finding that: (i) Kulick controlled or managed the title-owning entities across the portfolio; (ii) a Joinder Kulick himself proposed bound the title-owning entities as additional pledgors under the Collateral Pledge

4

and Security Agreements; (iii) the governing Power of Attorney authorized YSA, in its sole discretion, to take action against the real property owned by those entities; and (iv) YSA properly exercised that authority by recording mortgages against the Subject Properties. Those findings directly determine the validity of the interests on which YSA's claimed rights in the Subject Properties rest.

### C.    YSA Exercised the Rights Upheld in Delaware

After the Court of Chancery issued its post-trial opinion, YSA exercised the contractual rights recognized in that decision. A Special Warranty Deed conveying the Riverpark Property to YSA was recorded in the Tulsa County land records on June 18, 2026—more than a month before the commencement of Louis Investments' bankruptcy case. See App'x Ex. 18 (Special Warranty Deed for Riverpark). On July 20, 2026—the same day Louis Investments filed this bankruptcy and this Motion—YSA, accompanied by Tulsa Police Department officers and representatives of Capital Assets (a property management company), appeared at the Riverpark at Kensington property, as the record title holder. Kulick and Vesta Realty personnel were present. When informed of the bankruptcy, Officer Rice stated that YSA "has a deed" and that the bankruptcy was "not my concern." Vesta Realty personnel left the property under threat of trespass tickets and arrest. YSA also changed locks at three properties already in bankruptcy: 727 Lofts Best Living, Barcelona Best Living, and A-V Village Creek Owner LLC. Louis Investments frames these events as automatic stay violations. YSA's position is that its actions were the exercise of rights upheld after full trial in Delaware, against a debtor whose estate interests in upstream management are, at most, arguable rather than established.

### D.    The Maryland Bankruptcy Court Declined to Disturb YSA's Possession

On July 20, 2026, Jenk's Best Living, LLC—the Kansas entity affiliated with Kulick that owns the Thrive apartment complex in Jenks, Oklahoma, subject to the same YSA loan documents

and power-of-attorney at issue here—filed an adversary proceeding in the United States Bankruptcy Court for the District of Maryland (Case No. 26-17758-MMH; Adv. No. 26-00176-MMH), and moved on an emergency basis for a temporary restraining order seeking, among other things, to restore it to possession and operational control of the property. The Maryland court held an emergency hearing on July 22, 2026, and issued its Preliminary Order on July 24, 2026. *See* App'x Ex. 13 (*In re Jenk's Best Living, LLC*, No. 26-17758-MMH, Adv. No. 26-00176-MMH (Bankr. D. Md. July 24, 2026, Order). Despite hearing arguments that YSA's claimed ownership and title rested on invalid instruments and should be unwound—the same foundational question underlying Louis Investments' challenge here—the court declined to restore the debtor to possession or unwind YSA's acquisition of title. Instead, it allowed YSA to remain in possession and to collect rents from the property, requiring only that those proceeds be reinvested into the property's maintenance and operation, that excess funds be held in reserve, and that YSA file periodic accountings pending further order of the court. The court expressly acknowledged the significance of the Delaware Chancery Court's decision and calibrated its order to respect that ruling.

**ARGUMENT**

**I.    THE DELAWARE JUDGMENT PRECLUDES RELITIGATION OF THE PREMISE ON WHICH THE MOTION DEPENDS**

Louis Investments asks this Court to grant, on an emergency basis, substantially the same relief it seeks at the end of this adversary proceeding: to unwind completed prepetition conveyances, divest YSA of recorded title, and restore Plaintiff to operational control of more than 7,400 apartment units across thirty-plus properties. Stripped of its emergency framing, the Motion asks this Court to enter an order directly contrary to a judgment entered against Marc Kulick—Plaintiff's self-described manager and 100% owner—after a full trial on the merits in the Delaware

6

Court of Chancery.

The Motion largely omits the relevant chronology. On November 13, 2025, Kulick, Vesta Holdings, LLC, and Asset Holder, LLC sued YSA in the Court of Chancery to invalidate the very second mortgages Plaintiff now challenges. Kulick sought a preliminary injunction and lost: the Chancery Court held that the relief he requested would alter rather than preserve the status quo and conditioned any interim relief on security of approximately $22,368,257.93, which Kulick never posted. After live trial testimony from Kulick himself and more than two hundred exhibits, the Court of Chancery entered judgment for YSA on June 9, 2026, holding that the Joinder Kulick himself proposed bound the title-owning entities as additional pledgors, that the governing Power of Attorney authorized YSA to act against their real property in its sole discretion, and that YSA was entitled to record the mortgages.

What followed was a migration to the bankruptcy courts—but only after YSA had already recorded its deeds. YSA completed the conveyances by recording deeds in lieu of foreclosure for the Subject Properties in the applicable county land records well before any petition was filed. *See* App'x Ex. 18 (Special Warranty Deed for Riverpark, recorded June 18, 2026); App'x Ex. 19 (Special Warranty Deed for Village Creek, recorded June 18, 2026). Record title had passed to YSA, and the Delaware judgment had foreclosed the theory underlying every count of the Complaint, before Louis Investments commenced its Chapter 11 case on July 20, 2026 and filed this adversary proceeding. Plaintiff's own Witness and Exhibit List, filed July 24, 2026, confirms this sequence: Exhibits 28 and 29 are the YSA deeds in lieu for Riverpark and Village Creek, respectively—both predating the petition. *See, e.g., In re 727 Lofts Best Living*, *LLC*, No. 26-32779-sgj11 (Bankr. N.D. Tex. June 25, 2026); *In re Barcelona Best Living, LLC*, No. 26-33093-sgj11 (Bankr. N.D. Tex. July 9, 2026); *In re A-V Village Creek Owner, LLC*, No. 26-32922-sgj11

(Bankr. N.D. Tex. July 2, 2026). Only after YSA's title was a matter of public record did Kulick turn to the bankruptcy courts.

The Motion fails before the Court reaches the Rule 65 factors. First, collateral estoppel bars relitigation of the issues the Court of Chancery decided after a full trial—issues identical to those on which this Motion depends. Second, even if the Court reaches Rule 65, Plaintiff seeks mandatory relief that alters rather than preserves the status quo, triggering a heightened standard Plaintiff cannot meet. Third, the United States Bankruptcy Court for the District of Maryland, confronting the same underlying dispute on July 24, 2026, declined to restore the debtor to possession and instead imposed only preservation obligations on YSA—the correct template for any relief this Court might consider.

### A. Collateral Estoppel Bars Relitigation of the Issues on Which This Motion Depends

Under 28 U.S.C. § 1738, the Delaware judgment must receive the same preclusive effect Delaware courts would give it. *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380–81 (1985); *Shimon v. Sewerage & Water Bd. of New Orleans*, 565 F.3d 195, 199 (5th Cir. 2009). Under Delaware law, collateral estoppel applies where: (i) the issue previously decided is identical to the one presented; (ii) the prior action was finally adjudicated on the merits; (iii) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication; and (iv) that party had a full and fair opportunity to litigate. *In re Moran*, 413 B.R. 168, 181 (Bankr. D. Del. 2009). Each element is satisfied.

*Identical Issues*. Every claim in the Complaint shares a single premise: that Kulick lacked authority to subject the Title Owners' properties to YSA's collateral package, and that each instrument flowing from that authority is therefore void or avoidable. The Court of Chancery tried that premise and rejected it. After a trial at which Kulick testified and more than 220 joint trial

exhibits were admitted, the Court held:

- Kulick himself proposed expanding the collateral package through "a joinder to the portfolio as a whole" and instructed counsel to "add a joinder that joins any asset controlled by any affiliate of mine." App'x Ex. 9 at APP 64.

- Kulick controlled or managed the title-owning entities and executed the Joinder on their behalf. *Id.* at APP 59.

- By operation of the Joinder, the title-owning entities—including the entities that own the Subject Properties—became additional pledgors under the Collateral Pledge and Security Agreements. *Id.* at APP 59–60.

- The governing Power of Attorney authorized YSA, in its sole discretion, to "take whatever steps that it deems necessary" to "secure and protect its interests," including "taking any action against any of the Collateral or any real or personal property owned by the Collateral." *Id.* at APP 60. This power "is not tied to or limited by the definition of Collateral." *Id.* at APP 60–61.

- YSA properly exercised that authority by recording second mortgages on real property owned by the Collateral—i.e., the Subject Properties. *Id.* at APP 62–63.

Plaintiff now asks this Court to reach the opposite conclusion on the same questions against the same defendant that prevailed in Delaware after trial. Each holding was necessary to the judgment and each forecloses the premise on which this Motion depends—that YSA's interests in the Subject Properties arose from unauthorized acts. Nor were the Delaware court's findings limited to the specific instruments before it. The court directly addressed the broader portfolio of Title Owner properties at issue here, crediting Kulick's own testimony that he repeatedly recorded second mortgages on properties owned by Title Owners and that 32 of Vesta's 34 properties routinely needed cash—a shortfall Kulick addressed by commingling funds across the portfolio through a "lending pool" used to pay the debts of one property with proceeds from another. *Id.* at APP 47 n.107. The Delaware court thus examined the very network of Title Owner entities, and the management practices through which Kulick controlled them, that Plaintiff now places at the center of this Motion.

*Final Adjudication on the Merits*. The Court of Chancery entered a post-trial memorandum

9

opinion and judgment for YSA on June 9, 2026, following full discovery, briefing, and trial. S*ee* App'x Ex. 9. That is a final adjudication on the merits for purposes of collateral estoppel. Louis Investments' own conduct confirms it: the opinion appears as Exhibit 32 on Plaintiff's Witness and Exhibit List, without any notation that the judgment is stayed or on appeal. A party that affirmatively places a judgment in the record as its own exhibit cannot credibly dispute its finality.

*Privity*. Louis Investments is bound by the Delaware judgment because it was in privity with Kulick and the Vesta entities who litigated in Delaware. A nonparty is bound where it controlled or substantially participated in the prior litigation. *Montana v. United States*, 440 U.S. 147, 154 (1979); *Taylor v. Sturgell*, 553 U.S. 880, 895 (2008). Under Delaware law, a nonparty is bound when it "controls or substantially participates in the control of the presentation on behalf of the party." *In re Columbia Pipeline Grp.*, 2021 WL 772562, at *16, 21 (Del. Ch. Mar. 1, 2021) (quoting Restatement (Second) of Judgments § 39).

Plaintiff will likely argue that Kulick sued in Delaware in his personal capacity and that Louis Investments was not named. That argument fails. On Kulick's own account, Kulick is Louis Investments—he is its sole owner and manager, and the Delaware court found that he "controls or manages the Title Owners," App'x Ex. 9 at 59, whose properties make up Louis Investments' management portfolio. Kulick cannot litigate the question of whether YSA has rights over those properties in Delaware, lose, and then repackage an identical challenge through the corporate entity through which his management rights flow. Moreover, Louis Investments has confirmed its relationship to the Delaware proceeding by placing the post-trial opinion on its own Witness and Exhibit List as Exhibit 32—an entity that treats another court's judgment as authoritative enough to introduce as evidence cannot simultaneously disclaim any connection for preclusion purposes. Finally, the relief Kulick sought in Delaware was relief for Louis Investments' direct benefit: the

10

second mortgages he sought to remove were recorded against the very properties over which Louis

Investments asserts management rights here. The benefit of the Delaware action flowed to Louis

Investments; the burden of the judgment must follow. *See* Restatement (Second) of Judgments §

41 cmt. e.

That Louis Investments is now a Chapter 11 debtor in possession is of no moment. The

premise of preclusion is control at the time of the prior litigation, not at the time preclusion is

invoked. A losing party cannot escape a judgment by filing bankruptcy. *See In re Columbia*

*Pipeline Grp.*, 2021 WL 772562, at \*21.

*Full and Fair Opportunity to Litigate*. Kulick had every opportunity: he filed suit, moved

for a preliminary injunction, conducted discovery, participated in a trial, submitted post-trial

briefing, and testified on the precise questions at issue here. Having had a full and fair opportunity

to establish his position and having failed, Kulick and the entities he controls may not seek a second

bite at the apple in this Court.

### B.    The Rooker-Feldman Doctrine Independently Counsels Against Relitigation of the Delaware Judgment

Beyond collateral estoppel, the Rooker-Feldman doctrine reflects a broader principle:

federal courts, including bankruptcy courts, are not appellate courts for state-court losers. *See*

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005); *Union Planters Bank,*

*Nat'l Ass'n v. Salih*, 369 F.3d 457, 462 (5th Cir. 2004). Although Rooker-Feldman applies most

directly to named parties—and Louis Investments was not itself a named party in Delaware—the

Supreme Court has recognized the open question whether the doctrine applies against a nonparty

that "simply steps into the [state court plaintiff's] shoes" and seeks "de facto appellate review of a

state-court judgment." *Lance v. Dennis*, 546 U.S. 459, 465–66 (2006). Louis Investments is doing

precisely that: its Complaint asks this Court to declare that Kulick lacked authority to subject the

Subject Properties to YSA's collateral package—the identical question the Court of Chancery answered adversely to Kulick after trial. According to Kulick's own sworn declaration, Louis Investments is 100% owned and managed by him, he prosecuted the Delaware action on its behalf, and the relief he sought there was for Louis Investments' benefit. Asking this Court to reach the opposite conclusion is precisely what the Rooker-Feldman doctrine does not tolerate.

YSA does not invoke Rooker-Feldman as a wholesale jurisdictional bar to this adversary proceeding, which also asserts avoidance claims under 11 U.S.C. §§ 544, 547, 548, and 550 that are distinct federal bankruptcy causes of action. The principle does, however, support the conclusion that the contractual authority questions—whether the Joinder bound the Title Owners, whether the Power of Attorney authorized YSA's actions, and whether the mortgages and deeds in lieu of foreclosure were valid exercises of YSA's rights—may not be re-litigated on an emergency record in this Court. These questions have been tried and decided. Any claim for relief that requires a different answer to those questions fails at the threshold.

C.     **The Maryland Bankruptcy Court's July 24, 2026 Ruling Confirms That the Appropriate Relief, If Any, Is Preservation—Not Restoration of Vesta Realty**

On July 22, 2026, the United States Bankruptcy Court for the District of Maryland heard emergency argument on a TRO motion brought by Jenk's Best Living, LLC—one of the Title Owner entities in the same Kulick/Vesta portfolio—raising substantially identical claims against YSA. YSA opposed. On July 24, 2026, the Maryland court entered its Preliminary Order. See App'x Ex. 13.

The Maryland court's analysis is instructive and its outcome is telling. The court expressly acknowledged the Delaware post-trial opinion, observing that "the Delaware Chancery Court has issued an opinion addressing certain issues that may impact those before the Court" and that "the Delaware Chancery Court decision may not, in the end, affect the merits of a fraudulent transfer

12

action under section 548 of the Code, but at this early stage and on an interim basis, the Court feels compelled to recognize and respect a decision of that Court." *Id.* at APP 176. The court further noted that "the third and fourth factors are a closer matter for the Court, given the yet unresolved meaning of the Delaware Chancery Court's decision and potential grounds for YSA's actions under that decision." *Id.*

Critically, the Maryland court did not restore the debtor to possession. It did not displace YSA's management of the property. It did not require YSA to reinstall the debtor's former property manager. Instead, the court deliberately declined to address the automatic stay claims and grounded its limited relief solely on the debtor's fraudulent transfer claims under § 548—claims which are asserted in the parallel second adversary proceeding brought by the Title Owners here, not in this adversary proceeding brought by Louis Investments. *Id.* at APP 174–75.

The relief the Maryland court did grant reflects the correct balance. The court ordered YSA to: (i) maintain the subject property and take all steps reasonably necessary for its preservation; (ii) collect rents in accordance with applicable law and apply all proceeds to the ongoing maintenance, upkeep, operation, and preservation of the property; (iii) hold any excess proceeds in a separate reserve account pending further order; (iv) file regular accountings with the court; and (v) refrain from any further transfers, encumbrances, or dispositions of the property without court approval. *Id.* at APP 177–78. YSA remained in operational control.

That approach—preservation obligations on YSA, no restoration of the former management structure, and court supervision of rents and proceeds—is the appropriate model for any interim relief this Court might consider. Louis Investments' Motion seeks something categorically different: mandatory, immediate restoration of Vesta Realty to operational control of over thirty properties, withdrawal of instructions to law enforcement, return of keys, credentials,

13

and management offices, and production of communications—all on two days' notice and without any evidentiary record. The Maryland court, after hearing argument and reviewing the same underlying record, concluded that relief of that breadth was not warranted. This Court should reach the same conclusion.

The contrast in what Louis Investments seeks here versus what the Maryland court granted also reveals the mandatory nature of the relief sought. The Maryland order is prohibitory in character: it restricts what YSA may do going forward while leaving the current operational state intact. Louis Investments' proposed TRO order is mandatory in character: it commands affirmative acts—withdraw instructions, return property, restore management, produce documents—that would require undoing completed transactions and altering the petition-date status quo. Mandatory injunctive relief is disfavored and subject to a heightened standard. *TitleMax of Tex., Inc. v. City of Dallas*, 142 F.4th 322, 328–29 (5th Cir. 2025). Prohibitory injunctive relief of the preservation type granted in Maryland, on the other hand, is available upon the ordinary Rule 65 showing—and even that lesser form of relief requires a showing Louis Investments has not made, as set forth in Section II below.

## II.  PLAINTIFF CANNOT MEET THE HEIGHTENED STANDARD FOR THE MANDATORY INJUNCTION IT SEEKS

Federal Rule of Civil Procedure 65, made applicable by Federal Rule of Bankruptcy Procedure 7065, authorizes preliminary injunctive relief only upon a clear showing that the movant is likely to succeed on the merits, likely to suffer irreparable harm absent relief, that the balance of equities favors an injunction, and that the injunction serves the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *In re Abbott*, 809 F. App'x 200, 201–02 (5th Cir. 2020). The movant bears the burden on each factor, and failure to establish any one of them defeats the request for extraordinary relief.

14

Plaintiff's burden is even greater because the relief requested is not prohibitory. Plaintiff does not ask the Court merely to preserve existing conditions while the parties litigate the merits. Rather, it seeks to divest YSA of record title, restore Plaintiff to operational control of the Property, and undo completed prepetition transactions. Such relief alters—not preserves—the status quo and therefore constitutes a mandatory injunction, which is disfavored and should issue only in the most compelling circumstances. *See TitleMax*, 142 F.4th at 328–29. Plaintiff cannot satisfy that heightened standard.

### A.     Plaintiff Has Not Made the Clear Showing of Likely Success Required for Mandatory Injunctive Relief

Plaintiff's likelihood-of-success showing fails for several independent reasons. In addition to the fact that the Delaware Court of Chancery has already rejected the central factual premise underlying the Motion, as discussed above, Louis Investments holds no cognizable § 541 estate interest in the Subject Properties, Kulick's prior sworn testimony contradicts the evidentiary foundation of the Motion, and Louis Investments has adduced no evidence relevant to the vast majority of the Subject Properties.

#### 1.     Louis Investments Has No Cognizable § 541 Estate Interest in the Subject Properties

The automatic stay protects cognizable legal or equitable interests held by the debtor in property—a lien, a mortgage, a title claim, a contract right with a definite counterparty, a statutory entitlement. 11 U.S.C. § 541(a)(1). The breadth of § 541 is real, but it does not transform every corporate affiliation or upstream governance relationship into a protected estate interest. Louis Investments premises its alleged right to relief on the vague allegation that it has "upstream management rights, governance rights, control rights, contract rights, claims, defenses, causes of action, and other property-related interests in or relating to the Subject Properties." Mot. ¶ 82. It holds no mortgage, lien, or recorded security interest in any Subject Property. It holds no deed,

title, or fee interest in any Subject Property. Its only claimed "estate interests" are derivative of the organizational arrangements through which Kulick structured his portfolio, not legally cognizable rights in the Subject Properties protected by §§ 541 and 362.

Plaintiff's own witness forecloses Louis Investments' argument to the contrary. Benjamin Didier, Vesta's Chief Operating Officer, declares: "Vesta Realty's operational authority at those properties is derived from these [Property Management] agreements. It does not arise merely from Marc Kulick's position or authority as a sponsor, or from Louis Investments, LLC." Didier Decl. ¶ 3 (Dkt. 16). That concession is dispositive on two levels. First, Louis Investments has no independent management interest of its own to protect: the entity seeking TRO relief is, by the account of the COO, a stranger to the agreements that confer operational authority. Second, Vesta's PMAs run to the Title Owner entities, which conveyed their properties to YSA by recorded deeds before the petition date. YSA as successor owner is not bound by management agreements it did not assume. Even Vesta's own authority has been extinguished by the prepetition conveyances; Louis Investments' far more attenuated claim fares no better.

Plaintiff relies on *In re Westec Corp.*, 460 F.2d 1139 (5th Cir. 1972), *In re Three Strokes Ltd. Partnership*, 397 B.R. 804 (Bankr. N.D. Tex. 2008), and *In re Chesnut*, 422 F.3d 298 (5th Cir. 2005), for the uncontested proposition that non-fee interests can be property of the estate protected by § 362(a)(3). But those cases do not carry Plaintiff's argument. *Westec* protected the debtor's recorded first and second mortgage interests in Florida real estate against a taxing authority that foreclosed postpetition without seeking leave of the reorganization court. *Three Strokes* protected the debtor's perfected second lien note—a $1,992,643 recorded security interest—against a first lienholder that sought to foreclose postpetition. And *Chesnut* extended stay protection to a debtor's arguable community-property interest in real estate titled to his wife,

when a creditor proceeded with a postpetition foreclosure sale with knowledge of the bankruptcy. The interests the debtors held in each of those cases—recorded mortgages, a perfected lien, a statutory community-property right—are categorically different from vague, undefined "upstream management rights" that derive from Louis Investments' governance relationship with the entities that previously held title to the Subject Properties. Louis Investments points to no lien, no mortgage, no recorded instrument, and no statutory property doctrine that would place its claimed interests in the same category.

2. <u>Kulick's Prior Sworn Testimony Contradicts the Evidentiary Foundation of the Motion</u>

A mandatory injunction requires a clear evidentiary showing. The Motion rests principally on the Kulick declaration, which asserts that Kulick lacked authority to bind Louis Investments and the Title Owner entities to YSA's collateral package. That declaration is directly and materially contradicted by Kulick's own prior sworn trial testimony. When YSA's counsel asked before the February 2025 loan whether the collateral package should cover the rest of his portfolio, Kulick responded: "The answer is yes and no. I suggest we keep that the same but maybe add a joinder to the portfolio as a whole." App'x Ex. 9 at APP 64. The next day, he confirmed by text that the documents should have "no change . . . except to add a joinder that joins any asset controlled by any affiliate of mine." *Id.* At trial, Kulick admitted he signed the Joinder as "manager, member or other authorized person" of the Guarantor Entities, acknowledged he was "desperate" for funding, and stated he was "not playing the victim on paying high interest rates." *Id.* at APP 45–46, 59. His deposition testimony went further: he testified that he had "full power and authority to bind the Affiliates" and described himself as the "sole decision-maker." App'x Ex. 14 (Kulick Feb. 5, 2026 Dep. Tr.) at 643:24–644:3 (APP 276–77); App'x Ex. 15 (Kulick Dec. 30, 2025 Dep. Tr.) at 19:10–14, 149:3–6 (APP 354, 484).

17

Kulick now declares the opposite. Both positions cannot be true. His trial testimony—given under oath, tested by cross-examination against 222 exhibits, and credited in a post-trial opinion—is far more reliable than a litigation declaration prepared days before an emergency hearing. *See Hunn v. Dan Wilson Homes, Inc.*, 2014 WL 12584308, at *5 (N.D. Tex. Jan. 29, 2014); *United States v. Lucas*, 338 F. Supp. 3d 139, 145 (W.D.N.Y. 2018). A mandatory injunction that rests substantially on a declaration materially at odds with the declarant's prior sworn testimony cannot supply the clarity the heightened standard demands. The four supplemental Vesta employee declarations do not cure this problem. Rohan Joseph, Benjamin Didier, Kelley Washington, and Kendra Butterfield each address operational disruption—who was present at which property, how many employees have returned, and what maintenance issues exist. Joseph Decl. ¶¶ 5–7, 9–10 (Dkt. 15); Didier Decl. ¶¶ 6–7, 11–13; Washington Decl. ¶¶ 4–6, 8–9 (Dkt. 17); Butterfield Decl. ¶¶ 8–11, 13–17 (Dkt. 18). Not one has personal knowledge of the loan documents, the Joinder, the Power of Attorney, or the contractual authority questions that determine whether Louis Investments has any legal right to the relief sought. Operational disruption is not a substitute for the legal showing the heightened standard requires.

3.  <u>Louis Investments Fails to Support Its Overbroad Motion with Any Evidence Regarding the Vast Majority of the Subject Properties</u>

Even if Louis Investments could establish a clear right to relief with respect to one or two properties, its Motion sweeps across all thirty-plus Subject Properties—7,492 apartment units across multiple states. The evidentiary record it has assembled does not come close to supporting relief of that scope. The four supporting declarations address events at Riverpark, Village Creek, Lexington Commons, Barcelona, 727 Lofts, and Woodland Manor. *See* Joseph Decl. ¶¶ 5–7; Didier Decl. ¶¶ 6–7; Washington Decl. ¶¶ 4–6; Butterfield Decl. ¶¶ 2, 8–11. There is no property-specific evidence for the vast majority of the Subject Properties listed in Exhibit A to the

Complaint. A mandatory injunction is an extraordinary remedy that requires a property-specific showing, not a portfolio-wide allegation. Louis Investments has not clearly established its right to relief for any property, let alone for all of them. The Motion's ambition is inversely proportional to its evidentiary support, and that disproportion alone warrants denial.

### B.     Plaintiff Has Not Demonstrated Irreparable Harm

Plaintiff fails to establish irreparable harm. To obtain the extraordinary relief it seeks, Plaintiff must show harm that is actual, imminent, and not compensable in money damages. *See Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). Speculative or self-inflicted harm does not suffice. *State v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021); *Nat'l Ass'n for Gun Rights, Inc. v. Garland*, 697 F. Supp. 3d 601, 626 (N.D. Tex. 2023).

Plaintiff's own Complaint defeats its irreparable harm showing. Count IV alleges that "Louis Investments has no adequate remedy at law," Compl. ¶ 115, yet Counts I and II seek "compensatory damages," "operational damages," "business-interruption damages," "attorneys' fees," and "costs" and "expenses" for the identical conduct. Compl. ¶¶ 93, 102. A plaintiff cannot plead a full suite of compensatory remedies and simultaneously maintain that no adequate remedy at law exists. Those claims—together with the statutory remedies available in this proceeding, *see* 11 U.S.C. § 362(k)(1) (mandating actual damages, costs, and fees for willful stay violations); 11 U.S.C. § 105(a) (authorizing compensatory civil contempt sanctions)—are the adequate remedy. *See Trifinity Sols., LLC v. Seay Money Prods.*, LLC, 2026 U.S. Dist. LEXIS 154941, at *4 (N.D. Tex. May 6, 2026) ("injury is irreparable only if it cannot be undone through monetary remedies") (quoting *Ryan LLC v. FTC*, 739 F. Supp. 3d 496, 516 (N.D. Tex. 2024)); *Anyadike v. Vernon Coll.*, 2016 U.S. Dist. LEXIS 3161, at *28–29 (N.D. Tex. Jan. 11, 2016) (irreparable injury requires "no other adequate legal remedy").

The harms Plaintiff identifies are also economic in character and susceptible to calculation. Plaintiff describes disruption to management operations, rental income, software access, vendor and tenant relationships, and employee functions. Compl. ¶¶ 57, 114. Each of these is a business-interruption loss that can be valued in dollars. Courts consistently hold that loss of operational control over commercial real estate is not irreparable where the claimed losses are reducible to money. *See First Sec. Bank v. W&W Farms, Inc.*, 2020 U.S. Dist. LEXIS 18097, at *30 (N.D. Tex. Feb. 4, 2020) (what matters is "not so much the magnitude of the loss but rather the 'irreparability' of the loss"—whether losses "could not be undone through monetary remedies"). Recasting economic losses as "management rights" and "governance rights" does not convert them into equitable injuries for which no legal remedy exists.

No certain, great, and actual harm will follow from denial. As set forth *infra* § II.C–D, the greater danger to the Property—and to others holding valid interests in it—lies in Plaintiff and Kulick remaining in control. YSA intends to stabilize rents and address the operational and habitability failures that have accumulated under that control. Plaintiff has not carried its burden on this element, and the motion should be denied.

C.     **The Balance of Equities Strongly Favors Maintaining the Existing Legal Status Quo**

The balance of hardships favors YSA. YSA holds record title pursuant to instruments executed and recorded before the petition date, following litigation in which the Delaware Court of Chancery upheld the authority on which YSA acted. Granting an injunction would require the Court, on an abbreviated record, to displace that existing legal status quo, transfer operational control of a significant multifamily housing project, and effectively award Plaintiff much of the ultimate relief sought in this adversary proceeding. Denial of interim relief, by contrast, simply preserves the parties' legal positions while the merits are adjudicated. Should Plaintiff ultimately

prevail, the Bankruptcy Code provides mechanisms to unwind the challenged transactions; should YSA prevail, the extraordinary disruption of mandatory injunctive relief will have been avoided. The equities favor restraint.

**D.**      **The Public Interest Favors Preserving the Existing Legal Status Quo Pending a Decision on the Merits**

The public has a substantial interest in the stable operation of residential housing and the protection of tenants—interests the record shows Plaintiff has failed to serve. Local reporting documents a pattern of operational failures under Vesta's management—unpaid utility bills, neglected maintenance obligations, and tenants left to bear the consequences of Plaintiff's mismanagement. Hundreds of residents at Riverpark at Kensington faced an emergency water shut-off after the City of Tulsa posted termination notices citing more than $117,000 in unpaid utility bills at a complex that operates as an "all-bills-paid" community, meaning tenants pay utility costs through their monthly rent, yet management allowed the debt to accumulate while refusing to respond to city officials, leaving tenants to wonder where their rent money is going. *See* App'x Ex. 16 (*Tulsa Apartment Residents Face Water Shut-Off over $117,000 Unpaid Bill*, KRMG Mar. 23, 2026). Trash went uncollected for more than two weeks at multiple Vesta properties, including Riverpark, leaving overflowing garbage bins throughout the complex. *See* App'x Ex. 17 (*Progress on Apartment Trash Clean-Up, but Residents Still Frustrated*, KJRH, Jan. 9, 2026). The public interest is not served by restoring operational control to the very entity whose mismanagement produced these conditions. It demands orderly, stable management—not emergency judicial intervention transferring control before the parties' competing rights have been adjudicated.

Nor is this a case about preserving existing conditions. YSA's deed to the Riverpark Property was recorded on June 18, 2026—more than a month before Louis Investments filed its Chapter 11 petition. *See* App'x Ex. 18 (Special Warranty Deed for Riverpark). That recorded

21

instrument is the existing legal status quo. Plaintiff asks the Court to restore operational control to Vesta Realty and effectively grant substantial portions of the ultimate relief sought in the Complaint. Compl. ¶¶ 4, 25. Rule 65 should not be employed on an emergency record to accomplish what ordinarily requires full litigation on the merits. *See Savage Tavern, Inc. v. Signature Stag, LLC*, 589 F. Supp. 3d 624, 639 (N.D. Tex. 2022) (mandatory injunction that "seeks to alter the status quo prior to litigation rather than maintain it" requires that "the facts and law must *clearly* favor the moving party") (citing *Justin Indus., Inc. v. Choctaw Secs., L.P.*, 920 F.2d 262, 268 n.7 (5th Cir. 1990)).

Finally, the public has a significant interest in the stability and predictability of recorded property transactions. Recorded mortgages, deeds, and other publicly recorded instruments exist so that parties may rely upon them in structuring commercial affairs. *See Amarex, Inc. v. El Paso Natural Gas Co.*, 1987 OK 48, ¶ 14 (Okla. 1987). That interest is especially acute here, where the challenged transactions were followed by litigation culminating in a post-trial judgment upholding the authority on which those transactions were based. App'x Ex. 9 at APP 59–60, 66. Granting mandatory injunctive relief would undermine confidence in both recorded property interests and the finality of judicial proceedings. The public interest strongly favors preserving the parties' existing legal positions pending adjudication on the merits.

## III.    PLAINTIFF LACKS AUTHORITY TO COMMENCE THIS CASE OR SEEK EXTRAORDINARY EQUITABLE RELIEF

Although the hearing for July 27 was principally scheduled to address Louis Investments' Motion for Temporary Restraining Order, there remains an overarching issue concerning Louis Investments' purported authority to even seek the relief it requests through this proceeding. It is, of course, basic that a bankruptcy petition filed on behalf of an entity is only valid if authorized by those with the legal power to act on the entity's behalf. *See In re WC 1st & Trinity GP, LLC*, 2021

22

U.S. Dist. LEXIS 252285, at *4 (W.D. Tex. Mar. 18, 2021) (citing *Price v. Gurney*, 324 U.S. 100, 106 (1945)). Accordingly, even before the Court reaches Rule 65, the Court should assess whether the persons purporting to act on behalf of Louis Investments possessed authority to file bankruptcy, and by virtue of the bankruptcy petition, invoke this Court's jurisdiction. The threshold authority question arises from Louis Investments' own governing documents and the public record of its membership structure.

First, the Amended and Restated Operating Agreement of Louis Investments, LLC, executed on January 27, 2026—nearly six months before the July 20, 2026 petition date—designates YSA Investments 1, LLC as the Company's sole Member, owning 100% of the membership interests, and simultaneously designates YSA Investments 1, LLC as the Company's sole Manager. Ex. 20 (Operating Agreement) at APP 656. Section 6(a) of the Operating Agreement vests in the Manager "full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company" and expressly provides that "[n]o Member other than a Member who is the Manager has any authority to act for or on behalf of the Company." *Id.* at APP 657. Section 6(e) further provides that so long as YSA Investments 1, LLC or any affiliate is a Member, that entity must approve the appointment or removal of any Manager. *Id.* at APP 658. That ownership is confirmed by the executed Membership Certificate for Louis Investments, LLC, dated January 30, 2026, reflecting YSA Investments 1, LLC as the holder of 100% of the membership interests. Ex. 21 (APP 666). Marc Kulick's name appears nowhere in the Operating Agreement or the Membership Certificate. Yet Kulick's declaration filed in support of this Motion states under penalty of perjury that he is "the manager and 100% sole owner of Louis Investments, LLC." Kulick Decl. ¶ 1. Plaintiff has not demonstrated—because it cannot demonstrate—that YSA Investments 1, LLC, as the Company's sole Member and sole Manager, authorized or consented

to the filing of this Chapter 11 case or this adversary proceeding.

Second, the public record further corroborates YSA's ownership. A UCC-1 financing statement filed with the Kansas Secretary of State on January 26, 2026 (Filing No. 122068026) identifies the collateral as "100 out of 100 Membership Interests of Louis Investments, LLC, a Kansas Limited Liability Company." Ex. 22 (UCC-1 Filing) at APP 669. A UCC-3 Amendment filed three days later, on January 29, 2026 (Filing No. 122080526), substitutes YSA Investments 1, LLC as the secured party of record in place of YSA Holdings 1 LLC. Ex. 23 (UCC-3 Amendment) at APP 672. Those filings are stamped and acknowledged by the Kansas Secretary of State and were on file for nearly six months before the July 20, 2026 petition date. They are irreconcilable with Kulick's sworn statement that he is the Company's 100% sole owner. *See* Kulick Decl. ¶ 1. Conspicuously absent from Plaintiff's filing is any instrument showing that YSA Investments 1, LLC—the actual sole Member and sole Manager—authorized, approved, or even was consulted about the commencement of this bankruptcy case or the filing of this adversary proceeding. That omission matters because Plaintiff's present authority to prosecute this case depends on precisely that consent.

Where, as here, the authority of the persons purporting to act on behalf of the debtor is itself disputed—and where that dispute turns upon the same contractual provisions that form the basis of Plaintiff's merits claims—the Court should hesitate before issuing mandatory injunctive relief that would substantially alter the parties' legal and practical positions.

## IV.      ANY RELIEF SHOULD BE CONDITIONED ON SECURITY UNDER RULE 65(c)

Rule 65(c) permits a temporary restraining order or preliminary injunction only if "the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." Fed. R. Civ. P. 65(c), made applicable by Fed. R. Bankr. P. 7065. To the extent the Court grants any relief, YSA respectfully

24

requests that it be conditioned on the posting of a bond sufficient to compensate YSA for any costs

and damages resulting from a wrongfully issued injunction.

## CONCLUSION

For the foregoing reasons, YSA respectfully requests that the Court deny the Motion; or,

in the alternative, condition any relief on security under Rule 65(c) in an amount commensurate

with YSA's exposure; and grant such other relief as is just.

Dated: July 27, 2026          Respectfully submitted,
Dallas, Texas

**DECHERT LLP**


*/s/ Debbie E. Green*
Marcus A. Helt (TX 24052187)
Debbie E. Green (TX 24059852)
Jack G. Haake (TX 24127704)
2651 N. Harwood Street, Suite 120
Dallas, Texas 75201-1574
Telephone: (214) 453-4900
marcus.helt@dechert.com
debbie.green@dechert.com
jack.haake@dechert.com

- and -

Jerry L. Hall (admitted *pro hac vice*)
Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036
Telephone: (212) 698-3500
Facsimile: (212) 698-3599
jerry.hall@dechert.com

*Counsel for YSA Investments 1, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on this date a true and correct copy of the foregoing Response was served by the Court's CM/ECF system on all parties receiving electronic notification in this proceeding.

Dated: July 27, 2026
        Dallas, Texas

                                        /s/ Debbie E. Green
                                        Debbie E. Green

26

# EXHIBIT 18



**Kimberly Chilcutt <kc@investdig.com>**

## TRUSTEE EMAIL Louis Investments / YSA Bk Matter

1 message

**Maria Casariego** <maria@business-esq.com>                    Wed, Aug 12, 2026 at 10:01 AM
To: Kimberly Chilcutt <kc@investdig.com>

*Maria K. Casariego, Esq.*
Associate Attorney



1826 Ponce de Leon Blvd.
Coral Gables, FL 33134
O: (305) 600-3816
F: (305) 600-3817
maria@business-esq.com
www.business-esq.com

ATTORNEY-CLIENT PRIVILEGED COMMUNICATION: This communication was transmitted by an attorney, may contain privileged and confidential information, and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, please immediately reply to the sender that you have received this communication in error and then delete it. Thank you.
CIRCULAR 230 NOTICE: To comply with U.S. Treasury Department and IRS regulations, we are required to advise you that, unless expressly stated otherwise, any U.S. federal tax advice contained in this transmittal is not intended or written to be used, and cannot be used, by any person for the purpose of (i) avoiding penalties under the U.S. Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any transaction or matter addressed in this e-mail or attachment.
The hiring of a lawyer is an important decision that should not be based solely on advertising. Before you decide, ask us to send you free written information about our qualifications and experience.

**From:** Nicholas Gurguis <Nick@syllp.com>
**Date:** Tuesday, August 11, 2026 at 4:51 PM
**To:** Maria Casariego <maria@business-esq.com>; kdm@romclaw.com <kdm@romclaw.com>
**Cc:** Ryan Clancy, ESQ. <ryan@business-esq.com>; Ericka Johnson <ejohnson@bayardlaw.com>; james.grogan@gtlaw.com <james.grogan@gtlaw.com>; Emily Campbell <ecampbell@romclaw.com>
**Subject:** Re: Louis Investments / YSA Bk Matter

Hi Maria,

Thanks for reaching out. It probably makes sense for us to have a call to connect on those issues and discuss when in the case we want to address them at some point.

We just received copies of the authorizing resolutions and LLC agreements and are digging into those.

While we are doing that, it would be useful to know what deficiencies in authorization that you have identified, as well as the steps your client took to take control of the equity of Louis Investments.

Thanks,
Nick

Nick Gurguis
Attorney

Sherman & Yaquinto, L.L.P
509 N. Montclair Avenue
Dallas, Texas 75208
(214) 942-5504

**From:** Maria Casariego <maria@business-esq.com>
**Sent:** Tuesday, August 11, 2026 3:40 PM
**To:** Nicholas Gurguis <Nick@syllp.com>; kdm@romclaw.com <kdm@romclaw.com>
**Cc:** Ryan Clancy, ESQ. <ryan@business-esq.com>; Ericka Johnson <ejohnson@bayardlaw.com>; james.grogan@gtlaw.com <james.grogan@gtlaw.com>
**Subject:** Louis Investments / YSA Bk Matter

Mr. Gurgis/McCullough


This office represents YSA Investment 1, LLC. We write to inquire about the steps that have been taken to address the lack of authority and improper venue
issues previously raised. We would appreciate your clarification on these matters, as we believe further explanation is needed in this matter.

Thank you in advance.

Best,


*Maria K. Casariego, Esq.*
Associate Attorney



1826 Ponce de Leon Blvd.
Coral Gables, FL 33134
O: (305) 600-3816
F: (305) 600-3817
maria@business-esq.com
www.business-esq.com


ATTORNEY-CLIENT PRIVILEGED COMMUNICATION: This communication was transmitted by an attorney, may contain privileged and confidential information, and is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this transmission in error, please immediately reply to the sender that you have received this communication in error and then delete it. Thank you.
CIRCULAR 230 NOTICE: To comply with U.S. Treasury Department and IRS regulations, we are required to advise you that, unless expressly stated otherwise, any U.S. federal tax advice contained in this transmittal is not intended or written to be used, and cannot be used, by any person for the purpose of (i) avoiding penalties under the U.S. Internal Revenue Code, or (ii) promoting, marketing or recommending to another party any transaction or matter addressed in this e-mail or attachment.
The hiring of a lawyer is an important decision that should not be based solely on advertising. Before you decide, ask us to send you free written information about our qualifications and experience.

# EXHIBIT 19

EXHIBIT 19

# 26.08.03 - Vesta Louis Investments BK Trustee Hearing (Transcript)

**Judge Jernigan** This morning in all the related cases. Seven twenty seven Lofts Best Living Remington Ranch Lofts at North Penn Ave Village Creek owner Barcelona, Best Living, Lewis Investments, Woodland Manor Ridge. Best living. Um, I'd like to start by getting appearances from the lawyers in the courtroom who plan to say anything this morning. Mr. McCall.

**Speaker 2** Kevin McCullough, Rochelle McCullough, proposed counsel for Daniel Sherman, chapter eleven trustee, who's also in the courtroom. Okay. Good morning, Lauren, sort with us, who is clerking with us this summer.

**Judge Jernigan** Okay. We recognize Lauren from, uh, I think Judge Larson. You heard for her this summer. Good to see you. Good morning, Your Honor.

**Speaker 3** Liz Young and Asher Butler for the U.S. trustee.

**Judge Jernigan** Thank you.

**Marc Platt** Good morning, Your Honor. Marc Platt from Gibbons for creo Q r S and P LLC in the loss of North Penn Best Living LLC case and creo q r s v c LLC in the a v Village Creek LLC case.

**Speaker 2** Thank you. Your honor, Steve Moriarty for Q zero one eight retention LLC. Uh, Baker, uh, we're appearing in the seven twenty seven, both seven twenty seven cases. And with me today is Bob Richards with Dentons as co-counsel.

**Judge Jernigan** Okay. Thank you.

**Speaker 2** Thank you. Robert. Good morning, Your Honor. Eli Columbus with Haynes and Boone. Um, we represent the senior secured lender in the Woodland Manors Best Living LLC case. The Woodland Manor Tick Won LLC case and the Ridge Best Living LLC case. Uh, our co-counsel is Crowe and Dunleavy. I think Mr. William Hawk is on the WebEx meeting, uh, from Oklahoma City, Your Honor.

**Judge Jernigan** All right, and who is your client leader?

**Speaker 2** It's a mouthful. So, in the Woodland Manor, best living and Woodland Manor cases, our client is term fund B.

**Judge Jernigan** Okay.

**Speaker 2** For m r a seller LLC. And in the Ridge best Living LLC case, our client is term fund three m r a seller LLC. So all from here on out they'll be the senior lenders in those cases.

**Judge Jernigan** Okay. That that will be perfectly fine. Thank you. Thank you.

**Speaker 5** Good morning, Your Honor. Clay Taylor with Spencer Fain appearing on behalf of G. A m Chestnut Properties, LLC. And they are a tenant in common with Barcelona best living. And we're appearing in that case.

**Judge Jernigan** Thank you. Good morning, Your Honor.

**Eli Columbus** John Lozano with Bracewell LLP on behalf of Yamato OKC lender, LLC. And we're lender in the Barcelona Barcelona case.

**Judge Jernigan** Okay. Thank you. Your honor. Joyce Lindauer here on behalf of the debtors and and all of the cases this morning. I don't anticipate saying much unless the court has any questions of me, but. But I wanted to make an appearance. Thank you. Thank you.

**Speaker 7** Good morning, Your Honor. For John Alex Upperman Illini Holdings, LLC. Thrive Real Estate LLC, Wildwood Assets, LLC to properties LLC, both Oak Lending LLC and Oak Street Capital, LLC. Okay. Good morning.

**Judge Jernigan** All right. I know we have lots of people on the video. I don't know how many are observing versus plan to speak. Um, if, if you want to announce your appearance because you plan to speak, uh, you may do so at this time. All right. Well, Your Honor. Oh go ahead.

**Erick Johnson** Erica Johnson from Bayard, PA, I'm Delaware bankruptcy counsel for Wise Investments, and I may potentially address the court. Thank you, Your Honor. Okay.

**Judge Jernigan** I'm glad you're here, because we do have lots of questions about the bankruptcy filing. Uh, in the middle of a hearing, uh, we had last week, uh, involving. Yeah. All right. Anyone else?

**Eli Columbus** Good morning, your honor. This is Robert Nunley on behalf of the city of Stillwater, Oklahoma, in connection with the Remington Ranches. Best living writer.

**Judge Jernigan** Thank you.

**Eli Columbus** Mr. Hardcastle. Was the Oklahoma Council all right?

**Judge Jernigan** Thank you. Anyone else? All right.

**Speaker 9** Yes, this is Janice Schiff. We're calling tonight on behalf of our back opportunity Funds.

**Judge Jernigan** All right. Thank you. All right. Well, Mr. McCullough, I'm glad you're here. Oh, wait. Did we have someone else? Miss Stevenson? Sorry. My apologies, Your Honor, I was I had myself muted. Um, I'm here for David Rhodes, the prepetition receiver for Woodland Manor, best Living, LLC. Okay. Thank you. Thank you. All right. Well, Mr. McCullough, I'm glad you are here. I'm glad Mr. Sherman has accepted the US trustee's appointment. Uh, for any of you who don't know, he's, I guess, the longest tenured, most experienced trustee we have in the Northern District of Texas. And I'm never.

**Speaker 2** It's never a good sign when the.

**Marc Platt** Trustee's office.

**Speaker 2** Thank you for taking it.

**Judge Jernigan** Well, and you have probably dipped your toe in this enough to know this has been, uh, chaotic and unorganized, to say the least. Uh, so much so that, um, well, we can elaborate as we go today as appropriate. But needless to say, the court has huge concerns about, uh, lots of people getting caught in the fray of the unorganized series of filings. So what what can you tell us is based on I don't know how long you've been involved, but probably a few hours, maybe days.

**Speaker 2** Yeah, this weekend and I tried to get up to speed as much with the public filings that I had and some stuff that Miss Lindauer was kind enough to, to send over to get my learning curve as quick as possible. And it probably raised more questions the more I read than than less. But I'm not hearing a lot of issues with first lien holder positions.

**Judge Jernigan** So you're not hearing a lot as far as just challenging.

**Speaker 2** I'm disputing, so I'm not sure there's going to be a lot of that. Um, I'm not I don't have a clear picture on which properties have equity and which ones don't. I don't have a clear picture on who's operating them and why. Um, and this is kind of an equity fight in my opinion. in this case, not over the equity, over actual ownership type issues, which is unusual and not normal. To see that type of uncertainty in what I consider to be just single asset real estate. What should be a very simple case is probably as complicated as one I've ever seen with relating to just apartment complexes. Um, overlay that with all of the venue problems that we have. Um, and I'm not sure where we go from for that. Uh, in my perfect world, it would all be in one court and we would have one decider of what would happen because there's still who knows, but we're going to need an adult to cut the cord on certain issues. Um, and we're going to need, and I, I don't want venue games being played. Well.

**Judge Jernigan** We may already have had that. So the question is what do we do. and and you're getting up to speed. And we also have some new lawyer faces. So just so everyone is clear, what we have, we had by our last count or case for bankruptcy cases filed in Oklahoma. I think it was, I want to say Western District of Oklahoma, but I'm not sure I'm right about that. That's what I read, but I don't I'm not sure that was correct.

**Speaker 2** I stopped at Oklahoma. That's all I know so well.

**Judge Jernigan** Anyway, just for somewhere in Oklahoma. Then we had, I think by last count, ten different chapter elevens filed in the Northern District of Texas, but not all at once spread out over about two or three weeks.

**Speaker 2** And I'm not sure why on that.

**Judge Jernigan** But, well, you know, an experience, an experience judge and trustee might jump to conclusions. Okay. Um, and I don't think it's simple, as simple as, you know, right on the eve of I. Well, anyway, so for then at least ten by last count, although the last time we heard last week in court, we heard there might be more coming. Um, then we had one bankruptcy in Maryland and then we had, uh, just as Deborah Raleigh was about to testify at four forty nine p m last Tuesday, the entity he controls was a that claimed to first have second liens on all of these Mark Kulich properties and then through a power of attorney, transferred title allegedly, uh, to say. Uh, then you say filed bankruptcy and we'll hear from their counsel, but my staff has been monitoring and nothing has happened as far as debtor activity since Tuesday.

**Speaker 2** My understanding is the creditor body in that case is for law firms.

**Judge Jernigan** That's what we saw. So obviously. I wait for evidence. I wait for evidence. But this looks like a chaotic, unorganized pattern of filing cases here, there and everywhere to thwart the first lien holders. Okay. Including. I don't even know if Mr. Kulick and Mr. Devereaux are, for lack of a better term, in cahoots on this. You know it. Just a person might believe that. That it's all about hoarding the first lien holders. I am very concerned. But then we heard about bat infestations. We heard about roach infestations. We heard about water being cut off. We heard about a building that burned down on one, uh, one property. And it's just kind of sitting there. We heard about swimming pools, empty green. So it's a lot. It's a lot.

**Speaker 2** And I'm still not clear what we're fighting over what at the end of the day, how much equity is there. And, and it can cannot afford the weight of the administrative costs of a bankruptcy. And then at the end of the day, when I'm representing a trustee, I want to know, who am I doing this for?

**Judge Jernigan** Mhm.

**Speaker 2** So I want to meet with all the first lien holders, see if they're willing to carve outs, whether they want to pay the freight, whether there's a benefit being in bankruptcy for them, clearing up title or resolving this equity issue, or would they rather be somewhere else? Um, because it's really their money that we're playing with and what we're putting at risk, in my opinion, from just being in this for just hours, you know, a couple days probably.

**Judge Jernigan** Apparently there are a lot of investors who would hope you're wrong about that.

**Speaker 2** And I hope I'm wrong too. But I've been through enough of these where, um, the best the story ever is, is the first time you hear it. Mhm. So as we get into this further and further, it's just going to get messier and messier and more and more expensive. And when you come into these bankruptcies without a plan and you're just, it just doubles the cost. Um, so not having a well thought out, not having a game plan in place and us just playing catch up. I don't like being reactive in a case like being proactive. So it's, it's starting off as a nightmare, and I don't want to be coming back to this court on an emergency basis every other day asking for relief that you're not comfortable with, or it's an emergency and it's just putting out fires. And then who am I doing it for?

**Judge Jernigan** So yeah, it may very well be that they're, you know, as you say, uh, will help the secured lenders clear up title issues if they get orders from of course, are they going to have to get orders from this court and the Delaware court? Right. Um, but as far as others out there, I mean, there may be causes of action, massive causes of action to pursue against insiders, but maybe they aren't going to be the as we always say, the juice won't be worth the squeeze, right?

**Speaker 2** There's always with this type of activity, you can't help but think there's a piano can't help but think there's a pretty strong transfer point. I think this you know, I'm an open book on things. I think the most valuable asset in the Delaware bankruptcy is the privilege. I think if you can get a trustee up there that owns the privilege, that will break the logjam in this case. MM.

**Judge Jernigan** Okay. Well. Did you have anything at this early juncture you wanted to report to the court? I, you know, insurance. I don't know if that's something near and dear to your heart as well as the I understand.

**Speaker 2** I haven't seen any other policy. My understanding I reviewed any of them is that there is insurance on all the properties. The Fannie Mae properties have forced place insurance. Um, but I don't know what the.

**Judge Jernigan** That's what we heard, but I don't think we ever had documents. Yeah.

**Speaker 2** I don't know when they expire. I don't know any of the details of it. And I apologize for that.

**Judge Jernigan** All right. Well, you're very new on the scene. Um, well, I'll just jump to that right now because we've got a problem if there's no insurance.

**Speaker 3** Thank you, Your Honor. The short answer is yes. We have insurance. Okay. We still don't know all of the world of insurance that we have, and especially for I think it's undisputed that the two Fannie Mae properties just have Fannie Mae forced placed insurance, which may result in some other concerns we have about whether or not that's going to be sufficient, because I do believe I think it's just would have to look at the documents may just be property insurance, not liability insurance. And again, trying to keep all of these properties straight. I don't know if these are ones that have tenants where certainly, I think we would want to ensure that there is some kind of liability insurance, and some of this may be able to be addressed by the trustee and a go forward basis. If these are properties that are worth keeping in bankruptcy, or we may have to kind of go through in a much more with a scalpel and figure out what we can carve out. We have received copies of property and liability insurance for the other policies. Some are just certificates of insurance, and so we need to make sure that they are fully bound and not just a certificate that we have received. We do need the actual policies again, just to make sure that the estates are going to be protected. We received the copies of those policies, I believe, Thursday and Friday of last week. So we are still on our end, going through and figuring out what what concerns we may have about insurance. And, and then obviously the the big question would be, who has the money to pay for insurance on a go forward basis? So if these are installment plans, do we are we covered through the month of August? But we may be back here with September because the policies have lapsed due to non-payment, because there's no money in some of these estates because of all of these. You know, to quote Mr. McCullough, all of the questions on who actually owns these properties and where the rents may be being deposited on a go forward basis. So. So yes, we have insurance. We're still working through some of those nuances. But I can say that there is we have been provided, I think, everything that the debtors had. Um, again, not sure it's going to be sufficient for us, but there is some insurance in place.

**Judge Jernigan** Okay. Thank you. Um, I want to make sure the trustee knows and you, you you probably know, but. Among the chaotic facts we have is we have two different property managers, one capital assets which was retained by y a on I forget how many several of the properties for. Okay. Mr. Taylor, I think he's been in on these hearings from the beginning. Uh, so four of the properties have, uh, capital assets retained by Y s a, and then I guess all the remaining ones still have the Mark. Kulick controlled property manager, Vesta Realty. I guess we hit the first of the month over the weekend. I don't know if anyone knows where all of those rents have gone.

**Speaker 2** And I and I had a brief discussion on that issue in the hallway. And, um, once again, there are five steps ahead of me on the chess board. They have identified a property management group that they are all happy with. Oh, that could be more independent. And it wouldn't be beholden to one side or the other. So that will be the first test, um, to the parties on whether they're going to be reasonable negotiations. Can we all agree on just one property manager that will be independent.

**Judge Jernigan** Okay. All right. So I'm glad that people are in that loop. And since cash flow is involved, I I'm not surprised people are involved. Well, does anyone else in the courtroom wish to speak in any way? Um, all right. Well, I want to talk to Miss Johnson, uh, in Delaware, who filed the bankruptcy case for wise investments. Um, you know, what would you like to tell me? But what I would like to hear is what is going on with that bankruptcy? No motions to use cash collateral, no normal first day motions. Uh, the we looked at the voluntary petition because when we were told, after two long days of hearings involving Issa that they had suddenly filed bankruptcy, we felt like we needed to verify it. And we see for creditors, for law firms listed. And yet we see five hundred million to one billion dollars worth of liabilities. So what can you tell me about that case at this juncture?

**Erick Johnson** Thank you, Your Honor. Erica Johnson from Bayer on behalf of YSA Investments. I do want to note that there's been a lot of assumptions and a lot of speculation, I think, being said this morning that aren't supported by evidence. Um, you know, including kind of casting aspersions about why Essa and Issa's involvement with Kulick and I just wanted to spell and dispute any notion that they're acting in cahoots or that this is something that was perpetrated to negatively affect the first lien lenders. The bankruptcy was precipitated because of the chaos of what's going on, and Cook's statement that even more bankruptcies could potentially be filed. Your honor, there are cases pending in Oklahoma. And those cases, the US trustee has moved to dismiss the cases for improperly being filed for lack of corporate authorization. We understand that the trustee is seeking a hearing in mid-August. You know, on those cases, and you're correct, there's also a case that was pending in Maryland. And then the cases that were filed before, Your Honor, in Texas. And then there's a question in terms of whether that venue, um, you know, was manufactured or not, uh, if there's truly a tie within Texas. But frankly, why I say, you know, could not continue litigation costs in multiple venues without an end in sight with potentially more filings, uh, Occurring in the case. So while there haven't been a lot of filings in the bankruptcy case, there is work being done behind the scenes, Your Honor. There was appointed filings.

**Judge Jernigan** Let me stop you. Well, you said while there have not been a lot filings, there have been no filings by the debtor in six days.

**Erick Johnson** That's correct, Your Honor. And that's not unusual in a case that does not have operations itself. It does not have employees. It does not have its own lease. Affiliated entities have lease. So it doesn't have utilities. It doesn't owe taxes. So first day motions are only needed if there's Pre-petition asserts.

**Judge Jernigan** It asserts that it owns dozens of apartment complexes. That is the position it has taken in this court.

**Erick Johnson** It does, Your Honor, but it's not the direct liability of Ysaye to pay the Prepetition claims. Those are covered right now under an order in Maryland, as well as an order that Your Honor entered in terms of the chapter eleven trustee appointment and keeping the current management in place, at least until the chapter eleven trustee was in a position to make decisions, and we wanted to honor that request and actually understand.

**Judge Jernigan** I really want to drill down on this. I don't understand what you're saying. Why is a after having it second, liens basically validated on thirty something properties. It it, it took a power of attorney. It had from Mark Kulick and using that did deeds in lieu of foreclosure on I understood thirty two or something properties. Okay. Why they took the position in this court that it owns thirty two or so. I'm not sure that's the exact number. I'm not sure if it if it executed and filed the deeds in lieu on all of the properties or just many, many, many of them. So right now, it's claiming to be the owner of several apartment complexes in which thousands of residents reside. You're telling me that it doesn't have much, and it doesn't need to file any motions to use cash, collateral or other operating type? Chapter eleven motions.

**Erick Johnson** No, Your Honor. What I said was that there was no immediate need for paying pre-petition amounts, which is why you didn't see the traditional first day motions filed. I don't dispute that there needs to be a cash collateral.

**Judge Jernigan** Okay. Go ahead. Continue. Maybe you're about to address what I was going to ask.

**Erick Johnson** I believe I'm trying to address what the court's asking, but there will need to be a cash collateral order that's put in place with respect to use of rents. Right now for the properties, there's ten of them that Issa has. It's third party, not controlled by way, say, a third party property management company, which I think, Your Honor, heard testimony from its principal. That's handling that right is not controlled.

**Judge Jernigan** Why do you say not controlled by. Why is that.

**Erick Johnson** Meaning that it's not an insider or affiliate? It does have a contractual agreement with the third party vendor, but it's not like an insider related affiliate that's in place. So that property management company in August would start collecting the rent for the August for ten of the properties, not for all of the properties, as Your Honor knows. And those are being held in segregated accounts separated by property. And I've had some conversation with some of the first lien lenders that have a council. Um, and that money is only being

used for regular maintenance and upkeep of those properties. That's consistent with an order that was entered by the Maryland courts and consistent with Your Honor's order in terms of maintaining the status quo until chapter eleven, trustee can make decisions with respect to the property. Our intent was to try to confer with the chapter eleven trustee that's appointed in order to try and figure out a path forward. We do agree that it may make sense for the cases to be in one venue, to decide some of the issues going forward, and to determine on a property by property basis which ones have equity. But this is not just an equity, you know, dispute. Why I say it's also a lender and predator in certain of the cases. Um, and it is a threshold issue in terms of which properties have equity value, which ones don't. There are some also in addition to these bankruptcy cases that are enmeshed in receivership type disputes, as well as other state court litigation that's going on. So why is the primary creditors really are the law firms at the moment, which is why for general unsecured creditors, you saw primarily law firms listed in the top twenty predators, but there are numerous secured creditors that are involved as well, Your Honor, involved whose interests are at stake. Your honor, there's some that I've had communications with. I haven't been able to talk to all the secured lenders at this point to determine how obviously, they have a say in how the cases progress. Um, you know, one option and one thought in terms of if I had a say.

**Judge Jernigan** They have a say in how the case progresses, your client doesn't have authority to do a darn thing with their cash collateral unless they consent. And it sounds like you're saying you've talked to some of them and they've consented, or unless you have a court order and you haven't even filed a motion to get a court order.

**Erick Johnson** You're not. Your honor, I haven't said that anyone has consented. There's existing orders from the courts to maintain the status quo. And that's what we're operating under currently. We're trying to negotiate a consensual cash collateral order that would impact all of the first lien lenders. Obviously, we would like to do that first with the input of those lenders, and that's what we're trying to do first.

**Judge Jernigan** Why haven't you filed a motion? Why have you not filed a motion?

**Erick Johnson** We do intend to file a motion this week. We're trying to identify who the lenders are.

**Judge Jernigan** As everyone knows, the normal protocol in a single asset real estate case is to immediately file your motion to use cash collateral. And then if you, you know, hope to negotiate something consensual, that's sort of the impetus to get everyone focused.

**Erick Johnson** Agreed, Your honor, in a typical case, that's how it would be done. This case was filed without the benefit of having time to plan and prepare for it. Given the multitudes and chaos of all these filings going all around the country with various disputes, including whether or not the cases should even remain in bankruptcy. So understandably, why, I say was distracted in being able to kind of plan before it filed. However, there are, which is also unusual orders that are in place to maintain the status quo from various courts. And so and no cash collateral is being used. Your honor, at this point, to be clear, that's wonderful. Wonderful.

**Judge Jernigan** We have thousands of residents and no one is spending money on normal operating needs.

**Erick Johnson** Only pursuant to the existing orders. Would would cash collateral be spent? To be clear, why is hey hasn't had the management control of the properties with any rents coming in until August one. Not an issue where Y is control.

**Judge Jernigan** Control. Several weeks ago of certain of these properties.

**Erick Johnson** The rents the eight collected with the property management company did not start until August one.

**Judge Jernigan** All right. Well, I guess time will tell on that. So when when do we expect things to start happening in your case?

**Erick Johnson** Your honor this week part of the issue too is having the debt financing, which will be scheduled for this week for at least the is a control properties. And of course, we would like to talk with the chapter eleven trustee as well in the Texas cases to try to develop a path forward.

**Judge Jernigan** You have a debt financing lined up for Y. S.A. and the Y. S.A. controlled properties.

**Erick Johnson** Their marketing for outside lending. But it sounds like it's going to need to be an insider. Given all the litigation that is occurring, it would likely be an insider loan to help the process.

**Judge Jernigan** And it. Would it be a loan?

**Erick Johnson** No, Your Honor, that's not that's not what's been discussed.

**Judge Jernigan** Okay.

**Erick Johnson** But the negotiations have not finished. I know they're in the process of retaining counsel.

**Judge Jernigan** Okay. Well. That's a rather surprising report. Anything else?

**Erick Johnson** I think, Your Honor, we will have more to report once we've had a chance to confer with the lenders and the chapter eleven trustee.

**Judge Jernigan** You have had a chance. You have had a chance to confer. It's been six days.

**Erick Johnson** The chapter eleven trustee, Your Honor, was just appointed, and we have not had a chance to confer with the chapter eleven trustee. Okay.

**Judge Jernigan** But what about the lenders?

**Erick Johnson** I've spoken with two of them.

**Judge Jernigan** Okay. Well. Do you have anything else? I do have Mr. Moriarty getting up.

**Erick Johnson** No, Your Honor, not unless the court has further questions or there's something raised by any other party.

**Judge Jernigan** Okay. We'll see. All right, Mr. Moriarty.

**Eli Columbus** Thank you, Your Honor. Steve Moriarty. We have the baker and the seven twenty seven cases. I was just a little confused on what? To ask the court for some clarification. I was almost hearing you say bankruptcy counsel trying to bootstrap authority to spend rents on your order to maintain the status quo. And I didn't think that that was Your Honor's order.

**Judge Jernigan** Yeah, I don't have it in front of me. But but I was I was just concerned because we had thousands of residents in. I wanted some clarity on who the property managers for now were true, but I don't think I said anything about no use of cash collateral.

**Eli Columbus** So I just wanted that clarification on the record. That order does not authorize rents to be paid to maintain the properties.

**Judge Jernigan** Okay. Thank you. Would you like to respond to that, Miss Johnson?

**Erick Johnson** Yes, Your honor. The last paragraph of your order says that the current property management companies would remain in place, and that rents would only be used for maintenance of the properties. And there was a separate cash collateral order negotiated with respect to seven hundred twenty seven with the court. So I think Your Honor's order states that status quo in terms of only necessary expenses, should be paid to maintain the properties for the tenants.

**Judge Jernigan** Okay. At the very least, we need clarifying orders, I think. Uh, but. Is someone going to say the automatic stay of your bankruptcy is being violated? If this court enters order that an order that addresses these properties.

**Erick Johnson** I don't believe, Your Honor, that we dispute that regular maintenance needs to be done at the properties. Number of the properties have code violations from before is a um had their property manager come into into play here. And we also agree that these tenants need to be looked after and the rent need to be stabilized in the properties managed. So why I say doesn't intend to stand in the way of regular, you know, property maintenance or cutting the grass, making sure the trash is taken out. Um, those types of expenditures, the property management company is actually putting together budgets by property in terms of what we think this is going to cost, um, with respect to each property, given that there's multiple lenders, it can't be a consolidated budget.

**Judge Jernigan** Okay. I'm not sure I heard an answer to my question. In all of that, is someone going to say I'm violating the automatic stay of why say, bankruptcy if I enter orders more particular on usage of cash collateral?

**Erick Johnson** Your honor, I have not been able to speak to my clients specifically with respect to that question. Okay. But I have not.

**Judge Jernigan** That's all your question. That's a lawyer question.

**Erick Johnson** I have not spoken with the my counsel or my clients. So it's a mixture of a lawyer recommendation as well as client involvement. On that, I don't believe that would be something that's argued. They've consented to enter a similar order in Maryland. So I don't believe it's an issue. But without speaking to, you know, my client, I don't want to definitively say yes or no.

**Judge Jernigan** Okay. This is untenable, to say the least. Who else wishes to speak?

**Eli Columbus** Your honor. Eli Columbus with Haynes and Boone. With respect to the Woodland Manor. Best living and best living and Woodland Manor. Cases. Um, so they're only one. One of our cases had a cash collateral motion filed in it, and it showed a budget with start starting cash of negative twenty four thousand and ending cash of negative fifty four thousand. So we had some serious concerns about that budget and serious concerns about the use of cash collateral. Obviously that was never set for hearing the other case. No cash collateral motion was ever filed. Our position is it may be we have an assignment of rents under Oklahoma law in those cases, which may be absolute assignment. So that may actually be our rents, but we do have concerns about the use of cash at the property level and that it's appropriately done through a appropriate court order with with third party independent supervision. So we don't think my essay can use it unilaterally. And we think a court order has to be entered to to use our collateral. So we are concerned about that, Your Honor. And that's something we were going to get with the trustee and his the chapter eleven trustee in our cases and his counsel to try to sort out kind of the interim short term issue, and then we'll work on the longer term issue going forward. There's also a threshold issue in our cases of corporate authority. What was it proper corporate authority, how these cases were filed. And we'll have to sort through that. Uh, we had a receiver appointed in one of our cases. We'd have to talk to the trustee about whether it's more appropriate to put that back in, in the hands of the local independent fiduciary, especially if there wasn't proper corporate authority to file the chapter eleven petition in the first case. But these are the things we're now going to sort through with the chapter eleven trustee and his counsel, Your Honor, and hopefully, again, get a short term game plan put together and then a longer term game plan on how to stabilize the property properties and move forward, your Honor.

**Judge Jernigan** And in the lack of corporate authority, um, can you elaborate at all? Is that because of this is a mess or something more than that?

**Eli Columbus** Well, in at least in one of our cases, I believe a chapter under the LLC agreements, as I understand them. And I'm pretty new to this. Yes, but as I understand the LLC agreement, I think for at least one of the debtor required, there was an independent manager, kind of like an independent board member. Um, and it required consent by that independent, uh, manager to file a bankruptcy petition. We don't see anywhere that that consent was given. It just looked like the principal just filed it without, without going through the proper and formal corporate authority issues on the LLC side, I think it required independent manager consent and maybe another party or entity consent that we didn't see was on in included in the petition filings for the chapter eleven case here. So again, something we'll have to sort through. We now have an independent fiduciary here to work with on those issues.

**Judge Jernigan** Okay. I do remember seeing evidence sometime Monday or Tuesday on, I don't know if I got all of the LLC agreements or just certain ones, but I do remember seeing an independent manager and Mr. Kulick actually testified a bit like he said, oh, that only matters in bankruptcy. He said something sort of vague about, uh, that. So. All right.

**Eli Columbus** But again, the use of cash and what's happening and oversight of that is critical to us right now. And again, our first step would be talk to the trust trustee and his counsel on where we go from here.

**Judge Jernigan** Mhm. On that last point, my law clerk handed me the sort of status quo order. Um, well, it was the order, the suit sponte order appointing or directing the appointment of a chapter eleven trustee. But the last paragraph we've kind of hinted at, it reads ordered that all property managers for these debtors parentheses, Vesta Realty and Capital Assets, Inc. close parentheses shall remain in place and only exercise property management duties in the ordinary course of business until otherwise directed by the chapter eleven trustee or this court. Okay, so I did not specifically say may only use cash collateral, uh, in the ordinary course of business. Now, you know, maybe it wasn't worded as perfectly as it could be on that point. Only exercise property management duties in the ordinary course. But. That refreshes my memory and I hope everyone else's memory. I kind of contemplated there would be future cash, collateral orders or consent.

**Eli Columbus** Yeah.

**Judge Jernigan** Okay, Mr. Platt. Thank you, Mr. Columbus.

**Marc Platt** Uh, Your honor, Marc Platt again for for the Creole, entities. Uh, just to be clear, we filed something in the USA case, making it clear that we do not consent to the use of of our cash collateral. Uh, as, as you will recall, we have, uh, we have means in two separate entities, one of which is, is currently being managed by capital assets. Uh, the is a beholden entity. Uh, and the other one is, is being managed by, by, uh, Mr. Cook's entity. Uh, so it's certainly more focused on the, on the village creek one that, uh, that, that is being managed by the capital assets entity. And we made it very clear in that filing, we do not consent. Um, and, and so, uh, I do not see how your order, uh, filed in, in, uh, in these cases where you say is not the debtor, uh, could be used as a basis for the authority to use cash collateral. And if she's attempting to use the Maryland order, that is, that order was specific to the jinx best living case, and it certainly does not apply to any other debtors. So it's that that is equally baffling to me, Your Honor, that that, uh, your order, uh, that, that you entered last week, uh, directing the US trustee to appoint a chapter eleven trustee and the order in Maryland, uh, could be used as a, as a basis for authority to use cash flow. We absolutely disagree with that. And, um, and again, we thought our, our objection and we will obviously be available to discuss with, with chapter eleven trustee and, and, uh, and his counsel and, and, uh, Miss Johnson, at any time.

**Judge Jernigan** When did you file your objection up in Delaware on Friday. On Friday. Okay. All right.

**Erick Johnson** Yes, your honor, it was Friday evening, and I did reach out to their Delaware counsel and hope to be able to speak with them today.

**Judge Jernigan** Okay. Mr. Morgan. Thank you, Your Honor.

**Eli Columbus** One more thing I'd like to bring to the court's attention. It really doesn't have anything to do with what's in front of you. But I do think it's indicative of this morass that we're stuck in. It's our understanding that even though Issa claims ownership of these properties, they don't have any insurance.

**Judge Jernigan** Wow. Can you address that? Miss Johnson.

**Erick Johnson** Your honor, I don't have definitive guidance on general liability insurance. I know that they're getting quotes and have received quotes for that insurance on Fridays, so I know that's being put in place for the properties. So I know that seven two seven had reached out to ask about property Level insurance and we're looking at that. But, you know, more importantly too, was general liability insurance. So I asked the company about it. So I don't have a definitive answer for Your Honour. We know it's something that we need to have in place. Um, I know some of the properties are covered by the prior insurance, but we don't have a clear picture either on where those stand under its control. And so we're in the process of getting independent insurance in place if it wasn't already done late Friday.

**Judge Jernigan** Okay. A lot of things are in the process as opposed to where I think they should be.

**Erick Johnson** Agreed, your honor, it's been a disorganized, admittedly disorganized filing and situation. But, you know, part of that was precipitated by so much litigation in various jurisdictions and really needing to get control over what was happening and just the litigation cost kind of going forward and trying to create like a path forward, which I think ultimately may be a sale process with some of the disputes being resolved in terms of ownership and everything else with respect to the process. But but, Your Honor, that's something we would like to talk to the chapter eleven trustee and lenders about.

**Judge Jernigan** Okay. Um, Mr. Sherman, um, I'm going to ask if you remember something. I, I think this was your case I mentioned, I mentioned last week when I heard that at least one of the properties in Oklahoma was on so-called fire Watch. Fire watch because their equipment wasn't working. Okay. You know, there, I don't know. Fire alarms. Smoke detectors. What? And I said that brought back really bad memories. And I said I had a case, and I still remembered that it was May two thousand thirteen. It may have been twenty fourteen that there was a property. I think you were the trustee or maybe you were counsel to Trustee Jim Cunningham. Miss young remembers there was a property, I think it was right on the Garland Dallas City border, and one of the properties burned to the ground. And there was a Dallas fire, uh, fighter killed that. Were you representing the trustee in that?

**Speaker 7** I don't remember.

**Marc Platt** Whether.

**Speaker 7** I was or not. I remember.

**Marc Platt** The incident.

**Judge Jernigan** Okay. I, I feel like it was Jim Cunningham because I vividly remember him coming in very emotionally destroyed. And I was thinking maybe because you, you put together a transaction in the end where the whole darn thing was just torn down. And then we had to divvy out who got proceeds. But anyway, I, I didn't mean to pick on you, but I kind of feel like there might be human beings who don't understand why I am so concerned, because this is nothing to take lightly. Thousands of residents out there with property where there's no clear, you know, usage of cash collateral and, you know, not to mention the first lien holders who. Anyway, you you can sort of benignly call this unorganized, chaotic. But again, this is not just me being speculative. I heard days of evidence, days of evidence. The transcripts, you know, are probably going to be available soon if they're not out there. I think I think this is by design, I really do. I think it's by design at the at a minimum, to thwart these first lien lien holders, make it hard for them. Do they get a northern district of Texas or a motion to stay. Oklahoma, Maryland, Delaware. All of the above. Maybe some of them have. You know, it's, it's really disturbing. And, and I it creates an aura of bad faith. Okay. So what do we do about it? Well.

**Speaker 2** This is highly unusual. One thing I was thinking of over the weekend, I've never seen it before, but is a, a four court status conference. So we're all on the same page. If a judge has a concern about something, we all get to hear it. And that judges get to all hear what's going on at the same time. The logistics of that.

**Judge Jernigan** Or a motion to transfer venue. And I said the other day, I don't care if they're transferred here, Oklahoma or where.

**Speaker 2** Exactly.

**Judge Jernigan** But that seems more cumbersome than it need be. I happen to be good friends with Brendan Shannon in Delaware. I happen to be good friends with Michelle Harmer in Maryland, but we're not talking because we don't consider that, you know, the appropriate thing to do, I guess, unless parties ask us to. I don't know who the Oklahoma judge is. I don't know if it's one or multiple judges. But I truly believe based on evidence, not speculation, this this was not just an organized clients and lawyers reacting to the crisis of the day. I think it's designed to thwart all these first line lenders.

**Speaker 2** It feels like a lot of gamesmanship, and nobody is thinking about the tenants or the properties or the long term value diminution you're going to have from such an exercise.

**Judge Jernigan0** Mhm.

**Judge Jernigan** So where do we go from here? No one has authority to use cash collateral unless they have an order or consent, which I would hope they get in writing from a secured lender. Um. You're the point person for the debtors in these cases. And I don't know who the point person is for the other cases, but it's an untenable situation where we might have four different point people. Uh, keep in mind that the is a case was filed at four forty nine central time on Tuesday, right? As it says, uh, control person Ephraim Deborra-lee was about to take the witness stand.

**Speaker 2** Smacks of a litigation tactic.

**Judge Jernigan** It does, it does. Um, all right, so where do we go from here? I know we had besides just general status conferences. Uh, we do have pending motions that can't go anywhere without the trustees embrace of these motions. So does it make sense to have another status conference in a week or. I'll, I'll give anyone a hearing if they think some emergency is looming before that. But it seems like you've.

**Speaker 2** I think a week, a week would work. And in the meantime, you know, we may have to move quick on some of them and may not have as much due diligence done, um, to bring to this court on why we're making the decision. We are, but we will have an explanation for what we think is the best course of action for each of the properties.

**Judge Jernigan** Okay. All right. Well, your business judgment on that means a lot. You know, everything that is probably going through your brain. You know, I've thought about is this, you know, did this first lien secured lenders have all the value here. And, you know, would it end up being just a series of orders lifting stay. I don't know. You know, I, I know there have to be causes of action. Uh, are they those worth chasing or not? This is where, you know, an experienced trustee can do. Okay. Alright. So Hawaii, you're doing double duty today. Should they just call you or email you about our availability next Monday? Or do you know. Okay. Um. Next Monday, nine thirty. Okay. So we'll, um, we'll just do a minute entry order so you don't have to do a notice of hearing when you don't know.

**Speaker 2** What will be.

**Speaker 7** Said.

**Judge Jernigan** What will be said. Yes. All right. Um. Okay. Any anyone else? Mr. Clark?

**Marc Platt** On that point. As you noted, there are some pending motions. I think some of them might have hearing dates before the tenth. To the extent that that is the case, should those just be set for status conference on that date? To the extent that we can work things out with with the trustee.

**Judge Jernigan** And you have motions to use cash collateral.

**Marc Platt** We have we have we yes, we have a motion to use cash flow. Our motion, our our cash collateral motion, I believe was reset for status today. Um, and I suppose that's being reset for status, uh, for, for next Monday. But then we also had a pending motion, uh, in the village Creek case that I believe is set, uh, between now and, and the tenth. Does that sound right? It's not okay.

**Judge Jernigan** It's not.

**Marc Platt** Okay. Maybe. Perhaps I'm addressing an issue that, uh, that is not a concern. And so, um, so we're just, we're just moving everything from today to next to next Monday.

**Judge Jernigan** Yes. And, you know. A motion to lift stay emotion to use cash collateral. We have this wrinkle of the why do you need an order in both. Uh, yes, I. I said it last time. I'm going to say it again. I have my doubts how long that case is going to be pending. And that's just based on they don't seem to be filing things that are normal to be filed in cases like these. And the timing of the filing, right. As Mr. Devore was about to take the witness stand, I, I just, you know, time will tell. But, um, we'll see. We'll see if it's still pending a week from now. Alright. Miss young, did you have something?

**Speaker 3** I just did want to, uh, Miss Lindauer did send her a chart over to us, so I just wanted to kind of highlight what the hearings and three forty ones we've got in the next week, just to make sure this is all on the record. Uh, in the if you give me one moment, uh, in the a v village creek, there was a cash collateral hearing set on August fifth at two thirty. And then in the. Uh, Lewis Investments, there was the motion to appoint a chapter eleven trustee on August seventh at nine thirty, which is obviously moot. Uh, what we have over the course of the next week are three, three, forty one meetings, uh, that will need to be commenced and continued. Uh, and what will anticipate doing is commencing and continuing all of the currently set three forty one to a time where it is convenient for Mr. Sherman and Mr. McCullough to be able to attend those as well. But we have the seven twenty seven lofts, best living, seven twenty seven Lofts Holding and Remington Ranches Best Living LLC, all of which are set currently for August fourth, and there are two set on August eleventh as well. So we'll we'll need to do is probably go ahead, at least continue the August fourth ones, and we may just have to reset the rest. Again. We'll have to look at the timing. We may need to commence and

continue some of these to the sort of global. Three forty one date. But that's, I think, our anticipated path forward with those. But I just want to alert the court that those are what is at least hearing, court wise, coming down the pipeline in the next week before the status conference.

**Judge Jernigan** Just curious, the chart, is it just the ten or I guess it's still ten, uh, bankruptcies in the Northern District, or is it the whole In. Nationwide. Oklahoma. Maryland. Delaware.

**Speaker 3** Just the Oklahoma and Texas cases. We don't have any of the information on the case is not included. I think that would be a little bit different anyway. And I do not have the Maryland case included in the chart. I'm just not. So not sure if Miss Lindauer was handling the Maryland case as well, so I'm not sure if she would have been monitoring those developments.

**Judge Jernigan** Yeah, I think we were told that. I can't remember which group of investors precipitated that.

**Speaker 3** And it looks like for the at least the for Oklahoma. Yes. For the Oklahoma cases. They're all pending before Judge Hall. Uh, and the notes say that there is a continued hearing on the motion to dismiss that for August eighteenth.

**Judge Jernigan** Okay.

**Speaker 3** Just to make sure that, again, this is the best information that we have as to what's going forward in, in Texas and Oklahoma.

**Judge Jernigan0** Mhm.

**Judge Jernigan** Okay. Thank you.

**Speaker 2** Okay.

**Marc Platt** Just to close the loop on that, Miss Young, uh, reminded me that, yes, August fifth was the hearing date for the Village Creek cash. Collateral. Uh, motion. I believe the the, uh, I don't know if it was going to be final or next interim, but I guess the question is, can can we move that to Monday as part of the status?

**Judge Jernigan0** Certainly.

**Marc Platt** Thank you.

**Judge Jernigan** Why don't we just say all pending motions are set for status conference on Monday. So I'll I'll just do an order on that maybe instead of a minute entry. Anything else, Miss Lindauer? Anything you want to say? No, not really, but I'll say a couple of things. So, um, I did spend the greater part of Friday on the phone with Mr. Sherman and Mr. McCullough. We've, uh, dropbox our entire files to them so they wouldn't have to recreate anything. They have our list as they as I we pointed out with all the dates and deadlines and everything. Um, Mr. Taylor was concerned about authorizations on the cases. Um, in the documents that we delivered to Mr. Sherman and Mr. McCullough, there were independent director approvals for every case that required one. So, um, so those are in the files that Mr. Sherman and Mr. McCullough have. If they, uh, only some cases require that and not all. I yeah, I don't remember off the top of my head, but I know the ones that did require them. We got them and we had confirmation from the independent directors before those cases were filed. Um, I don't remember. And again, I would have to just go back and look and see if there were any that didn't require that. But if they did require it, we did get it before we filed the case. Otherwise the case would not have been filed. Um, what I want you to understand, Your Honor, and I know, I know this seems helter skelter, and I apologize for that. But a lot of these cases were filed on the eve of foreclosures. Um, Oklahoma does their foreclosures differently than Texas. They don't necessarily have a foreclosure on a particular date. They can. So a lot of these cases, for example, right. For example, um, I think seven, I'd have to go back and look, Your Honor, I wouldn't want all of them had a precipitating event, let's put it that way. Either there was a foreclosure or there was an appointment of a receiver that was fixing to happen. And that's why the case was filed. Okay. Um, there have been no additional cases filed because I don't think there's any authority now to file any additional cases. Um, because if you remember, Louis Investments was the overarching entity. It's in bankruptcy. Um, there's a question why I say claims they own Lewis Investments, if you remember, they provided you that change in operating agreement. Um, and you also have now a trustee over Lewis Investments. So I don't anticipate that there'll be any additional properties filed unless the trustee were to approve it or you say were to file it. So so Your Honor, that's that's where we are. Um, cash collateral,

I think of the the ten cases are actually, I believe eight properties. Uh, half of those do have orders in them allowing cash collateral. The other ones should. I was surprised to hear that the Ridge one didn't have a motion filed because I thought we had filed that um they all had filed schedules. Now every case has filed schedules and statement of affairs. Okay. I only looked yesterday for Lewis. Okay. In the first few pages, there's some sort of glitch where you can't see assets. In fact, um, why don't we check this. Yes, Your Honor. Well, now that you raised that, I'll go back and double check, but all the schedules and statements were filed. Now, if there's some sort of technical problem. I wasn't aware of that, but we'll look at that. Okay. So, Emily, check to see if it was just my operator error or my laptop, but like the first eight pages or something were not. The case right now? No. I will look at Lewis Lewis investments. I know that it showed like a billion dollars of debt. Plus, I don't know what happened on that. What do you mean? We'll definitely take a look at that. But what what I wanted to be clear though, is we have spent and we will continue to spend time with the trustee, getting them up to speed and getting them good files and getting them whatever information I have. We've already Dropbox to them, so they won't have to go on the docket and print things out that we already have. That doesn't seem like a good use of trustee time. I will mention. Yeah. Joyce. Hang on, hang on. Mark. Hang on. Mark. I will mention that the dip financer we mentioned before has asked to meet with the chapter eleven trustee. Um and I don't know if that's been set up or not, but I know there is a move afoot to do that, um and visit and see if something can be worked out. We have two or three investors who have also expressed an interest in working with the trustee. So, so I think there are still no anonymous. Well I don't know if it's anonymous. The papers were given to the trustee. I'm not sure that's. Well yeah. So lenders care about this. Yeah. So since we heard it was going to be priming. Yeah. I Mark is that can can the the disclosure of who the lender be made at this time. I, I don't know that. So I heard Mr. Hewitt make a comment. I wasn't sure if he I will uh, so I'll answer that first. Um, I mean our fear of disclosing the name of the lender was, as the court can see, whenever you say has information, they use it. Um, the lender, uh, is, is named, um, uh, Annenberg Capital. Okay. Who is that? Who is that? Your honor, it's a group that we were connected to. Um, uh, they're a, they're a private equity firm. Uh, and we were connected to them in, I believe, January or February when we were trying to be prepared if, if, uh, Fannie Mae ended up filing foreclosures against us. And they ultimately did, uh, a number looked at doing, buying the Fannie Mae senior loans, uh, because of complexities, continued complexities with the situation, they couldn't move forward. But they did tell us that if we ever filed eleven, they'd want to be they wanted us to, they wanted to be our first call. Uh, when we did move forward with the eleventh, uh, that was, that was the call we made. And that's how they ended up in our network. I also just wanted to offer there's some of the questions Your Honor has asked that I have absolute answers to, but I don't want to be inappropriate. So if there are if you want me to answer some of the questions that you've asked previously that Miss Lindauer didn't know, I would be happy to do so.

**Speaker 3** Okay.

**Judge Jernigan** Maybe another day. Uh, I hope a nom nom isn't proposing a seven zero zero zero percent interest rate.

**Speaker 2** Can I reach out to their principal on Friday requesting that their counsel contact me? I sent it back.

**Judge Jernigan** Okay. All right. Well, uh, one thing I would like to put on the record is that the few times we have had emergency requests for, uh, things at the properties, I have reached out to the lenders, and I know Mr. Platt approved some emergency expenditures. So, um, we will continue to get those calls and feed them to the trustee, but but so far, if we've had those situations come about, um, so far the secured lenders have been very helpful in approving those. We do have those in writing that those expenses have been approved. So, so I want the court to know that to the extent that there are tenants, uh, that we are aware of, if there is an issue for this instance, involves something with their gas and we needed to get their gas addressed. It was addressed within like twenty four hours. Uh, Mr. Platt approved the expense and it was repaired. So, uh, so those things are being taken care of. I want you to know that. Well, on some level, that's comforting. But of course, this is no way to operate in chapter eleven. Understood. Your honor, I understand this is, um. Again, we we see unorganized, chaotic filings a lot. That's why we even have this term free fall bankruptcy. Okay. That's kind of a term of art that bankruptcy lawyers have come up with over the years, because it's either a soft landing or a freefall. Uh, this is so much. More than a freefall. Okay. It is. To say it's unacceptable isn't even enough. I mean, when it is this bad. When it is. Four cases in Oklahoma, ten cases in Texas, one in Maryland. And then the is a in Delaware, it looks strategic. The question is who all is in on the, uh, strategic effort, I think, to thwart the first lien lenders. Um, you know, I'm. Again, I'm not just speculating. Okay. I heard

testimony and I see the pattern here, and it's just it's too bad to assume it's just, oh, we're unorganized. Okay. So that's where I am. We'll see where it goes. We'll see you in a week. Did your did your clerk pull up the Lewis case? Um, I.

**Erick Johnson** Think that.

**Judge Jernigan** Does it. Forty five. Okay. Three. Six three three one one three. And I see everything. Okay. Okay. Okay. Good good good good good good. All right. Thank you. Appreciate it. All right.